Michael P. Canty SBN 4271508 (*pro hac vice*)
Carol C. Villegas SBN 4154324 (*pro hac vice forthcoming*)
Danielle Izzo SBN 5957303 (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com
cvillegas@labaton.com
dizzo@labaton.com

Christian Levis SBN 5153853 (*pro hac vice*)
Margaret MacLean SBN 4588182 (*pro hac vice*)
Amanda Fiorilla SBN 5772033 (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
mmaclean@lowey.com
afiorilla@lowey.com

*Attorneys for Plaintiffs and the Proposed Class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **MARCUS BAKER, EVA ADAMS, JILLIAN ABBINANTI, ANN BRESNEN, and CAROLE BUCHANAN,** individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> - vs – <br><br> **MATCH GROUP, INC.** (individually, d/b/a, and as successor to Match Group, LLC (f/k/a and d/b/a Match.com), s/i/i Tinder, Inc. (d/b/a Tinder), s/i/i Humor Rainbow, Inc., and d/b/a Match.com, OkCupid, Tinder, Hinge, PlentyOfFish, OurTime; BLK, and Chispa), **MATCH GROUP, LLC** (individually, d/b/a, | Civil Action No.: 3:23-CV-02761-N <br><br><br> **AMENDED CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL** |

and as successor to Tinder, Inc., Humor
Rainbow, Inc., and Hinge, Inc., and d/b/a
Match.com, OkCupid, Tinder, Hinge,
PlentyOfFish, and OurTime),
**HINGE, INC.** (individually, and d/b/a Hinge);
**HUMOR RAINBOW, INC.** (individually, and
d/b/a OkCupid),
**PEOPLE MEDIA, INC.** (individually, and
d/b/a OurTime and s/i/i to
SeniorPeopleMeet.com), and
**AFFINITY APPS, LLC** (individually, a/k/a
Affinity Apps, LTD, and d/b/a BLK and
Chispa),

Defendants.

Plaintiffs Marcus Baker, Eva Adams, Jillian Abbinanti, Ann Bresnen, and Carole Buchanan (hereinafter collectively referred to as "Plaintiffs") individually and on behalf of persons similarly situated (hereinafter collectively referred to as the "Class"), bring this class action against Defendants Match Group, Inc. (individually, d/b/a, and successor to Match Group LLC (f/k/a, and d/b/a Match.com), s/i/i Tinder, Inc. (d/b/a Tinder), s/i/i Humor Rainbow, Inc., and d/b/a Match.com, OkCupid, Tinder, Hinge, PlentyOfFish ("POF"), OurTime; BLK, and Chispa), Match Group, LLC (individually, d/b/a, and as successor to Tinder, Inc., Humor Rainbow, Inc, and Hinge, Inc., and d/b/a Match.com, OkCupid, Tinder, Hinge, POF, and OurTime), Hinge, Inc. (d/b/a Hinge), Humor Rainbow, Inc. (individually, and d/b/a OkCupid), People Media, Inc. (d/b/a OurTime and and s/i/i to SeniorPeopleMeet.com), and Affinity Apps, LLC ("Affinity") (a/k/a Affinity Apps, LTD; d/b/a BLK and Chispa) (hereinafter collectively referred to as "Match Group" or "Defendants") to redress and put a stop to Defendants' surreptitious collection, use, storage, and disclosure of Plaintiffs' and the proposed Class members' sensitive biometric data in violation of Illinois' Biometric Information Privacy Act ("BIPA").

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action complaint on behalf of themselves and all individuals who had their biometric data and/or biometric identifiers collected, captured, received, otherwise obtained, or disclosed by Defendants while residing in the State of Illinois during the applicable statutory period.

2.      Match Group operates the largest collection of mobile dating applications ("apps") and websites in the world.  Match Group claims its goal "is to spark meaningful connections for users around the world."[1]

3.      Because "[c]onsumers' dating preferences vary significantly" by "demographics, geography, cultural normal, religion, and intent," Match Group's online dating community is comprised of the top global dating websites and mobile apps, including, but not limited to, Affinity Apps, a mobile app developer and the operator of BLK and Chispa, Match.com, OkCupid, Hinge, PlentyofFish ("POF"), OurTime, and Tinder (hereinafter collectively referred to as "Dating Sites").  It is estimated that Match Group has cornered approximately 60% of the dating app market through these offerings,[2] and consumers frequently use multiple Dating Sites at once.

4.      In 2014, Match Group reported approximately 56 million downloads across its Dating Sites.  In the first three quarters of 2020, Match Group's Dating Sites were installed 82 million times worldwide.[3] These Dating Sites are so popular that approximately 60% of all relationships start on a dating website or app that is owned by Match Group and its subsidiaries.

---

[1] https://mtch.com/ourcompany.

[2] https://www.businessinsider.com/what-is-match-group-history-of-tinder-parent-company-2021-1#the-road-to-attaining-what-is-essentially-a-monopoly-on-dating-hasnt-been-smooth-and-it-began-with-the-birth-of-tinder-5.

[3] https://www.businessinsider.com/what-is-match-group-history-of-tinder-parent-company-2021-1#diller-acquired-some-of-the-hottest-online-dating-sites-in-the-years-following-his-decision-to-splinter-off-match-group-4.

5.      Tinder, one of Match Group's most successful dating apps, consistently holds the #1 spot in most downloaded dating app and #1 grossing app overall worldwide.

6.      The purpose of Match Group's Dating Sites is to allow users to find a romantic relationship with another user who is part of the platform, based on specific criteria such as location, age, gender, and sexual orientation.  To use the Dating Sites, users must create an account with the specific Dating Site the individual seeks to join.  Upon creation, the user is required to provide certain personal information, which typically includes the users' name, date of birth, geographic location, weight, and height, and will be asked to answer certain questions and upload a profile picture.  The Dating Sites store user information and data on Match Group's shared servers and make profiles visible to other users on Match Group's platforms and/or servers.

7.      Defendants encourage users to upload photos to use Match Group's Dating Sites to increase their chances of finding a potential match and *require* users to upload their photo to complete their account setup and begin using the Dating Sites.[4]

8.      Unbeknownst to users, Match Group and the Match Group Dating Sites collect, analyze, and use the unique biometric identifiers (i.e., graphical representations of facial features, also known as facial geometry) associated with people's faces in the photographs uploaded to the Defendants' Dating Sites.  Match Group and the Match Group Dating Sites do not disclose their biometric data collection to their users, nor do they ask users to acknowledge, let alone consent to, these practices.

9.      Match Group and the Match Group Dating Sites promise users that they value users' privacy and only collect data that is clearly disclosed in their privacy policy. For instance, OkCupid's privacy policies  state that users' "privacy is a top priority" and contain the same

---

[4] Users can only bypass this requirement if they create an account through Facebook.

message: "privacy is at the core of the way [it] design[s] and build[s] the services and products [users] know and love, so that [users] can fully trust [its services] and focus on building meaningful connections."[5] But OkCupid fails to disclose that they collect and use people's biometric data.

10.     If Plaintiffs had known that Match Group and the Match Group Dating Sites would collect and use their biometric data, Plaintiffs would not have used Defendants' Dating Sites.

11.     Defendants' actions constitute an invasion of Plaintiffs' and the proposed Class members' right to privacy and violate BIPA, 740 ILCS § 14/2 *et. seq*. Match Group and the Match Group Dating Sites violated BIPA because they did not:

- Properly inform Plaintiffs and the proposed Class in writing that their biometric identifiers (face geometry) were being generated, collected, or stored;

- Properly inform Plaintiffs and the proposed Class in writing of the specific purpose and length of time for which their biometric identifiers were being collected, stored, and used;

- Provide a publicly available retention schedule and guidelines for permanently destroying the biometric identifiers of Plaintiffs and the proposed Class; and/or

- Request or receive a written release from Plaintiffs and the proposed Class to collect, capture, or otherwise obtain their biometric identifiers.

**PARTIES**

12.     Plaintiff, Marcus Baker, is a natural person who is member of Tinder and OkCupid, and has uploaded photographs of himself, including photographs of his face and other physical attributes while residing in the State of Illinois.[6]

---

[5] https://www.pof.com/privacypolicy#section3;
https://www.OkCupid.com/legal/privacy#information-we-collect; https://hinge.co/privacy.html.
[6] Plaintiff Marcus Baker filed his demand for arbitration before JAMS, but the arbitration closed upon Match Group's request for administrative closure and to have the case sent to small claims court.  Match Group's request was denied.  The case was transferred to the U.S. District Court for the Northern District of Texas. *See Baker v. Match Group, Inc. et al*, No. 1:2022-cv-06924 (N.D. Ill., Dec. 13, 2023), ECF No. 37.

13.     Plaintiff, Eva Adams, is a natural person who is a member of Match.com, Tinder, and OkCupid, and has uploaded photographs of herself, including photographs of her face and other physical attributes while residing in the State of Illinois.

14.     Plaintiff, Jillian Abbinanti, is a natural person who is a member of Hinge, Tinder, and OkCupid, and has uploaded photographs of herself, including photographs of her face and other physical attributes while residing in the State of Illinois.

15.     Plaintiff, Ann Bresnen, is a natural person who is a member of Match.com, POF, and OurTime, and has uploaded photographs of herself, including photographs of her face and other physical attributes while residing in the State of Illinois.

16.     Plaintiff, Carole Buchanan, is a natural person who is a member of Tinder, Match.com, POF, OurTime, and BLK, and has uploaded photographs of herself, including photographs of her face and other physical attributes while residing in the State of Illinois.

17.     Defendant Match Group, Inc. (individually, d/b/a, and successor to Match Group, LLC (f/k/a and d/b/a Match.com), s/i/i Tinder, Inc. (d/b/a Tinder), s/i/i Humor Rainbow, Inc., and d/b/a Match.com, OkCupid, Tinder, Hinge, POF, OurTime, BLK, and Chispa) is a Delaware corporation with its principal place of business located at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231.  Match Group, Inc. is a publicly-traded company and the leading provider of dating products, operating the world's largest online dating community consisting of more than 21 million users in 24 countries.  Match Group's online dating community is comprised of the top global Dating Site, including Affinity, a mobile app developer and the operator of BLK, and Chispa mobile dating apps, Match.com, OkCupid, Hinge, POF, OurTime, and Tinder.  Match

Group owns approximately 60% of the online dating market share.[7]   In 2014, Match Group reported more than 56 million downloads across its Dating Sites.   By 2020, the number of downloads increased to 82 million.[8]

18.     Defendant Match Group, LLC (individually, d/b/a, and as successor to Tinder, Inc., Humor Rainbow, Inc, and Hinge, Inc., and d/b/a Match.com, OkCupid, Tinder, Hinge, POF, and OurTime) (hereinafter referred to as "Match.com") is a Delaware limited liability company with its principal place of business located at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231.   Match Group, LLC operates Match Group Dating Sites such as Match.com, Tinder, and POF.   Launched in 1995, Match.com is one of the world's oldest and most popular dating sites[9] with millions of active users.[10]   Tinder (f/k/a Tinder, Inc.) is the world's most popular online dating app with an estimated 66 million users and 6.7 million paid subscribers.   Tinder is famous for its "Swipe" functionality, which presents users with a stack of "swipeable cards" containing photographs of potential matches nearby.   If a user is interested in the person shown, the user swipes right. If not, the user swipes left. POF was launched in Canada in 2003 and acquired by Match Group in 2015 for $575 million.[11]   POF is one of Match Group's largest Dating Sites with

---

[7] Avery Hartmans and Allana Akhtar, *How Tinder and Hinge owner Match Group grew to dominate the country's online dating market — but let Tinder get away,* Business Insider (Feb. 3, 2021), https://www.businessinsider.com/what-is-match-group-history-of-tinder-parent-company-2021-1.

[8] *Id.*

[9] https://www.match.com/.

[10] Match Group's Form 10-Q, For the Fiscal Year Ended December 31, 2019 (Feb. 27, 2020), https://s22.q4cdn.com/279430125/files/doc_financials/2019/ar/Match-Group-2019-Annual-Report.pdf at 4.

[11] Georgia Wells and Angela Chen, *IAC's Match Plans a New Hookup,* WALL STREET JOURNAL (Jul. 14, 2015), https://www.wsj.com/articles/match-group-to-buy-dating-site-plentyoffish-for-575-million-1436877537.

more than 150 million registered users.[12]  Similar to Match.com, POF can receive algorithmic matches and search user profiles.[13]

19.    Defendant Hinge, Inc. (d/b/a Hinge) (hereinafter referred to as "Hinge") is a Delaware corporation with its principal place of business located at 508 LaGuardia Place, New York, New York 10012.  Launched in 2013, Hinge markets itself as the dating app "designed to be deleted" and has more than 6 million active members per month and approximately 400,000 paying customers.[14]  In 2018, Match Group purchased a 51% stake in Hinge and subsequently became the sole owner of Hinge in February 2019, when Match Group purchased the remaining shares.

20.    Defendant Humor Rainbow, Inc. (individually, and d/b/a OkCupid) (hereinafter referred to as "OkCupid") is a New York corporation with its principal place of business located at 555 W. 18th St., New York, New York 10011.[15]  Humor Rainbow, Inc. operates the Dating Site

---

[12] *MATCH GROUP APPOINTS MALGOSIA GREEN CHIEF EXECUTIVE OFFICER OF PLENTY OF FISH* (April 12, 2018), https://ir.mtch.com/news-and-events/press-releases/press-release-details/2018/Match-Group-Appoints-Malgosia-Green-Chief-Executive-Officer-of-Plenty-of-Fish/default.aspx.
https://s22.q4cdn.com/279430125/files/doc_financials/2019/q4/MTCH-4Q-2019-Earnings-Release-FINAL.pdf?mod=article_inline.

[13] *Match Group's Form 10-Q, For the Fiscal Year Ended December 31, 2019* (Feb. 27, 2020), https://s22.q4cdn.com/279430125/files/doc_financials/2019/ar/Match-Group-2019-Annual-Report.pdf at 6. ("*PlentyOfFish.* PlentyOfFish was launched in 2003. Similar to Match, among its distinguishing features is the ability to both search profiles and receive algorithmic matches. Similar to Tinder, PlentyOfFish has grown in popularity over the years and relies on a freemium model. PlentyOfFish has broad appeal in the central United States, Canada, the United Kingdom, and a number of other international markets.").

[14] *Hinge     Information,     Statistics,     Facts     and     History*, https://www.datingsitesreviews.com/staticpages/index.php?page=hinge-statistics-facts-history; *Hinge Launches New Online Store Around Its Mascot Hingie* (Jan. 27, 2020) https://www.datingsitesreviews.com/article.php?story=hinge-launches-new-online-store-around-its-mascot-hingie.

[15] https://www.okcupid.com/legal/terms.

OkCupid, acquired by Match Group in 2011 for $50 million.[16]  Since its launch in 2004, OkCupid has amassed more than 50 million members[17] and 5 million active members per month.[18]

21.     Defendant People Media, Inc. (individually, and d/b/a OurTime and OurTime.com, and s/i/i SeniorPeopleMeet.com) (hereinafter referred to as "PeopleMedia" or "OurTime") is an Arizona corporation with its principal place of business in the State of New York and is a subsidiary of Match Group.  People Media operates OurTime (d/b/a OurTime.com, and s/i/i to SeniorPeopleMeet.com).  In 2011, OurTime was launched as a Dating Site specifically designed for members over 50 years of age.  OurTime boasts over one million users, with thousands joining weekly.  In July 2019, People Media, owned by Match Group, merged its two senior Dating Sites, OurTime and SeniorPeopleMeet, into one. As a result, SeniorPeopleMeet's user database was transferred to OurTime, the surviving Dating Site.

22.     Defendant Affinity Apps, LLC (individually, a/k/a Affinity Apps, LTD d/b/a BLK and Chispa) is a Delaware limited liability company with its principal place of business located in Dallas, Texas.  Affinity operates Match Group Dating Sites BLK and Chispa.[19]  BLK, launched in

---

[16]Brenna Ehrlich, *OkCupid Acquired by Match.com for $50 Million, Mashable* (Feb. 2, 2011), https://mashable.com/archive/match-okcupid.

[17]Zak Doffman, *Why Your Dating App Might Be Dangerous*, Forbes (Jul. 29, 2020), https://www.forbes.com/sites/zakdoffman/2020/07/29/dating-app-dangerous-cyber-warning-iphone-android-update/?sh=29dd2fb47775.

[18]*OkCupid        Information,        Statistics,        Facts        and        History*, https://www.datingsitesreviews.com/staticpages/index.php?page=OkCupid-Statistics-Facts-History.

[19] *MATCH GROUP AND UNIVISION COMMUNICATIONS INC. LAUNCH NEW FREE DATING APP FOR LATINO SINGLES, CHISPA* (Dec. 19, 2017), https://ir.mtch.com/news-and-events/press-releases/press-release-details/2017/Match-Group-and-Univision-Communications-Inc-Launch-New-Free-Dating-App-for-Latino-Singles-Chispa/default.aspx; *BLK, The Largest Dating App For Black Singles, Invites Black Community To 'Educate An Ally' Through New In-App Feature #BLKVoices, Inspiring Dialogue Through Online Social Movement* (Jun. 29, 2020), https://mtch.com/single-news/512.

August 2017,[20] is Match Group's largest Dating Site for Black singles with over 5 million downloads,[21] 40,000 members and 5,000 weekly active members.[22]  Chispa, launched in 2017 as part of Match Group's affinity brands,[23] was developed to enable Latinos to create connections with matches from similar backgrounds.[24]  Chispa is currently the largest Dating Site for Latinx singles with more than 4 million downloads in the United States.[25]  Both BLK and Chispa look and function similar to Tinder, giving users the ability to swipe right to connect with potential matches and swipe left to skip individuals.[26]

## JURISDICTION AND VENUE

23.     Venue is proper pursuant to 28 U.S.C. § 1391.  This action was transferred to this Court pursuant to the transfer order in *Baker v. Match Group, Inc. et al*, No. 1:2022-cv-06924 (N.D. Ill., Dec. 13, 2023), ECF No. 37. Further, substantial acts in furtherance of the alleged violations or their

---

[20] *Match Group's BLK Sets Out to Reclaim "Once You Go BLK" and Celebrates the Unlimited Potential of Black Love* (Feb. 4, 2021), https://www.prnewswire.com/news-releases/match-groups-blk-sets-out-to-reclaim-once-you-go-blk-and-celebrates-the-unlimited-potential-of-black-love-301222306.html.
[21] *Match Group's BLK Launches Atlanta Takeover as Next Phase of "Once You Go BLK" Campaign* (Jun. 16, 2021), https://markets.businessinsider.com/news/stocks/match-group-s-blk-launches-atlanta-takeover-as-next-phase-of-once-you-go-blk-campaign-1030528637?op=1.
[22] https://www.datingscout.com/blk/review.
[23] *How Match Group CEO Mandy Ginsberg helps people find their person* (Feb. 14, 2019), https://www.fastcompany.com/90288670/how-match-group-ceo-mandy-ginsberg-helps-people-find-their-person.
[24] *Match Group and Univision Communications Inc. Launch New Free Dating App for Latino Singles, Chispa* (Dec. 19, 2017), https://www.prnewswire.com/news-releases/match-group-and-univision-communications-inc-launch-new-free-dating-app-for-latino-singles-chispa-300573046.html.
[25] *Leading Latinx Dating App Chispa Reaches 4MM Downloads & Partners with Tragos Party Card Game* (Mar. 31, 2021), https://www.findtuchispa.com/post/leading-latinx-dating-app-chispa-reaches-4mm-downloads-partners-with-tragos-party-card-game.
[26] Carolina Moreno, *Latinos Can Now Look For A 'Chispa' In New Tinder-Style Dating App*, HUFFINGTON POST (Dec. 19, 2017), https://www.huffpost.com/entry/latinos-can-look-for-a-chispa-in-new-tinder-style-dating-app_n_5a394399e4b0fc99878f144d; Alondra Valle, *Chispa, the new dating app for Latino singles*, CHICAGO TRIBUNE (Jan. 11, 2018), https://www.chicagotribune.com/hoy/ct-hoy-chispa-the-new-dating-app-for-latino-singles-20180111-story.html.

effects have occurred in this District.  Many of the acts alleged in this Complaint occurred in, or emanated from, this District.  In addition, certain of the Defendants reside, are headquartered, and/or maintain substantial operations in this District.

## FACTUAL BACKGROUND

I.   **Defendants Waived Their Right to Arbitration by Electing to Proceed in Small Claims Court and Requesting Administrative Closure of All Arbitrations Filed with JAMS**

A.   **Relevant Procedural History**

24.   As of the date of this filing, Labaton Keller Sucharow LLP ("Labaton") has been retained by current and former State of Illinois residents, each of whom allege individual BIPA claims against the Defendants, including Plaintiffs Marcus Baker, Eva Adams, Jillian Abbinanti, Ann Bresnen, and Carole Buchanan, who are users of at least one of the Match Group Dating Sites.

25.   Plaintiff Marcus Baker is an Illinois state resident and has been an active user of Match Group Dating Sites OkCupid and Tinder.   Plaintiff Baker registered and created an account with OkCupid in approximately 2018 and Tinder in approximately 2016. To create an account with OkCupid and Tinder, Plaintiff Baker and the proposed Class members agreed to OkCupid's and Tinder's Terms of Service, both of which contained a madatory arbitration clause, and uploaded multiple photographs of their face to create their own respective dating profiles.  A copy of OkCupid's Terms of Service in effect in 2018 is attached hereto as **Exhibit A**, and a copy of Tinder's Terms of Service in effect in 2016 date attached hereto as **Exhibit B**.  Both OkCupid and Tinder's Terms of Service included "Arbitration Procedures" instructing claimants to engage in an informal dispute resolution process before initiating arbitration.  *Id.*  Subsquently, in 2021, Plaintiff Baker retained Labaton to investigate and pursue claims against Defendants for violating his privacy by collecting biometric data from his dating profile without his knowledge or consent and in violation of BIPA.

11

26.     Plaintiff Eva Adams is an Illinois state resident and has been an active registered member of Match Group Dating Sites Match.com, OkCupid, and Tinder.  Plaintiff Adams registered and created an account with Match.com in approximately January 2019, OkCupid in approximately January 2019, and Tinder in approximately 2018.  To create an account with Match.com, OkCupid, and Tinder, Plaintiff Adams and members of the proposed Class agreed to Match.com's, OkCupid's, and Tinder's Terms of Service, which contained a madatory arbitration clause, and uploaded multiple photographs of their face to create their own respective dating profiles.  A copy of OkCupid's Terms of Service in effect in 2018 is attached hereto as **Exhibit A**, a copy of Tinder's Terms of Service in effect in 2016 attached hereto as  **Exhibit B,** and a copy of Match.com's Terms of Service attached hereto as **Exhibit R**.  Match.com, OkCupid, and Tinder's respective Terms of Service included "Arbitration Procedures" instructing claimants to engage in an informal dispute resolution process before initiating arbitration.  *Id*.  In 2024, Plaintiff Adams retained Labaton to investigate and pursue claims against Defendants for violating her privacy by collecting biometric data from her dating profiles without her knowledge or consent and in violation of BIPA.

27.     Plaintiff Jillian Abbinanti is an Illinois state resident and has been an active registered member of Match Group Dating Sites Hinge, OkCupid, and Tinder.  Plaintiff Abbinanti registered and created an account with Hinge in approximately 2020, OkCupid in approximately 2012, and Tinder in approximately 2012 and 2020.  To create an account with Hinge, OkCupid, and Tinder, Plaintiff Abbinanti and members of the proposed Class agreed to Hinge's, OkCupid's, and Tinder's Terms of Service, which contained a madatory arbitration clause, and uploaded multiple photographs of their face to create their own respective dating profiles.  A copy of OkCupid's Terms of Service in effect in 2018 is attached hereto as **Exhibit A**, a copy of Tinder's

Terms of Service in effect in 2016 date attached hereto as **Exhibit B,** and a copy of Hinge's Terms of Service is attached hereto as **Exhibit S**.  Hinge, OkCupid, and Tinder's respective Terms of Service included "Arbitration Procedures" instructing claimants to engage in an informal dispute resolution process before initiating arbitration.  *Id*.  In 2024, Plaintiff Abbinanti retained Labaton to investigate and pursue claims against Defendants for violating her privacy by collecting biometric data from her dating profiles without her knowledge or consent and in violation of BIPA.

28.    Plaintiff Ann Bresnen is an Illinois state resident and has been an active registered member of Match Group Dating Sites Match.com, POF, and OurTime.  Plaintiffs Bresnen registered and created an account with Match.com in approximately 2020, POF in approximately 2002, and OurTime in approximately 2002.  To create an account with Match.com, POF, and OurTime, Plaintiff Bresnen and members of the proposed Class agreed to Match.com's, POF's, and OurTime's Terms of Service, which contained a madatory arbitration clause, and uploaded multiple photographs of their face to create their own respective dating profiles.  A copy of Match.com's Terms of Service is attached hereto as **Exhibit R**, a copy of Tinder's Terms of Service in effect in 2016 date attached hereto as **Exhibit B,** and a copy of Hinge's Terms of Service is attached hereto as **Exhibit S**. Hinge, OkCupid, and Tinder's respective Terms of Service included "Arbitration Procedures" instructing claimants to engage in an informal dispute resolution process before initiating arbitration.  *Id*.  In 2024, Plaintiff Bresnen retained Labaton to investigate and pursue claims against Defendants for violating her privacy by collecting biometric data from her dating profiles without her knowledge or consent and in violation of BIPA.

29.    Plaintiff Carole Buchanan was at all relevant times an Illinois state resident and has been an active registered member of Match Group Dating Sites Tinder, Match.com, POF, OurTime, and BLK since approximately 2011.  Plaintiff Buchanan registered and created an

account with Tinder, Match.com, POF, OurTime, and BLK.  To create an account with Tinder, Match.com, POF, OurTime, and BLK, Plaintiff Buchanan and members of the proposed Class agreed to Tinder's, Match.com's, POF's, OurTime's, and BLK's Terms of Service, which contained a madatory arbitration clause, and uploaded multiple photographs of their face to create their respective dating profiles.  A copy of Match.com's Terms of Service is attached hereto as **Exhibit R**, a copy of Tinder's Terms of Service in effect in 2016 date attached hereto as **Exhibit B,** a copy of POF's Terms of Service is attached hereto as **Exhibit T,** a copy of OurTime's Terms of Service is attached hereto as **Exhibit U,** and a copy of BLK's Terms of Service is attached hereto as **Exhibit V**.  Hinge, OkCupid, and Tinder's respective Terms of Service included "Arbitration Procedures" instructing claimants to engage in an informal dispute resolution process before initiating arbitration.  *Id*.  In 2024, Plaintiff Buchanan retained Labaton to investigate and pursue claims against Defendants for violating her privacy by collecting biometric data from her dating profiles without her knowledge or consent and in violation of BIPA.

30.     On June 7, 2021, counsel for Match Group contacted Plaintiffs's counsel to discuss the anticipated claims against the Match Group's Dating Sites for violating BIPA.  **Exhibit C**.

31.     After failing to persuade Plaintiff Baker and his counsel to drop their claims against Match Group, the Match Group Dating Sites updated their Terms of Use less than two weeks later on  June 21, 2021.  A copy of OkCupid's Terms of Service is attached hereto as **Exhibit D** and Tinder's Terms of Use last revised on June 21, 2021 is attached hereto as **Exhibit E**.

32.     On September 2, 2021, in accordance with OkCupid's and Tinder's Terms, Plaintiff Baker, through counsel, served a Notice of Dispute (the "Notice") on Match Group along with 5,078 other claimants (hereinafter, "Claimants").  A copy of the Notice of Dispute is attached hereto as **Exhibit F**.  The Notice explained in great detail various claims that Plaintiff Baker and

other Claimants intended to pursue claims against Match Group and the Match Group Dating Sites, including the various ways that Match Group and its Dating Sites violate BIPA. *Id.*

33.     Thereafter, on October 26, 2021, the parties executed a Tolling & Stand Down Agreement[27] and agreed to a mediation with JAMS on December 3, 2021. *See* **Exhibit C**. Over the course of the following weeks, Plaintiffs' counsel timely responded and provided all requested case information to JAMS, the mediator, and Defendants' counsel to ensure efficiency and a productive mediation. *Id*.

34.     Following a failed mediation on December 3, 2021, Plaintiffs' counsel continued to investigate Plaintiffs' claims against the Match Group Dating Sites and provided Match Group and its counsel a detailed analysis of all biometric data related privacy claims Plaintiff Baker and other Claimants intended to pursue, including claims based on newly discovered evidence that the Dating Sites also violated BIPA by collecting users' voiceprints and applying voice recognition technology without users' knowledge or consent. *Id*.

35.     After additional failed attempts to resolve Plaintiff Baker's and other Claimants' claims, the parties participated in a required pre-filing conference call with JAMS on February 18, 2022. *Id*.  During this conference call, Match Group's counsel requested various extensions to respond to Plaintiffs and the Claimants' demands and requested the issuance of separate invoices for each Claimant. *Id*.

36.     On February 28, 2022, ten (10) days after the JAMS mandatory pre-filing conference call, Match Group revised the terms of service/use for all eight (8) Dating Sites (hereinafter collectively referred to as "Revised Terms").

---

[27] All claims were tolled from October 15, 2021 through December 31, 2021.

37.     Unaware at that time of the changes to the arbitration provision, of which Match Group was silent, Plaintiffs' counsel  agreed on March 1ˢᵗ to suspend filing individual arbitrations to engage in limited discovery where Claimants' expert would be given access to the algorithms and source code for the Match Group sites.  Upon learning of the changes to the arbitration provision, Plaintiffs' counsel sent an email to confirm that Match Group did not intend to apply its changes to the long-noticed claims of Plaintiff Baker and the other Claimants.  However, Match Group's counsel was adamant that it intended to apply its changes retroactively to Plaintiff Baker and the other Claimants. Defendants' Revised Terms are unconscionable and unenforceable.  The one-sided and unfair revisions effectively prevent Plaintiffs and other Claimants from litigating their claims and allow Defendants to avoid their self-imposed burdens and obligations.  *Id.*

38.     After more than ten (10) months of failed negotiations the parties, Plaintiffs' counsel filed individual demands for arbitration on behalf of 25 Claimants with JAMS on April 19, 2022, in accordance with the Terms applicable at the time the claims were tolled. *See* **Exhibit G**.

39.     On April 25, 2022, Plaintiffs' counsel filed Plaintiff Baker's individual demand with JAMS along with individual demands on behalf of 49 other Claimants.  *See* **Exhibit H**.

40.     JAMS subsequently processed Plaintiff Baker's arbitration demand and issued an invoice to Defendants' counsel on May 3, 2022.  *See* **Exhibit I**.

41.     On May 12, 2022, JAMS followed up with Defendants' counsel regarding payment of the filing fee.  *See* **Exhibit J**.

42.     Subsequently, on May 13, 2022, Defendants' counsel submitted a letter to JAMS requesting "administrative closure of *all* claims" brought by Plaintiff Baker and the other 74 Claimants.  *Id.*   In response, Defendants argued for the first time that closure was proper "because

16

(1) certain Claimants d[id] not have agreements to arbitrate with Respondents Match Group, LLC or Humor Rainbow, Inc.; (2) certain Claimants have agreed to arbitrate claims against Respondents Match Group, LLC or Humor Rainbow, Inc. in front of National Arbitration and Mediation ("NAM"), not JAMS (because the claimants accepted the updated terms and conditions on the app); and (3) ***Respondents elect to proceed in small claims court with respect to all remaining claims asserted under valid arbitration agreements that specify JAMS as the arbitral forum***." *Id.* at p. 1 (emphasis added).  As acknowledged in Defendants' request, Defendants' Terms ***only*** permit the responding party to proceed in small claims court "***if the party's claim is within the jurisdiction of the small claims court***":

> The JAMS Tinder Terms contains an arbitration provision with an exception that either party may elect small-claims-court litigation:
>
>> The one exception to the exclusivity of arbitration is that either party has the right to bring an individual claim against the other in a small-claims court of competent jurisdiction, or, if filed in arbitration, ***the responding party may request that the dispute proceed in small claims court if the party's claim is within the jurisdiction of the small claims court***. If the responding party requests to proceed in small claims court before the appointment of the arbitrator, the arbitration shall be administratively closed . . . .
>
> JAMS Tinder Terms 15(1) (emphasis added).
>
> The JAMS OkCupid Terms have the same provision:
>
>> The one exception to the exclusivity of arbitration is that either party has the right to bring an individual claim against the other in a small-claims court of competent jurisdiction, or, if filed in arbitration, ***the responding party may request that the dispute proceed in small claims court if the party's claim is within the jurisdiction of the small claims court***. If the responding party requests to proceed in small claims court before the appointment of the arbitrator, the arbitration shall be administratively closed . . . .
>
> JAMS OkCupid Terms 15a(1) (emphasis added).

*Id.* at 4-5 (emphasis added); *see also* **Exhibit D** at 15 and **Exhibit E** at 13. Despite knowing that the claims brought by Plaintiff Baker and the other 74 Claimants sought injunctive relief and monetary damages of at least $20,000, thereby far exceeding the jurisdictional limits of both Illinois and Texas small claims courts,[28] Defendants elected to proceed in small claims court and requested that JAMS administratively close all pending arbitrations. *See* **Exhibit J** at 1, 4-6. Therefore, Defendants waived their right to arbitration in favor of having the claims proceed through the court system.

43.     On May 20, 2022, Plaintiffs' counsel submitted a response to Defendants' request for administrative closure, requesting JAMS deny the request for all but two Claimants, because: (1) Plaintiff Baker and the other Claimants have valid accounts, (2) Match Group's Revised Terms are not the terms applicable to Plaintiffs or the other Claimants' claims, and (3) small claims court does not have jurisdiction over Plaintiff Baker's or the other Claimants' claims.  *See* **Exhibit K**.

44.     On June 3, 2022, Defendants responded to Plaintiffs' May 20th letter and in furtherance of their request for administrative closure emphasizing that Defendants "***have elected to litigate all remaining claims in a small claims court of competent jurisdiction*** ─ and therefore JAMS lacks jurisdiction over such claims."  *See* **Exhibit L** at 1 (emphasis added).  That is, Defendants again reinforced their election of the court system and waived their right to have the cases heard in an arbitral forum.

45.     Subsequently, on June 13, 2022, Plaintiffs' counsel responded to Defendants' June 3rd letter urging JAMS to deny Defendants' request and in furtherance of Plaintiff Baker's position that: (1) Defendants' Revised Terms are illusory, unconscionable, and unenforceable, (2) the

---

[28] As explained in Section I(B), Illinois and Texas small claims courts have jurisdiction over monetary claims less than $10,000 and cannot issue injunctive relief.

Revised Terms were implemented through improper and prohibited communications with Plaintiff Baker and the other Claimants, and (3) small claims court is an improper venue to hear the claims because neither Illinois nor Texas small claims courts have jurisdiction over claims that exceed $20,000 and cannot award injunctive relief.  *See* **Exhibit M**.

46.     On June 27, 2022, Defendants responded to Plaintiff Baker's June 13th letter and once again waived their right to arbitration by requesting for a third time, that all arbitrations be administratively closed because Defendants "***elected to proceed in small claims court for all claims governed by the JAMS Terms***."  *See* **Exhibit N** at 2 (emphasis added).

47.     Subsequently, on July 22, 2022, the JAMS National Arbitration Committee ruled that "[t]he right to proceed in small claims court is a contractual 'exception' to a JAMS arbitration" and therefore, "a small claims court must determine whether it has jurisdiction before JAMS may proceed."  *See* **Exhibit O**.

**B.     The Amount in Controversy Exceeds the Jurisdictional Limits of Small Claims Courts in the States of Illinois and Texas**

48.     Plaintiffs seek minimum damages of *at least* $20,000, plus attorneys' fees, and injunctive relief.

49.     Moreover, because Match Group's technology generates and collects biometric data each and every time a user uploads a photograph or video to a Dating Site, Match Group and its subsidiaries capture and save multiple photographs and videos of their users on a regular basis. Whether Plaintiffs and members of the proposed Class can recover separately each time their biometric data is taken was recently argued before the Illinois Supreme Court (*see Cothron v. White Castle Sys.*, 20 F.4[th] 1156 (7th Cir. 2021).

50.     Should the Illinois Supreme Court determine that a BIPA violation exists every time a person's biometric data is taken, Plaintiffs and members of the proposed Class intend to

seek the full amount of damages allowable under the statute, in addition to reasonable attorneys' fees and costs (740 ILCS 14/20(3)), exposing Match Group to liability of ***more than $20,000 per Plaintiff***. Because all Claimants, including Plaintiffs, seek damages exceeding $20,000, electing small claims court, on its face, is an improper and unavailable venue to hear their claims.

51.     More importantly, aside from monetary relief, all Claimants, including Plaintiffs, seek injunctive relief, a remedy which is unavailable in small claims court.

52.     Neither Illinois nor Texas small claims court have jurisdiction over any claims asserted by the Plaintiffs and the proposed Class as all claims exceed the amount in controversy and seek injunctive relief, a remedy which is unavailable in small claims court.

53.     In Illinois, the state in which the conduct of this action arises, individuals cannot seek injunctive relief or pursue monetary claims in small claims court that exceed $20,000. *See* Ill. Sup. Ct. R. 281 (limiting relief in small-claims court to monetary damages); *Benson v. Abbott*, 761 N.E.2d 754, 756, (Ill. App. Ct. 2001) ("Pursuant to Supreme Court Rule 281 a court may not award a Plaintiffs more than $5,000 in a small claims action."). Moreover, even if small claims court was an available venue and could issue injunctive relief, which it cannot, filing in small claims court would be counterintuitive and a waste of judicial resources because all the small claims court actions in Illinois are subject to mandatory arbitration. *See* Cook Co. Cir. Ct. R. 18.3(b) (eff. Aug. 1, 2001) (all civil actions seeking monetary relief only and not in excess of $30,000 are subject to mandatory arbitration); *see Allstate Ins. Co. v. Avelares*, 693 N.E.2d 1233, 1235  (Ill. App. Ct. 1998) ("Pursuant to the Illinois Supreme Court rules, all civil cases, including jury cases, must proceed to mandatory arbitration if the claim is an amount not in excess of an amount designated by the county or circuit court. Supreme Court Rule 86(b).134 Ill.2d R. 86(b)) Hence, all small claims actions are subject to arbitration.").

54.     Similarly, in Texas, the state where Defendants' principal place of business resides, small claims courts only have jurisdiction over monetary claims less than $10,000 and cannot issue injunctive relief.  *See* TEX.R. CIV. P. 500.3 ("Small claims courts may entertain claims for 'no more than $10,000, excluding statutory interest and court costs but including attorney fees.'"); *see also* TEX. GOV'T CODE ANN. §§ 27.060(a), 27.031(a)(1) (West Supp.2015) (providing that justice courts shall preside over small claims and limiting jurisdiction of justice courts to civil matters "in which the amount in controversy is not more than $10,000, exclusive of interest"); compare *Lost Creek Ventures, LLC v. Pilgrim*, 2016 WL 3569756, at *8 (Tex.App.-Hous. (1 Dist.), 2016) (the general rule that small claims court may not award sums in excess of the jurisdictional limit does not apply to sums that are "sustained as a result of the passage of time, such as attorney's fees." (quoting *Kendziorski v. Saunders,* 191 S.W.3d 395, 406 (Tex.App.–Austin 2006, no pet.)); *Bowles v. Angelo* (Civ.App.1945) 188 S.W.2d 691 ("Since the cause of action exhibited by the petition of the Administrator is one involving the issuance of an injunction, the justice court is not an 'appropriate' court to which to apply, as it is powerless to issue injunctions. Elimination of the justice court leaves the county court and district court as the remaining courts of the first instance, to be examined as to whether the petition stated a cause of action within their jurisdiction."); *Poe v. Ferguson* (Civ.App.1914) 168 S.W. 459 (same); *Texas Soap Mfg. Corporation v. McQueary* (Civ.App.1943) 172 S.W.2d 177 (same); *see also*, *Trustees of Crosby Independent School Dist. v. West Disinfecting Co.* (Civ.App. 1938) 121 S.W.2d 661, error dismissed 135 Tex. 492, 143 S.W.2d 749 (The justice of the peace courts do not have the power to issue writs of injunctions and mandamus, which power is conferred exclusively on the district courts); *Andrio v. Kennedy Rig Servs., LLC*, No. Civ A. 4:17-1194, 2017 WL 6034125 at *5-*6. (S.D. Tex. Dec. 6, 2017) (J.

Ellison) (determining that the defendant's arbitration agreement was unenforceable because it waived the plaintiff's substantive, statutory rights).

55.     The right to equitable relief, as requested here, is substantive.  The Supreme Court has made clear that an arbitration agreement may not waive a party's substantive rights under the law.  *Gilmer v. Interstate/Johnson Lane Corporation,* 500 U.S. 20, 26 (1991) (a party may not "forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum" (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628 (1985)).

### C.     **Defendants Waived Their Right to Arbitration**

56.     Defendants have waived their right to arbitration.

57.     In waiving their rights to arbitration, Defendants have opened the door to this proceeding in a court with jurisdiction to award the damages sought and to provide injunctive relief.  *See Brickstructures, Inc. v. Coaster Dynamix, Inc*., 952 F.3d 887 (7th Cir. 2020) ("A party waives its right to arbitrate when it acts inconsistent with its right to pursue arbitration by withdrawing its request for arbitration and will generally not be permitted to rescind its waiver and renew its request"); *see also*, *Norgren, Inc. v. Ningbo Prance Long, Inc*., No. 14-CV-03070-CBS, 2015 WL 5562183, at *13 (D. Colo. Sept. 22, 2015) ("[t]he benefits of arbitration (e.g., lower costs, greater efficiency, and speed) are well-recognized.   However, these laudable objectives may be frustrated if an arbitration provision is exploited as a tool for gamesmanship or evasion."); *In re Tyco Int'l Ltd. Secs. Litig*., 422 F.3d 41, 46 (1st Cir. 2005) ("[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party" or unilaterally change the terms and conditions of the arbitration process.").

### D.   This Court Has Jurisdiction Over Plaintiffs' Claims and the Authority to Determine the Validity of Defendants' Terms

58.     "[A]rbitration is a matter of contract," *AT&T Techs., Inc. v. Comm's Workers of Am.*, 475 U.S. 643, 648 (1986), so "federal courts [must] enforce arbitration agreements according to their terms—including terms providing for individualized proceedings*," Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018).  The Supreme Court has recognized that individual arbitration offers many benefits, "not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved." *Id.* at 1621, 1623.  Where, as here, parties have agreed to resolve disputes in individual arbitration, courts may not compel them to arbitrate in any other manner that "interferes with [the] fundamental attributes" of "the individualized form of arbitration envisioned by the" Federal Arbitration Act ("FAA") "in the absence of the parties' consent." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416, 1418 (2019).

59.     Defendants' Revised Terms expressly provide that the only exception for arbitration is the right to request that the dispute proceed in small claims court but only "***if the party's claim is within the jurisdiction of the small claims court***":

> The exclusive means of resolving any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof) or our Services shall be BINDING ARBITRATION administered by JAMS under the JAMS Streamlined Arbitration Rules & Procedures, except as modified by our Arbitration Procedures. ***The one exception to the exclusivity of arbitration is that either party has the right to bring an individual claim against the other in a small-claims court of competent jurisdiction, or, if filed in arbitration, the responding party may request that the dispute proceed in small claims court if the party's claim is within the jurisdiction of the small claims court***. If the responding party requests to proceed in small claims court before the appointment of the arbitrator, the arbitration shall be administratively closed, and if requested after the appointment of the arbitrator, the arbitrator shall determine if the dispute should be decided in arbitration or if the arbitration should be administratively closed and decided in small claims court. ***Whether you choose arbitration or small-claims court, you may not under any circumstances commence or maintain against the Company any class action, class arbitration, or other representative action or proceeding***.

*See, e.g.,* **Exhibit E** at p. 13 (emphasis added).  Yet, Defendants have elected to resolve Plaintiffs' claims in a manner that violates the individual arbitration requirement and fundamentally interferes with the "attributes of arbitration" by creating "a scheme inconsistent with the FAA," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344, 346 (2011).  Neither Plaintiffs nor Claimants ever agreed to resolve disputes in a manner that fundamentally bars them from pursuing their claims in federal court, individual arbitration, ***and*** small claims court.

60.     However, because Defendants' Terms and Revised Terms provide identical provisions permitting federal or state courts to hear claims that cannot be properly brought in small claims court, by Defendants' own words and agreement, Plaintiffs must be allowed to proceed with their claims before this Court as Plaintiffs' claims exceed the amount in controversy for small claims and seek injunctive relief.  *See, e.g., id.* at 17 ("Except for claims that may be properly brought in a small claims court of competent jurisdiction, ***all claims arising out of or relating to this Agreement, to the Service, or to your relationship with Tinder that for whatever reason are not submitted to arbitration will be litigated exclusively in the federal or state courts of Dallas County, Texas, U.S.A***. You and Tinder consent to the exercise of personal jurisdiction of courts in the State of Texas and waive any claim that such courts constitute an inconvenient forum.") (emphasis added); *see also*, **Exhibit D** at 16 ("Any proceeding to enforce this arbitration agreement, including any proceeding to confirm, modify, or vacate an arbitration award, may be commenced in any court of competent jurisdiction. ***In the event that this arbitration agreement is for any reason held to be unenforceable, any litigation against the Company (except for small-claims court actions) may be commenced only in the federal or state courts located in Dallas County, Texas***. You hereby irrevocably consent to the jurisdiction of those courts for such purposes.") (emphasis added).

24

61.     Despite the above provisions, Defendants will likely assert that their Terms and Revised Terms delegate all disputes arising out of their arbitration agreements to a neutral arbitrator.  Plaintiffs' position is that both the Terms and Revised Terms contain ambiguities concerning proceedings outside of small claims court and arbitration.  Under Illinois law, "[a] contract is to be construed as a whole and meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary" *McClenon v. Postmates, Inc.*, 473 F.Supp.3d 803, 810 (N.D. Ill. 2020) (quoting *Coles-Moultrie Elec. Co-op. v. City of Sullivan*, 709 N.E.2d 249, 253 (Ill. App. Ct. 1999)). However, where there is ambiguity or silence as to "*who* should decide an issue, federal courts must apply a presumption against arbitration." *McClenon*, 473 F.Supp.3d at 810 (emphasis added); *First Options of Chicago, Inc. v. Kaplan*, 115 S.Ct. 1920, 1921, 514 U.S. 938, 939 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (citing *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 647 (1986)); *Ringgold Capital IV, LLC v. Finley*, 993 N.E.2d 541, 547 (Ill. App. Ct. 2013) ("An ambiguity does not exist simply because the parties disagree as to the meaning of a contractual provision[,] [r]ather an ambiguity exists when the contractual provision contains language that is susceptible to more than one reasonable interpretation."); *Regency Commercial Assocs., LLC v. Lopax, Inc.*, 373 Ill.App.3d 270, 275 (Ill. App. Ct. 2007) (unambiguous terms must be enforced according to their plain language).  Defendants' Terms and Revised Terms are unconscionable as they contain ambiguous and conflicting procedures for pursuing claims outside of small claims court.

62.     The Revised Terms also attempt to change the arbitral forum from JAMS to National Arbitration and Mediation ("NAM") and proceed under NAM's Comprehensive Dispute

Resolution Rules and Procedures. *See* **Exhibit P** (OkCupid 2/28/22 Terms); **Exhibit Q** (Tinder 2/28/22 Terms); **Exhibit R** (Match.com 2/28/22 Terms); **Exhibit S** (Hinge 2/28/22 Terms); **Exhibit T** (POF 2/28/22 Terms); **Exhibit U** (OurTime 2/28/22 Terms); **Exhibit V** (BLK 2/28/22 Terms); **Exhibit W** (Chispa 2/28/22 Terms).

63.     Conspicuously missing from the Revised Terms is any mention of NAM's "Supplemental Rules for Mass Arbitration Filings" or indication of how the parties or NAM determine whether a consumer is part of a "Mass Filing."  A normal consumer is typically not sophisticated or familiar with arbitration rules or forums and cannot be expected to search through all the applicable rules and procedures on NAM's website and then make their own independent determination of whether certain rules apply.  Further, because the Revised Terms did not and do not provide for NAM's "Supplemental Rules for Mass Arbitration Filings," there was never a "meeting of the minds" that arbitrations could or would proceed in this manner.

64.     Therefore, because courts may not compel parties to arbitrate in any manner other than the manner provided for in the arbitration agreement, neither Plaintiffs nor the members of the proposed Class can be compelled to file individual arbitration demands with either JAMS or NAMS or proceed before small claims court.

### E.     Defendants' Revised Terms are Unconscionable and Unenforceable

65.     The Revised Terms attempt to impose egregious and unreasonably burdensome requirements on all users, including Plaintiffs and the Claimants, that shock the conscious and offend the spirit of arbitration.  *See, e.g.,  AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1749, 563 U.S. 333, 345 (2011) (The objectives and benefits of arbitration (e.g., lower costs, greater efficiency, and speed) may be frustrated if an arbitration provision is exploited as a tool for gamesmanship or evasion); *Menorah Ins. Co., Ltd. v. INX Reinsurance Corp*., 72 F.3d 218, 222-23 (1st Cir. 1995) ("Arbitration clauses were not meant to be another weapon in the arsenal for

imposing delay and costs in the dispute resolution process."); *In re Tyco Int'l Ltd. Secs. Litig.*, 422 F.3d, 41, 46 (1st Cir. 2005). ("[e]ven as justice delayed may amount to justice denied, so it is with arbitration." […] "[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party.").

66.     Specifically, the Revised Terms contain unconscionable provisions such as: (i) changing the arbitration provider from JAMS to NAM; (ii) imposing burdensome prenotice requirements and condition precedents commanding each user send a ***personally signed*** notice with "information that enables" Defendants to "identify" their account including a "picture or screenshot" of the user's profile and a "corresponding calculation" of their alleged damages, personal appearance and participation in a telephone conference with Defendants, if requested, regardless of whether the user is represented by counsel, and demanding that the above conditions be met before initiating arbitration;[29] (iii) waiver of a Plaintiffs' right to demand a jury trial in the

---

[29] *See, e.g.,* **Exhibit Q** ("Notice must contain all of the following information: (1) your full name; (2) ***information that enables Tinder to identify your account, including a picture or screenshot of your profile***, your address, mobile phone number, email address, and date of birth you used to register your account if any; and (3) a detailed description of your Dispute, including the nature and factual basis of your claim(s) and the relief you are seeking with a corresponding calculation of your alleged damages (if any). ***You must personally sign this Notice for it to be effective***…As part of these good faith negotiations, ***if Tinder requests a telephone conference with you to discuss your Dispute, you agree to personally participate, with your attorney if you're represented by counsel***…However, if the Dispute is not resolved within 60 days after receipt of a fully completed Notice and the Parties have not otherwise mutually agreed to an extension of this informal dispute resolution time period, you or Tinder may initiate an arbitration (subject to a Party's right to elect small claims court as provided below). Completion of this informal dispute resolution is a condition precedent to filing any demand for arbitration or small claims court action. Failure to do so is a breach of this Agreement. The statute of limitations and any filing fee deadlines will be tolled while you and Tinder engage in this informal dispute resolution process. Unless prohibited by applicable law, ***the arbitration provider, National Arbitration and Mediation ("NAM"), shall not accept or administer any demand for arbitration and shall administratively close any arbitration unless the Party bringing such demand for arbitration can certify in***

event that arbitration is not compelled; (iv) limiting the scope of discovery; (v) preventing a consumer from filing a demand for arbitration if the consumer's counsel represents more than 24 consumers with similar claims; (vi) and implementing unfair and on-sided "Mass Filing" provisions comprised of dilatory tactics to further delay and prevent Plaintiffs and the Claimants from pursuing their claims.  *Id.*

67.     Courts throughout the country have rendered similar provisions unconscionable and unenforceable.  *See, e.g., Potiyevskiy v. TM Transp., Inc*., No. Civ. A. 1-13-1864, 2013 WL 6199949, at *7-*10 (Ill. App. Ct. Nov 25, 2013) (arbitration agreement held unconscionable because it deprived employees of their ability to bring a claim due to travel costs and the low amount in controversy); *Dietrich v. Boeing Co*., 14 F.4th 1089, 1095 (9th Cir. 2021) ("Delaying the ability of one to vindicate a legal claim by years, possibly 156 years, conflict[s] with one of the basic principles of our legal system—justice delayed is justice denied."); *Andrio v. Kennedy Rig Servs., LLC*, No. Civ A. 4:17-1194, 2017 WL 6034125 at *5-*6. (S.D. Tex. Dec. 6, 2017) (determining that the defendant's arbitration agreement was unenforceable because it waived the Plaintiffs' substantive, statutory rights); *Baltazar v. Forever 21, Inc*., 62 Cal. 4th 1237, 1244 (2016) (Terms that "contravene the public interest or public policy" are substantively unconscionable"); *In re CenturyLink Sales Pracs. and Secs. Litig*., MDL No. 17-2795, 2020 WL 3513547 (D. Minn. June 29, 2020) (finding that failing to comply with a presuit notice provision was not a material breach of the parties' arbitration agreement that would allow the defendant to avoid arbitration because failing to provide notice did not deprive CenturyLink of the fundamental benefits of the arbitration clause); *Zubin et al., v. Coinbase Global, Inc. et al*, Case No., 3:21-cv-07478 (N.D.

---

*writing that the terms and conditions of this informal dispute resolution process were fully satisfied*..." (emphasis added).

Cal.) (holding the arbitration clause procedurally unconscionable because it was a contract of adhesion and substantively unconscionable because there is no legitimate commercial need for burdensome obstacles prior to arbitrating disputes relating to a basic user agreement for services); *Yeomans v. World Fin. Grp. Ins. Agency, Inc*., 485 F. Supp. 3d 1168, 1188 (N.D. Cal. 2020) ("This provision undermines the balance of the risk of fee shifting prescribed by statute and can have a substantial chilling effect on Plaintiffs seeking to vindicate their rights. This provision is substantively unconscionable.").

68.     Because the Revised Terms are permeated by unconscionability, Defendants' arbitration clause cannot be enforced.

## II.     Biometrics and Consumer Privacy

69.     "Biometrics" refers to measurable characteristics or processes used for identification.  As a characteristic, biometrics is defined as "a measurable biological (anatomical and physiological) and behavioral characteristic that can be used for automated recognition."[30]  As a process, biometrics is defined as "automated methods of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics."[31]

---

[30] http://www.biometrics.gov/Documents/Glossary.pdf.  The term "biometrics" was developed and defined by the National Science & Technology Council's (NSTC) Subcommittee on Biometrics (2006), as updated.
[31] http://www.biometrics.gov/Documents/Glossary.pdf.

70.     Biometrics are used to identify individuals based on unique, distinctive, and measurable characteristics or features known as "biometric identifiers." [32, 33]

71.     A biometric(s) can be either a characteristic or a process: it can be "a measurable biological (anatomical and physiological) and behavioral characteristic that can be used for automated recognition" or an "automated method of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics."[34] "Measurable means that the characteristic or trait can be easily presented to a sensor and converted into a quantifiable, digital format. This allows for the automated matching process to occur in a matter of seconds."[35]

72.     "Biometric identifiers" are categorized by physiological and behavioral characteristics.  Examples include, but are not limited to, face or hand geometry, fingerprints, palm

---

[32] "Biometrics: A general term used alternatively to describe a characteristic or a process: As a characteristic: A measurable biological (anatomical and physiological) and behavioral characteristic that can be used for automated recognition. As a process: Automated methods of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics." *Biometrics Foundation Documents,* NSTC Subcommittee on Biometrics (2009), http://www.dtic.mil/dtic/tr/fulltext/u2/a505048.pdf; Sushma Jaiswal, et al., *Biometric Case Study*, J. GLOBAL RESEARCH COMPUTER SCIENCE (Oct. 2011),  ("A biometric is any measurable, robust, distinctive, physical characteristic or personal trait of an individual that can be used to identify, or verify the claimed identity of, that individual. Measurable means that the characteristic or trait can be easily presented to a sensor and converted into a quantifiable, digital format. This allows for the automated matching process to occur in a matter of seconds."); Stephen Mayhew, *History of Biometrics* (Feb. 1,2018), https://www.biometricupdate.com/201802/history-of-biometrics-2; *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017) ("Biometrics" refers to "biology-based set[s] of measurements").

[33] Sushma Jaiswal, *et al*, *BIOMETRIC: CASE STUDY,* J. GLOBAL RESEARCH IN COMPUTER SCIENCE (Oct. 2011), https://www.rroij.com/open-access/biometric-case-study-19-49.pdf.

[34] Biometrics Foundation Documents, NSTC Subcommittee on Biometrics (2009), http://www.dtic.mil/dtic/tr/fulltext/u2/a505048.pdf; Sushma Jaiswal, et al., *Biometric Case Study*, J. GLOBAL RESEARCH COMPUTER SCIENCE (Oct. 2011), https://www.rroij.com/open-access/biometric-case-study-19-49.pdf

[35] Stephen Mayhew, *History of Biometrics*, BIOMETRICUPDATE (Feb. 1, 2018), https://www.biometricupdate.com/201802/history-of-biometrics-2.

prints, irises, retinas, veins, and DNA sequences.   Behavioral based biometric identifiers "are apparent in a person's interaction with the environment, such as signatures, gaits, and keystroke,"[36] while "[v]oice/speech contains both behavioral features, such as accent, and physiological features, such as voice pitch."[37]

73.   Biometric technologies vary widely depending on the biometric identifier.  Modern era biometric processes include:

a) Face recognition,

b) Fingerprint recognition,

c) Hand geometry,

d) Retina scan,

e) Iris scan,

f) Voice recognition,

g) Vascular or vein recognition,

h) Skin texture,

i) DNA,[38]

j) Dynamic signature verification,[39]

k) Keystroke dynamics, and

l) Gait analysis.

---

[36] *Id.*

[37] *Id.*

[38] *The National Biometrics Challenge*, NATIONAL SCIENCE AND TECHNOLOGY COUNCIL SUBCOMMITTEE ON BIOMETRICS AND IDENTITY MANAGEMENT, (September 2011) at p. 14, available                                                                                              at: https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/biometricschallenge2011.pdf.

[39] *Access Control Technologies Handbook*, HOMELAND SECURITY (Sept. 2015) https://www.dhs.gov/sites/default/files/publications/ACT-HB_0915-508.pdf at p. 47.

74.    One of the most prevalent uses of biometrics is in facial recognition technology, which records the "spatial geometry" or more commonly known as "facial geometry" of distinguishing features of the face.[40]   These distinguishing features include the nose, eyes, eyebrows, mouth, chin, and lips.[41]   The graphic in <u>Figure 1</u> below illustrates the way "face geometry" is commonly used to refer to the location and spatial relationships between the distinguishing features.



*Fig. 1[42]*

75.    Facial recognition technology works by: (1) scanning[43] a photograph and/or digital image to detect a human face, (2) extracting the distinguishing facial features, such as the nose, eyes, mouth, chin, ear, and their relative portions in the digital image that are based on specific details about the face geometry as determined by facial points and contours and their relative

---

[40] https://www.biometric-solutions.com/face-recognition.html.

[41] Sushma Jaiswal, et al., *Biometric Case Study,* J. GLOBAL RESEARCH IN COMPUTER SCIENCE (Oct. 2011), https://www.rroij.com/open-access/biometric-case-study-19-49.pdf.

[42] Daniel Thomas, *Future airports could become hi-tech pleasure dome* BBC NEWS (Feb. 2, 2015), https://www.bbc.com/news/business-30830296.

[43] A software program can be said to "scan" a digital image to detect a face by identifying key facial landmarks or features such as the nose, mouth, eyes and chin. *See* Belhumeur, *Localizing Parts of Faces Using a Consensus of Exemplars,* 2011 IEEE Conference on Computer Vision and Pattern Recognition (CPVR*)* (2011) ("Many fiducial point detectors include classifiers that are trained to respond to a specific fiducial (e.g., left corner of the left eye). These classifiers take as input raw pixel intensities over a window or the output of a bank of filters (e.g., wavelets, Gaussian Derivative filters, Gabor filters, or Haarlike features). These local detectors are scanned over a portion of the image and may return one or more candidate locations for the part or a "score" at each location.").

portions in the digital image, (3) generating a face "template," (or "faceprint"), and (4) comparing the resulting "face template" to the face templates stored in a "faceprint database" for identification.

76.    The recent sophistication of facial recognition software has generated many commercial applications of the technology but has also raised serious privacy concerns about its massive scale, scope, and surreptitiousness.[44]

77.    The use of biometric data presents unique risks. Biometric data is one of the most sensitive forms of personal information because—unlike other types of data such as account or ID numbers—biometric data cannot be changed if stolen or compromised.  Once a person's unique and permanent biometric identifiers are exposed, she has no way to prevent identity theft and unauthorized tracking.

78.    Proprietary biometric data collected by companies—especially those who collect it unlawfully and without permission—can be leaked, hacked, exposed, or otherwise exploited, as demonstrated by the highly publicized breach of the Clearview AI scandal and the Defendant and Cambridge Analytica scandal. Unlike other identifiers such as Social Security or credit card numbers, which can be changed if compromised or stolen, biometric identifiers linked to a specific voice or face cannot.  These unique and permanent biometric identifiers, once exposed, leave victims with no means to prevent identity theft and unauthorized tracking.

A.    **Facial Recognition Technology and Facial Processing Systems**

79.    Facial recognition technology is just one form of technology that processes faces.

---

[44] *What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing Before the Subcomm. on Privacy Tech & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012) (statement of Jennifer Lynch, Staff Attorney, Electronic Frontier Foundation), available at https://www.govinfo.gov/content/pkg/CHRG-112shrg86599/pdf/CHRG-112shrg86599.pdf.

80.    There are at least three main categories of facial processing technology: (1) facial detection; (2) facial analysis; and (3) facial recognition or identification.

81.    Facial detection determines whether the image contains a face, and can also be used to determine whether any face is present and where the face is located.

82.    Facial analysis technology enables the detection of various facial characteristics, also known as landmark features.  Facial analysis enables facial recognition by comparing an individual's facial features to available images for verification or identification purposes.[45]

83.    Facial recognition technology ("FRT") confirms a photo matches a different photo of the same person in a facial template database.

84.    FRT is based on algorithms that learn how to recognize human faces and the hundreds of ways in which each one is unique.

85.    These algorithms create a unique "face template" or "faceprint" of a person's facial geometry by scanning, identifying, and measuring various facial landmarks, such as the location of the mouth, chin, nose, ears, eyes, and eyebrows.

86.    To automatically extract face templates from new images, a facial recognition algorithm must be "trained" to identify and measure the relevant facial landmarks.

87.    This is typically accomplished by the algorithm evaluating "triplet" sets of photographs—i.e., two images of the same person (known as the "anchor" and "positive sample"), and one of a completely different persons (known as the "negative sample").

---

[45] Testimony provided on Feb. 6, 2020, by Dr. Charles H. Romine, Director, Information Technology Laboratory, NIST, United States Department of Commerce, to the Committee on Homeland Security, U.S. House of Representatives. https://homeland.house.gov/imo/media/doc/Testimony-Romine1.pdf.

88.     The algorithm reviews the measurements collected from each image, and then adjusts itself so that the measurements collected from the anchor sample are closer to those collected from the positive sample, and further apart from those collected from the negative sample.

89.     After repeating this process a few times, the algorithm learns to reliably scan for and recognize a given face.

### B.     Deep-learning Facial Recognition and Processing Techniques

90.     Biometric recognition methods utilize deep learning-based models to provide an end-to-end learning framework, which can jointly learn the feature representation while performing classification.  This is achieved through a multi-layer neural network, also known as Deep Neural Networks ("DNN"), to learn multiple levels of representations that correspond to different levels of abstraction, which is better suited to uncover underlying patterns of the data.

91.     Facial recognition is a biometric technology that identifies facial vectors and features and matches them to an individual pre-enrolled in a database.  In the mid-2000s, the technology based on digital signal processing techniques ("DSP") was restricted to frontal-facing images.  However, more recently, there has been a dramatic improvement in precision advancements of artificial technologies ("AI") based DNNs leading to the development of AI-based facial recognition engines.   AI based FRT leverages proprietary AI algorithms and mathematical equations to make its connections to individuals by measuring a number of facial variables, such as nose depth and width, forehead length, and eye shape, and saves the information as a template.  The template generated for an individual is used as a basis for comparison to confirm identity if there is a match with an existing template.

92.     The key features of a facial recognition engine are face detection, face feature extraction, and face recognition.  Face detection is the first step the technology takes to detect a

face.  Face detection works by scanning the entire image, video, and/or scene to determine if the frame contains full or partial human faces.  Once a face is detected, the engine extracts a n-dimensional vector set creating a face template from the face image.  The face template that is extracted from the individual's face is used for matching or searching.  The newly extracted face template is then matched to pre-existing templates in a database.  This is called a "1:N search", where one face template is matched against a database containing n-number faces to find the best match and confirm identity.

###### C.   <u>Voice Recognition Technology</u>

93.     Voice recognition takes the acoustic signal of an individual's voice and converts it into a digital code, which can be stored in a database.

94.     A voiceprint is a digital model of the unique vocal characteristics of an individual. Voiceprints are created by specialized computer programs which process speech samples, typically in WAV format.  The creation of a voiceprint is often referred to as "enrollment" in a biometric system.  There are two general approaches to the creation and use of voiceprints.

95.     In traditional voice biometric systems, which use classical machine learning algorithms, a voiceprint is created by performing "feature extraction" on one or more speech samples.  This feature extraction process creates a "voiceprint," which is a personalized calculation or vector related to specific attributes that make the user's speech unique.  In these systems, feature extraction is also used to create a Universal Background Model ("UBM"), otherwise known as a voiceprint.  UBMs are created from many speech samples collected from many representative users of the system and stored in a database.  The newly extracted voiceprint is compared to UBM voiceprint templates to identify and verify individuals.

96.     In the last decade, biometric systems have implemented machine learning methods that have played a significant role in improving the performance of biometric systems.   Modern

voice recognition systems use deep neural networks ("DNN"), which are commonly referred to as "deep learning" approaches and allow both speaker verification and speaker identification.[46]

97.     These systems start by creating a composite DNN model, which is like a UBM conceptually.   This DNN model is derived from processing often hundreds of hours of representative speech samples.   To create an individual voiceprint, users provide one or more enrollment speech samples to the DNN model, then the DNN is fine-tuned to learn the individual's unique speech characteristics.   The DNN modeling process occurs directly against the speech samples and no feature extraction is needed.   To verify a user, a speech sample is evaluated against the fine-tuned DNN model to arrive to identify a match.

## III.     Illinois's Biometric Information Privacy Act

98.     The Illinois Legislature has found that "[b]iometrics are unlike other unique identifiers" such as social security numbers, which can be changed if compromised.   740 ILCS 14/5(c).   "Biometrics . . . are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."   *Id.*

99.     In 2008, to protect Illinois residents from the surreptitious collection and use of their biometric data, the Illinois Legislature enacted BIPA.[47]   Under BIPA:

---

[46] *The National Biometrics Challenge*, NATIONAL SCIENCE AND TECHNOLOGY COUNCIL SUBCOMMITTEE ON BIOMETRICS AND IDENTITY MANAGEMENt, (September 2011) at 14, available at
https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/biometricschallenge201
1.pdf.

[47] In passing BIPA, the Illinois Legislature found that (1) "[b]iometrics are unlike other unique identifiers . . . [and] are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions" (740 ILCS 14/5(c)); (2) "[a]n overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances and other personal information" (740 ILCS 14/5(d)); (3) "[t]he full ramifications of biometric

(b) No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

(1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

(2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

. . .

(d) No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless:

(1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure[.]

740 ILCS 14/15(b) and (d).

100.    BIPA applies to entities that interact with two forms of biometric data: "biometric identifiers"[48] and "biometric information." 740 ILCS 14/15(a)-(e).

101.    "Biometric identifiers" means "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry."  740 ILCS 14/10.[49]  However, BIPA only provides a non-exhaustive

---

technology are not fully known" (740 ILCS 14/5(f)); and (4) "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information" ((740 ILCS 14/5(g)).

[48] "Biometric identifiers" are categorized by physiological and behavioral characteristics. Examples include, but are not limited to, voiceprints, face or hand geometry, fingerprints, palm prints, iris patterns, retina patterns, veins, and DNA sequences.

[49] *See also*, *Sekura v. KrishnaSchaumburg Tan, Inc.*, 115 N.E.3d 1080, 1093 (Ill. App. Ct. 2018), *appeal denied*, 119 N.E.3d 1034 (Ill. 2019) ("A person cannot obtain new DNA or new fingerprints or new eyeballs for iris recognition, at least not easily or not at this time.  Replacing a biometric identifier is not like replacing a lost key or a misplaced identification card or a stolen accesscode. The Act's goal is to prevent irretrievable harm from happening and to put inplace a process and rules to reassure an otherwise skittish public.").

list of biometric identifiers, and the legislative intent behind BIPA was to protect its residents from irreputable harm by placing strict requirements on companies regarding the collection, usage, storage, retention, and destruction of unique and highly sensitive biometric identifiers and information.

102.    "A person cannot obtain new DNA or new fingerprints or new eyeballs for iris recognition, at least not easily or not at this time.  Replacing a biometric identifier is not like replacing a lost key or a misplaced identification card or a stolen accesscode.  The Act's goal is to prevent irretrievable harm from happening and to put inplace a process and rules to reassure an otherwise skittish public." *Sekura v. KrishnaSchaumburg Tan, Inc.*, 115 N.E.3d 1080, 1093 (Ill. App. Ct. 2018), *appeal denied*, 119 N.E.3d 1034 (Ill. 2019).

103.    "Biometric information" consists of biometric identifiers used to identify an individual.  BIPA defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id*.

104.    BIPA imposes various requirements on private entities that collect or maintain biometric data and requires a company to develop a publicly available written policy establishing a retention schedule and guidelines for permanently destroying biometric data when the initial purpose for collecting such data has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first.  740 ILCS 14/15(a).

105.    Under BIPA, "[a] prevailing party may recover *for each violation*: (1) against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages, whichever is greater; (2) against a private entity that intentionally or recklessly violates a provision of this Act, liquidated damages of $5,000 or actual damages, whichever is

greater; (3) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses; and (4) other relief, including an injunction, as the State or federal court may deem appropriate." *Id.* (emphasis added).

106.    Each part of section 15 described above "imposes various duties upon which an aggrieved person may bring an action under section 20… as section 20 provides that a 'prevailing party may recover for each violation' (740 ILCS 14/20), a Plaintiffs who alleges and eventually proves violation of multiple duties could collect multiple recoveries of liquidated damages. *Id.* § 20(1), (2)." *Tims v. Black Horse Carriers, Inc.*, 2021 WL 4243310, at *5 (Ill. App. Ct. Sept. 17, 2021).

## IV.    Defendants and Their Dating Sites Encourage Users to Upload Photographs with Unobstructed Views of Their Faces

107.    Defendant Match Group operates the largest global collection of online dating websites including, but not limited to, Match.com, OkCupid, Hinge, PlentyofFish ("POF"), OurTime, Tinder, BLK, and Chispa (collectively, "Dating Sites").

108.    Defendants boast of a collective 21 million users across its platform[50] and own approximately 60% of the online dating market share.[51]   As portrayed in <u>Figure 2</u>.  Defendants own and operate the Dating Sites at issue.[52]

---

[50] *Match Group News & Events – Quarterly Results* (2017-2021), https://ir.mtch.com/news-and-events/quarterly-results/default.aspx (2017, 2018, 2019, 2020, and 2021 Results, Shareholder Letters, Presentations, SEC Filings, and Annual Reports).
[51] Avery Hartmans and Allana Akhtar, *How Tinder and Hinge owner Match Group grew to dominate the country's online dating market — but let Tinder get away* Business Insider (Feb. 3, 2021), https://www.businessinsider.com/what-is-match-group-history-of-tinder-parent-company-2021-1.
[52] Match Group Our Company, https://mtch.com/ourcompany.



*Fig. 2*

109.    The purpose of the Defendants' Dating Sites is to "spark meaningful connections for users around the world" and allow members to find a romantic connection with other members, based on specific criteria such as location, age, gender, and sexual orientation.[53]

110.    All Dating Sites require users to create an account and "personal profile"[54] that must include one or more photos of themselves[55] and may contain certain "personal

---

[53] *See* Match Group's Form 10-Q, For the Quarterly Period Ended December 31, 2020 (Feb. 25, 2021),
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000891103/000089110321000014/mtch-20201231.htm.
(According to Match Group, its goal "is to spark meaningful connections for users around the world.").

[54] *See* Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017) ("A 'personal profile' is a collection of personal information that may include biographic information and that is made available to third parties over a network, such as the Internet.").

[55] *Id.* ("As part of the profiles, users also include one or more pictures of themselves. The physical appearance of a person may be an important factor in determining whether a profiled individual is a suitable match. These pictures are generally digitized images and may include a picture of the person's face").

characteristics"[56] about the user.[57] Personal profiles are added to the sites' databases,[58] become visible to other members and potential matches, and are shared with Defendants, their Dating Sites, and Defendants' "family of businesses."[59]  Defendants encourage users to upload multiple photos to increase their chances of finding a potential match.  For instance, Match.com encourages users to upload up to 26 photographs,[60] Defendant Hinge requires users to upload up to 6 photographs, and OkCupid, POF, OurTime, BLK, Chispa, and Tinder all require at least 1 photograph but encourage users to upload several photos to increase match potential.[61]  Additionally, Defendants' Dating Sites provide "advice," articles, reviews, instructions, or tips that persuade users to upload or post photographs that include an unobstructed view of the user's face.[62]  The reasoning behind this method is simple: the more photographs a user uploads and the clearer depiction of a user's face, the easier it is for Defendants to apply facial recognition technology to the user's photograph to extract, collect, store, and use the user's biometric information.

111.    In addition to uploading a profile picture, users are encouraged to upload several additional photos to their profile to improve their chances of matching with members.  Notably,

---

[56] *Id.* ("A 'personal characteristic' is information that a person uses to identify an attribute of themselves, such as their age, ethnicity, height, body type (whether slim, average, athletic, large, ... etc.), education, general location of where they live, income level, marital status (single, divorced, widowed, separated), eye color, hair color, preferences with respect to children, profession, religion, language spoken, personality traits and the like.")

[57] *See* Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017).

[58] *Id.*

[59] *See, e.g.,* https://www.match.com/registration/privacystatement.aspx ("Match is part of the Match Group family of businesses which, as of the date of this Privacy Policy, includes websites and apps such as Tinder, OkCupid, Plenty of Fish, Match, Meetic, BlackPeopleMeet, LoveScout24, OurTime, Pairs, ParPerfeito, and Twoo. We share your information with other Match Group companies [...].").

[60] *Guidelines for Posting a Photo,* MATCH.COM, https://www.match.com/dnws/help/#holder.

[61] Users can only bypass this requirement if they create an account through Facebook and import their data, including their profile picture.

[62] *Id.*

several of Defendants' Dating Sites offer advice about the type of images to upload and recommend users upload an unobstructed view of the user's face that is big enough for potential matches to see clearly.[63]

### A.    Match.com

112.    Match.com, launched in 1995, is one of the world's oldest and most popular dating sites consisting of millions of active users.[64]   To join Match.com, a free or subscription membership is required.  The free membership permits users to create a profile, upload and post photographs, conduct searches, and communicate with matches and other members on both the desktop and mobile site.[65]  The subscription-based membership, in addition to providing access to the same features as free membership, grants members access to Match.com's "growing set of tools" such as removing members from the user's match list, and attend events with other members.[66]

113.    Regardless of the membership selected, to join Match.com, users must create a profile that requires the user to input various personal information including, but not limited to, their name, date of birth, zip code, height, body type, relationship status, and whether the user has

---

[63] https://www.match.com/help/faq/7/135/.

[64] https://www.match.com (**Every year, hundreds of thousands of people find love on Match.com.** Match.com pioneered the Internet dating industry, launching in 1995 and today serves millions of singles in 24 countries.).

[65] https://www.match.com/dnws/help/#holder.

[66] https://www.match.com/dnws/help/#holder ("Subscribing to Match gives you access to a growing set of tools – on our desktop site, our mobile site, or any of our apps – that will help you find the relationship you want and deserve. As a subscriber, you can:
- Receive and reply to Messages from other Match subscribers.
- Send Messages to Match members you're interested in.
- See who has Viewed your profile.
- See who has Liked your profile.
- Remove members you're not interested in from your search results in order to make room for other possibilities.
- Attend Match Events to meet other Match members face-to-face."

children.  Users can also answer certain prompts to improve their changes of matching with members with the qualities they are seeking.  Once the user has completed the personal information section of their profile, the user can either upload a profile picture or begin conducting searches for potential matches.  However, Match.com requires users upload at least one primary profile picture to communicate with potential matches and other members.

114.    Match.com posts several guidelines for posting photographs, strongly encouraging users to upload up to 26 photographs to make the user's profile stand out, and requiring primary photos meet certain criteria such as including an unobstructed view of the user's face:[67]

> **Guidelines for Posting a Photo**
> Good photos can really make your profile stand out, so we strongly encourage you to post several of them. We do currently limit you to 26 photos total (including your Primary photo). If you already have 26 photos and you want to upload a new one, you'll need to remove one of your old photos first.
>
> We have to reserve the right to crop or reject photos as needed to keep a clean, attractive, and appropriate atmosphere on the site. Once your photos are approved, they will appear on the site.
>
> ***
>
> Guidelines for Primary photos:
>
> - Your Primary photo must include a good, unobstructed view of your face that's big enough for potential matches to see you clearly.
> - There shouldn't be any other people in the photo.
> - If a photo was taken from further away and shows more of your body, we'll make a thumbnail that just shows your face. Don't worry, the full-size photo is still available on your profile page.
> - Even if a photo has a clear view of your face, it might still be too small to use as a Primary photo.
> - Also keep in mind the following:
> - You must appear in the Primary photo.
> - Potentially offensive photos will not be posted.
> - Image files must be received in an approved format (eg, jpg,

---

[67] *See Guidelines for Posting a Photo* available at https://www.match.com/dnws/help/faq (last viewed on July 2, 2021).

bmp, gif) and should be larger than 100kB and less than
5MB. (Please note, we convert all images to jpg to be viewed
by all browsers.)

115.    Match.com reviews and approves each photograph uploaded to the user's profile.[68]

116.    Photographs containing "red eye", or blurred images are rejected.  Additionally,
Match.com will crop photographs "to keep a clean, attractive, and appropriate atmosphere on the
site."[69]

117.    Match.com provides various "tips" for primary photographs:[70]

**Tips for Photos**
Whether you're a new member or simply want a fresh look, adding
new photos can really help improve your experience on the site.

**Your Primary Photo**
- DO use a good headshot or a shot of your head and
  shoulders.
- DO smile!
- DO use a recent photo.
- DO make it a photo of just you.
- DON'T wear sunglasses or a hat.

118.    Match.com also provides sample pictures for members to view as a template:[71]

**Examples**
Here are some examples of great Primary photos:

---

[68] https://www.match.com/help/aboutus.aspx?lid=4 ("**How It Works**. At Match.com, we give
singles the opportunity to express themselves through various free writing sections. Profiles may
include up to 26 photos, as well as selected preferences regarding the person they're searching for.
With the click of a mouse, members can instantly see photos and read about potential matches in
their area. Match.com also understands the importance of privacy and integrity. All
communication between members on Match.com happens through an "anonymous" email
network. The names and contact information of all our members are kept confidential until the
member personally decides to share the information with a potential match. And to help ensure the
integrity of our community, every profile and photo is screened by our Customer Care team for
appropriateness before it's posted to the site.")
[69] *See Guidelines for Posting a Photo* available at https://www.match.com/dnws/help/#holder (last
viewed on July 2, 2021).
[70] https://www.match.com/dnws/help/faq.
[71] https://www.match.com/dnws/help/faq.



119.    When performing searches, users can search and sort through members by selecting

several options to narrow their search or by selecting a Match.com search algorithm.[72]

**B.      OkCupid**

120.    OkCupid was launched in 2004 with a focus on a Q&A approach to the dating

category.[73] To join OkCupid, users are prompted to provide their name, gender, date of birth,

location, the type of connections they are looking for, as well as the gender of their dating

preference. Before continuing, users *must* upload at least one picture.

121.    OkCupid provides "photo rules" for users to follow emphasizing the importance of

uploading photographs that clearly show the user's face.  *See* <u>Figures 3-5</u>.

---

[72] *See, e.g.,* https://www.match.com/help/faq/8/164/#holder ("Mutual Match is one of the best
ways we have of pairing you up with other members we think you might be interested in.  This
feature sifts through our impressive database of members (we are the largest dating site out there)
to identify those who not only match your criteria, but whose criteria also look an awful lot like
you!").

[73]    https://www.sec.gov/ix?doc=/Archives/edgar/data/0000891103/000089110321000014/mtch-
20201231.htm.







*Fig. 3*                    *Fig. 4*                    *Fig. 5*

## C.   **Hinge**

122.     Hinge was launched in 2012 as a mobile-only experience[74] designed to connect members with friends of friends.  The Hinge community, as initially launched, required users to create a Hinge account by syncing their Facebook account to the app, which would collect and import the user's contact and friend lists, basic profile information, photographs, and geolocation to generate potential matches.

123.     In 2018, Hinge expanded its user base by allowing individuals to create an account through association with a mobile phone number rather than requiring users to have a Facebook account and sync the applicable Facebook data.

124.     To create an account, Hinge requires users to input basic and personal information including their name, email address, date of birth, location, gender, dating preferences, height, ethnicity, family plans, job title, religious and political beliefs, and drinking and smoking preferences.   Users are then required to upload six self-images to "make [their] profile stand out

---

[74] *Id.*

even more" and provides users with "Photo Guide Tips" encouraging users to upload a variety of photographs with a clear view of their face.[75] *See* Figures 6-8.







| *Fig. 6* | *Fig. 7* | *Fig. 8* |

### D.    POF

125.    POF was launched in 2003.  "Among its distinguishing features is the ability to both search profiles and receive algorithmic matches.  POF has grown in popularity over the years and relies on a freemium model.  POF has broad appeal in the central United States, Canada, the United Kingdom, and a number of other international markets.  In 2020, POF launched *Live!*™, a one-to-many live streaming video feature that allows users to engage with other users at POF in a new and different format from traditional dating profiles."[76]

---

[75]    *Hinge   Won't   Let   Me   Update   Pictures   Or   Connect   To   Instagram,* https://datingappworld.com/hinge-wont-let-me-update-pictures-or-connect-to-instagram/.
[76]    Match Group's Form 10-K, For the Fiscal Year Ended December 31, 2020 (Feb. 25, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000891103/000089110321000014/mtch-20201231.htm.

126.    To join POF, users must create a username, enter an email, date of birth, gender, ethnicity, occupation, education, and income, as well as select the gender of their dating preference, what type of relationship they are looking for, their dating intent, and whether they will date smokers, people with kids, and people with a larger BMI, among other questions.  POF also requests certain physical characteristics, including eye color, hair color, height, and body type.[77]

127.    To continue the sign-up process, users are required to enter a phone number to verify their account and upload at least one picture.  *See* Figures 9-11.



*Fig. 9*



*Fig. 10*



*Fig. 11*

128.    POF posts several guidelines for posting photographs, strongly encouraging users

---

[77] Users are then required to answer a series of prompts, including their goals, hobbies, or favorite memory, their favorite topic of conversation, and interests.

to upload up to 8 photographs to make the user's profile stand out, and requiring primary photos meet certain criteria such as including an unobstructed view of the user's face:



*Fig. 12*[78]

**E.    OurTime**

129.    OurTime is the largest community of singles over 50[79]  available via website and mobile app.   To join OurTime, users must provide their name, location, date of birth, email address, and upload at least one photograph (while prompting users to upload at least three).   *See* Figure 12 and Figure 13.

---

[78] https://blog.pof.com/2017/11/7-tips-creating-stand-dating-profile-picture/.
[79] Match Group, Inc. Form 10K For the Fiscal Year Ended December 31, 2020 (Feb. 25, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000891103/000089110321000014/mtch-20201231.htm.



*Fig. 13.*



*Fig. 14.*

130.    OurTime provides guidelines for making a photograph a primary photo. The guidelines explain that all photographs must be submitted for review and approval and that OurTime reserves the right to crop or reject submitted images.

*Fig. 15[80]*

131.     According to OurTime's "7 Highly Effective Habits of Successful Online Dates" the most effective habit is "refreshing photos" as often as possible.[81] OurTime further encourages users to upload new photos after events, holidays, family visits, and other activities.[82]

### F.     **BLK and Chispa**

132.     In addition to the brands above, the Match Group portfolio includes dating apps, BLK and Chispa, both of which were modeled after Tinder and utilize Tinder's Swipe feature.[83]

133.     BLK was launched in 2017, to create an exclusive community for Black men and Black women.  Members sign up for BLK, either by mobile number or through Facebook.  If users sign up by mobile number, they need to provide their name, gender, dating preference, and birthday before they are required to upload a photo and provide their location.  Users cannot access the app

---

[80]  https://www.ourtime.com/v3/help/article/19.

[81]https://www.ourtime.com/v3/articles?article=33&title=7-Highly-Effective-Habits-of-Successful-Online-Daters ("1. Refresh, Refresh, Refresh.   *Refresh your profile and photos. Keeping current is important. It says that you're active and serious about showing people who you are and what you have to offer. Did your family recently visit you during the holidays? Post the photos of you by the Christmas tree or Menorah, with your children or grandchildren. Leading a full life is attractive.*") (emphasis added).

[82]            https://www.ourtime.com/v3/articles?article=33&title=7-Highly-Effective-Habits-of-Successful-Online-Daters.

[83]Match Group's Form 10-K, For the Fiscal Year Ended December 31, 2020 (Feb. 25, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000891103/000089110321000014/mtch-20201231.htm.

without providing this information.  If using Facebook, the user must give consent for BLK to access basic information.  If permitted, the user's profile photo, name, and birthday are automatically synced and appear on the user's public profile.  Users' profiles consist 90% of photos and 10% of text information.  Overall, users can upload up to six photos.  Figure 15 illustrates the design of BLK.



*Fig. 16*[84]

134.    Users have two options to sign up for Chispa, either by mobile number or through Facebook.  If users sign up by mobile number, Chispa asks users for their name, gender, date of birth, and national origin, before prompting users to upload a photo and provide location tracking before they can continue the account set-up process.  If using Facebook, the user must give consent to Chispa and the Facebook app to access basic information.  If permitted, the user's profile photo, name, and birthday are automatically synced and appear on the user's public profile.  Users' profiles consist 90% of photos and 10% of text information.  Overall, users can upload up to six photos.  Figure 16 illustrates the design of Chispa.

---

[84] https://play.google.com/store/apps/details?id=com.affinityapps.blk&hl=en_US&gl=US.

    

*Fig. 17*[85]

135.    The photo prompts of BLK, and Chispa are depicted in <u>Figure 18</u> and <u>Figure 19.</u>



*Fig. 18*



*Fig. 19*

**G.    <u>Tinder</u>**

136.    Tinder requires users to enter their age, gender, sexual orientation, gender preferences, and passions to create an account. After providing this information, users are required to upload at least two photos and provide location data to access the app. Tinder's photograph

---

[85] https://play.google.com/store/apps/details?id=com.affinityapps.chispa<u>.</u>

prompt is depicted in <u>Figure 20.</u>



*Fig. 20*

137.    In 2021, Tinder announced the public release of its new "ID Verification" which launched on August 16, 2021.[86]   Although Tinder issued its public statement in 2021, upon information and belief, Tinder was already using ID verification.

138.    Upon information and belief, Tinder marketed this feature to Tinder users as a "vectorization" process that allowed users to verify their identity.  Tinder did not notify users that vectorization is a feature-based representative model that scans facial geometry analyzes skin tone, pigment, and texture, and facial shape to identify and recognize individuals.[87]   In other words, upon information and belief, Tinder failed to inform users that vectorization is a type of facial recognition technique and receive users' consent to apply facial recognition technology to their photographs.

---

[86]https://www.tinderpressroom.com/2021-08-16-Tinder-Commits-to-ID-Verification-for-Members-Globally,-a-First-in-the-Dating-Category.
[87] *See, e.g.,* David Beymer, *Vectorizing Face Images by Interleaving Share and Texture Computation* MIT ARTIFICIAL INTELLIGENCE LABORATORY (1995), available at https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.18.4910&rep=rep1&type=pdf.

139.    Presently, Tinder describes its "ID Verification" process as a part of its Photo Verification program that allows users to self-authenticate through a series of selfies, which are compared to existing profile pictures using facial recognition software.  Tinder's description and instructions for Photo Verification are depicted in <u>Figure 21</u>.



*Fig. 21*

140.    Photo Verification is not required to join or use Tinder's services.  Moreover, users are not provided notice of this feature upon account creation or during regular use.  However, for users who are aware of ID Verification, they can click the grey checkmark next to their name to start the verification process.  Before submitting photos for verification, Tinder provides users with two notices: (1) Get Verified; and (2) How it Works, as depicted in <u>Figure 22</u> and <u>Figure 23</u> below.



*Fig. 22*



*Fig. 23*

141.    Visibly missing from Tinder's privacy policy is any mention of ID or Photo Verification, use of facial recognition technology, collection of facial geometry, face scans, biometric identifiers, or biometric data, or how and where Tinder stores user's biometric data. Nevertheless, even if there was a disclosure in the privacy policy about Photo Verification, the privacy policy would still be deficient and misleading because Tinder uses facial recognition technology to collect biometric data regardless of whether a user uses Photo Verification.

142.    Notably, on January 17, 2022, Tinder updated its privacy policy for the first time admitting that Tinder was and had been collecting biometric data of its users within the prior year.[88] However, Tinder did not make this admission in the main text of its privacy policy, but instead, admitted its collection of biometric information *only* in its notice to California users.[89] Plaintiffs

---

[88] https://policies.tinder.com/privacy/intl/en/.
[89] https://policies.tinder.com/ccpa-addendum/us/en/.

were never made aware of this collection of biometric information.  Moreover, an Illinois resident is not expected to review Tinder's "California Privacy Statement" to "learn about California privacy rights," which are listed in a separate link and on a separate page.

143.    As described above, all of Defendants' Dating Sites require (or at least prompt) users to upload photographs and advise users to upload more than one photo to improve their chances of meeting a potential match.  Moreover, all Defendants' Dating Sites offer advice on the types of images to upload and recommend users to upload unobstructed, clear photos that are big enough for potential matches to see clearly (and for Defendants' algorithms to analyze and use for collecting biometric information).[90]

144.    Once a user completes the account registration process, answers the required prompts, and provides photographs, Defendants store the information and data on their servers and make  the information and data visible to other Dating Site members.

## V.    Defendants' Various Uses of Biometric Data

145.    Defendants use facial processing technology to detect, analyze, and recognize faces.  Upon information and belief, Plaintiffs allege Defendant Match Group uses biometric data in the following ways:

146.    Match Group uses facial processing technology to prevent "bad actors" from getting back on its sites after being removed.  To accomplish this, it uses its facial processing technology on every photo a user uploads, generates a face scan, and then saves that face scan to its face scan database.  Once a user is identified as a bad actor, he or she is removed from the

---

[90]*See, e.g., Guidelines for Posting a Photo*, https://www.match.com/help/faq/7/135/#holder; *7 Tips for Creating a Stand Out Dating Profile Picture* (Nov. 2, 2017), https://blog.pof.com/2017/11/7-tips-creating-*stand*-dating-profile-picture/; *How to choose great photos*, https://help.okcupid.com/article/57-how-to-choose-great-photos; *Creating a Great Dating Profile on OurTime.com*, https://www.ourtime.com/v3/articles?article=18&title=Creating-a-Great-Dating-Profile;  and https://www.chispa-app.com/en/frequently-asked-questions.

dating site and his or her biometric data (face scan) is identified as being that of a bad actor. Upon signing up, a face scan of every new user is generated and compared against the bad actors' face scans to deny bad actors re-entry.

a) Match Group uses facial processing technology to verify a user. User verification can be done through a user taking a selfie in real-time. To verify a user, Match Group generates and collects a user's biometric data in the form of a face geometry and compares it against the photos already on file.

b) Match Group uses facial processing technology to create user-specific Avatars that may be used in its chats and live features.

c) Match Group uses facial processing technology to provide users with potential matches that fit their preference, e.g., certain shades of faces (skin tone).

d) Match Group employees can confirm whether any person is a user on its site simply by uploading a photograph and processing it through the site's backend.

e) Upon information and belief, Match Group uses voice recognition technology in its video chat features and voice notes.

## VI. Defendants' Issued Patents Unequivocally Evidence Biometric Data Collection and Storage Practices That Violate BIPA

147. Defendants' use of facial recognition technology is irrefutable. Defendants' patents confirm the companies' use of facial recognition technology and collection of biometric data. For over a decade, Defendants researched, developed, and implemented various proprietary facial recognition techniques and mechanisms[91] to collect, share, and retain sensitive biometric data of all users without users' knowledge or consent.

---

[91] *See, e.g.,* Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017); Patent No.: US 10,203,854 B2: Matching Process System and Method (Feb. 12, 2019); Patent No.: US

148.    Specifically, in October 2013, Yahoo! Inc. assigned six patents and five patent applications, including the "Face Search in Personals"[92] application, to Defendant.  All assigned patents  relate explicitly to online dating services and improves matches through the "face search" process by leveraging the data generated by members on the platform to create matches with the user's preferred physical characteristics.[93]   The "face search" technique sets forth the logical flow for reducing and extracting biometric data from user photographs utilizing the mathematical tool, principal component analysis ("PCA"), and conducting a personal profile search for specific facial features using the Eigenfaces facial recognition method,[94] one of the earliest facial recognition

---

9,959,023 B2: Matching Process System and Method (May 1, 2018); Patent No.: US 9,733,811 BS: Matching Process System and Method (Oct. 21, 2013).

[92] Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017); Kin Man Lo, the Inventor, filed the patent application for "Face Search in Personals" on May 28, 2008, and immediately assigned all interest to Yahoo! Inc. Between 2008 and 2017, the United States Patent Office ("USPTO") rejected the application on 9 separate occasions.  After nearly 10 years and thousands of dollars in filing fees, the USPTO approved and issued the patent on September 5, 2017. On September 8, 2020, Match Group paid $1,600 in patent maintenance fees extending its active status through September 30, 2021.  *See* USPTO Maintenance Fee Details and Maintenance Fee Statement for "FACE SEARCH IN PERSONALS" Patent# 9753948, Application# 12127577, Attorney         Docket#         076533-0354         (Sept.         8,         2017). https://fees.uspto.gov/MaintenanceFees/fees/details?patentNumber=9753948&applicationNumber=12127577&caresActSelected= (confirming the active status of Patent No.: US 9,753, 948 B2: Face Search in Personals (Sept. 5, 2017) "Approved for use through 9/30/2021" and verifying Match Group's maintenance fee payment of $1,600 on September 8, 2017.) (last viewed Apr. 12, 2022); Patent No. US 9,753,948 BS: Face Search in Personals (Sept. 5, 2017) is currently used by Match Group and applies to all Match Group Dating Sites. *Id.*
[92] *Id.*
[93] *Id.*
[94] *See* Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017) ("The present invention relates generally to enabling a personal search based on an image of a person in the context of on-line dating. More particularly, the invention integrates the ability to search personal profiles based on attributes or characteristics in conjunction with characteristics that are provided through a photograph or image … Eigenfaces have advantages over other techniques available, such as the systems speed and efficiency. Using eigen-10 faces is very fast, and able to functionally operate on lots of faces in very little time."); *see also*., Amendments to the Claims in Patent Application No.: 12/127,577, attached to the Request for Continued Examination or Response to Examiner's Action submitted on November 4, 2016:

techniques developed in 1987,[95] and used by Matthew Turk and Alex Pentland in 1991.[96]  Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017) is currently and actively used by Defendant Match Group and applies to all Match Group Dating Sites.

149.    In November 2013, approximately one month after Defendant acquired multiple patents and patent applications from Yahoo!, Defendant filed an application with the United States Patent Office ("USPTO") to patent its matching services and third-party social network import feature.[97]  This patent was subsequently approved by the USPTO and published on July 28, 2015. Notably, the drawings associated with Patent No. US 9,094,396 B2 contain images of both OkCupid's and Match.com's mobile app,[98] signify Defendants' control over OkCupid's technology and establish similarities between the two sites.  Figure 24 and Figure 25 depict two images of a Match.com profile taken from FIG. 2A and FIG. 2B of Patent No. US 9,094,396 B2, and an OkCupid profile taken from FIG. 3 of the same patent.

---

"8. (Currently Amended) A method for managing a personal profile search over a network, comprising: receiving a request to search a plurality of different personal profiles, ~~the request including a personal characteristic and a target image, the target image depicting at least one desirable feature~~, and each of the plurality of different personal profiles includes an image having a corresponding reduced image data set comprising a face space, <u>wherein the request comprises a personal characteristic and a target image, and receiving the request comprises: receiving, from a device associated with a personal profile from the plurality of different personal profiles. selection of the personal characteristic. And receiving, from the device associated with the personal profile, selection of the target image, the target image depicting at least one feature that is desirable in a potential match for the personal profile, wherein the at least one feature depicted by the target image comprises eyes or body type of the potential match</u>."

[95] Michael Kirby; Larry Sirovich, *Application of the Karhunen-Loeve Procedure for the Characterization of Human Faces*, IEEE TRANSACTIONS ON PATTERN ANALYSIS AND MACHINE INTELLIGENCE 12 (1): 103–108 (1990).

[96] Matthew Turk and Alex P. Pentland, *Face Recognition Using Eigenfaces*, VISION AND MODELING GROUP, THE MEDIA LABORATORY MASSACHUSETTS INSTITUTE OF TECHNOLOGY (1991) available at: https://sites.cs.ucsb.edu/~mturk/Papers/mturk-CVPR91.pdf.

[97] *See* Patent No.: US 9,094,396 B2: Integrated Profile Creation for a Social Network Environment (Jul. 28, 2015).

[98] *See, e.g.*, *id.* at Figure 2D (displaying a Match.com drawing) and Figure 3 (displaying a drawing of OkCupid's login page).

**Match.com**                    **OkCupid-Match.com**





*Fig. 24*[99]

150.    Defendants' patents confirm that the Dating Sites have used the same facial

recognition algorithm and processes for years.   For instance, Defendants' proprietary matching

algorithm "Matching Process System and Method" has been amended and reissued by the USPTO

on four separate occasions since its first issuance in 2013.[100]  This method, first developed by Todd

M. Carrico, Kenneth B. Hoskins, and James C. Stone in 2007, and later patented on October 22,

---

[99] *Id.*

[100] Patent No.: US 10,203,854 B2:  Matching Process System and Method (Feb. 12, 2019), which is a continuation of application No.: 15/676,773, filed on August 14, 2017, which is a continuation of application no. 14/059,192, filed on October 21, 2013, now Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017), which is a continuation-in-part of application No.: 12/339,301, filed on December 19, 2008, now Patent No.: US 8,566,327 B2: Matching Process System and Method (Oct. 22, 2013); *see also* Patent No.: US 9,959,023 B2: Matching Process System and Method (May 1, 2018) and application publication: US 2019/0179516 A1: Matching Process System and Method (Jun. 13, 2019) and prior publication: US 2018/029281 Al (Oct. 11, 2018).

2013, as Patent No. US 8,566,327 B2, confirms that Defendants' Dating Sites utilize the same matching system and take into consideration personal preferences.   Notably, on March 15, 2013, prior to becoming part of the Match Group family, Tinder, Inc., filed an application to continue-in-part Patent No. US 8,566,327 B2 to include facial recognition.  Tinder's patent was later issued as Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017) states:

> Matching server 20 may be configured to parse the profiles of the users in set 52, e.g., collecting data and applying algorithms. For example, matching server 20 may use explicit signals from social networking platform 50 such as common friends, common interests, common network, location, gender, sexuality, or age to evaluate potential matches between users 14. Matching server 20 may also use implicit signals such as for whom a user 14 expresses approval and disapproval. ***Implicit signals may also include facial recognition algorithms to detect ethnicity, hair color, eye color, etc., of profiles that user 14 has expressed interest in***.[101]

151.    Tinder subsequently filed an application continuing-in-part Patent No. US 9,733,811 BS in 2016, confirming the use of the same methodology and use of facial recognition technology.[102]

152.    In 2018, after acquiring Tinder, Defendant Match Group amended Tinder's facial recognition patents again, confirming that Tinder's facial recognition methodology is used in each Defendants' Dating Sites.  Notably, this patent, in which Match Group is both the applicant and

---

[101] Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017), which is a continuation-in-part of application No.: 12/339,301, filed on Dec. 19, 2008, now Patent No.: US 8,566,327 B2: Matching Process System and Method (Oct. 22, 2013) (Inventor: Todd M. Carrico; Assignee: Match.com, LLC); Pub. No.: US 2016/0127500 Al: System and Method for Modifying a Preference (May 5, 2016) ("Matching server 20 may be configured to parse the profiles of the users in set 52, e.g., collecting data and applying algorithms. For example, matching server 20 may use explicit signals from social networking platform 50 such as common friends, common interests, common network, location, gender, sexuality, or age to evaluate potential matches between users 14. Matching server 20 may also use implicit signals such as for whom a user 14 expresses approval and disapproval. *Implicit signals may also include facial recognition algorithms to detect ethnicity, hair color, eye color, etc., of profiles that user 14 has expressed interest in.*") (emphasis added).

[102]  This application, later issued as Patent No.: US 9,959,023 B2: Matching Process System and Method (May 1, 2018).

assignee, utilizes the same drawings of Tinder's profile to explain the patented technology and Defendants' algorithms. <u>Figure 26</u> below shows Defendants' use of Tinder's profile to explain its technology, establishing Defendants' control over Tinder's technology and use the same technology.



*Fig. 26[103]*

153.    On July 21, 2020, Defendant Match Group filed an application with the World Intellectual Property Organization ("WIPO") entitled "System and Method for Recommending Users Based on Shared Digital Experiences,"[104] later approved by the WIPO on February 21, 2021,

---

[103] *Id.*
[104] International Application No.: PCT/US2020/042840: System and Method for Recommending Users Based on Shared Digital Experiences (Jul. 21, 2020).

and published as International Publication Number: WO 2021/02588 A1[105] (hereinafter referred to as "International Patent").  Defendant Match Group's International Patent relates particularly to a system and method for recommending users based on shared digital experiences.  A recommendation for a potential match is accomplished through a tool that employs a machine-learning algorithm to generate ranked lists based on attributes, such as physical attributes and characteristics obtained from profiles, personality trait scores, and on additional attributes extracted through facial recognition technology and algorithms in the same or a similar manner as described in Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017), Match Group's primary facial recognition patent:

> As an example, in embodiments in which recommendation engine 160 employs a machine-learning algorithm trained to generate ranked lists of compatible users 110 based on attributes that include the users' personality trait scores, the machine-learning algorithm may operate on additional attributes obtained from profiles 135 in a manner similar to the systems described in, for example, ***U.S. Patent No. 9,733,811, the entire disclosure of which, except for any definitions, disclaimers, disavowals, and inconsistencies, is incorporated herein by reference.***

---

[105] International Patent No.: W.O. 2021/025855 A1: System and Method for Recommending Users Based on Shared Digital Experiences (Feb. 11, 2021).

154.    As previously discussed, Defendants employ their "matching process system and method"[106] and "face search in personals"[107] facial recognition methods to leverage the data generated by members on the platforms and generate matches.[108] Moreover, like the International

---

[106] *See* Patent No.: US 10,203,854 B2:  Matching Process System and Method (Feb. 12, 2019), prior publication: US 2018/029281 Al (Oct. 11, 2018), which is a continuation of application No.: 15/676,773, filed on August 14, 2017, which is a continuation of Application No. 14/059,192, filed on October 21, 2013, now Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017), which is a continuation-in-part of application No.: 12/339,301, filed on December 19, 2008, now Patent No.: US 8,566,327 B2: Matching Process System and Method (Oct. 22, 2013); Patent No.: US 9,733,811 BS: Matching Process System and Method (Oct. 21, 2013); Patent No.: US 9,959,023 B2: Matching Process System and Method (May 1, 2018); Patent No.: US 8,566,327 B2: Matching Process System and Method (Oct. 22, 2013); Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017);   Patent No.: US 9,959,023 B2: Matching Process System and Method (May 1, 2018); Patent Application Publication: US 2019/0179516 A1: Matching Process System and Method (Jun. 13, 2019); International Patent No.: WO2021025855A1: System and Method for Recommending Users Based on Shared Digital Experiences (Feb. 11, 2021); International Application No.: PCT/US2020/042840: System and Method for Recommending Users Based on Shared Digital Experiences (Jul. 21, 2020); Patent No.: US 11,151,208 B2: System and Method for Recommending Users Based on Shared Experiences (Oct. 19, 2021); Patent Publication No.: US 2016/0127500 Al: System and Method for Modifying a Preference (May 5, 2016); Prior Publication Data: US 2018/029281 Al (Oct. 11, 2018).
[107] Patent No.: US 9,753,948 B2: Face Search in Personals (September 5, 2017).
[108] *Id.*

Patent, Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017)[109] conducts searches

based on personal characteristics:[110]

> As part of the profiles, users also include one or more pictures of themselves. The physical appearance of a person may be an important factor in determining whether a profiled individual is a suitable match. These pictures are generally digitized images and may include a picture of the person's face. The present invention permits a search of the pictures in the personal profiles to be included in the personals search. This allows a user to conduct a more exhaustive search.

***

> In one embodiment of the invention, a user may request a personal profile search that includes a search for a personal characteristic and a request to match a target image. ***A subset of reduced image data sets corresponding to personal profiles that contain the personal characteristic is retrieved and compared against the reduced image data set of the target image. The comparison is achieved by using distance calculation. When two points in the face space are close together, this is an indication that the two images look similar. The converse is also true. Where there is a large distance between two points in the face space, such images will not look similar***. The images that correspond to the personal profiles would then be sorted according to the distance from the target image in the face space. The personal profiles that are close enough can then be presented to the user.

---

[109] *See* Patent No.: US 9,753,948 B2: Face Search in Personals (September 5, 2017) ("face search" process leveraged the data generated by members on the platform to generate matches with the user's preferred physical characteristic)'. s*ee, e.g.,* 11/4/16 Amended Claim:
8. (Currently Amended) A method for managing a personal profile search over a network, comprising: receiving a request to search a plurality of different personal profiles, ~~the request including a personal characteristic and a target image, the target image depicting at least one desirable feature~~, and each of the plurality of different personal profiles includes an image having a corresponding reduced image data set comprising a face space, <u>wherein the request comprises a personal characteristic and a target image, and receiving the request comprises: receiving, from a device associated with a personal profile from the plurality of different personal profiles. selection of the personal characteristic. And receiving, from the device associated with the personal profile, selection of the target image, the target image depicting at least one feature that is desirable in a potential match for the personal profile, wherein the at least one feature depicted by the target image comprises eyes or body type of the potential match;</u>
[110] Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017) ("A 'personal characteristic' is information that a person uses to identify an attribute of themselves, such as their age, ethnicity, height, body type (whether slim, average, athletic, large, ... etc.), education, general location of where they live, income level, marital status (single, divorced, widowed, separated), eye color, hair color, preferences with respect to children, profession, religion, language spoken, personality traits and the like.").

155.    Indeed, the alternative method described incorporates the "Face Search in Personals" method, which, as confirmed by Defendants' counsel, unquestionably implicates the collection, use, and storage of Plaintiffs' and other users of the Dating Sites' biometric data in the form of face scans.  Moreover, like most facial recognition algorithms, the method described in the International Patent uses a machine-learning algorithm to learn how to recognize human faces, identify key facial landmarks such as eyes, nose, hair, ears, and eyebrows, and then use that data to extract and collect its users' facial geometry and related data.

156.    Defendants' patents and investor relation documents confirm that Defendant' place emphasis on the importance of considering physical characteristics and user preferences when developing new or improved matching techniques and algorithms.  For instance, Patent Nos. US 9,158,821 B2, US 9,245,301 B2, and US 9,251,220 B2 explain:

> Using the web pages illustrated in FIGS. 2E-2G, system 10 collects a variety of information from an end user, including, but not limited to, basic information about the end user (FIG. 2E), as well as ***information about the type person the end user would be interested in dating, including information about a potential date's physical appearance*** (FIG. 2F) and background and values (FIG. 2G).[111]

157.    Similarly, as depicted in Figure 27 below, Defendant Match Group's letter to its shareholders discusses significant improvements with matching users after incorporating machine learning to identify user preferences based on users' swiping history.

---

[111] *See, e.g.,* US 9,158,821 B2: System and method for optimizing interactions between users in a network environment (Oct. 13, 2015); US 9,245,301 B2: System and Method for Finding Matches Between Users in a Networked Environment (Feb. 2, 2016); US 9,251,220 B2: System and Method for Finding Matches Between Users in a Networked Environment (Feb. 2, 2016); Pub. No.: US 2016/0134713 Al: System and Method for Tracking and Illustrating User Activity in a Network Environment (May 12, 2016).



*Fig. 27*

158.    Defendants' patents also confirm that all Dating Dite data, including but not limited to biometrics, is stored on the Defendants' databases and visible to Dating Site members regardless of the site.[112]

## VII.    The Match Group Dating Sites Operate and Function in Accordance with Match Group's Assigned Patents

### A.    Patent No.: US 9,753,948 B2

159.    In 2008, Yahoo! filed a provisional application (the "Yahoo! App") entitled "Face Search in Personals" with the USPTO disclosing two primary innovations: (1) enabling a personal search based on an image of a person in the context of online dating; and (2) integrating facial recognition technology to provide users with the ability to search personal profiles based on facial features, attributes, or characteristics provided through a photograph or image (hereinafter collectively referred to as the "Face Search in Personals").[113]   Yahoo!'s application was filed in connection with Yahoo! Personals, Yahoo!'s online dating site and major competitor of

---

[112] International Patent No.: WO 2021/025855 A1:  System and method for recommending users based on shared digital experiences (Feb. 11, 2021).

[113] *See* Patent Application Publication No. US 2009/02999 61 AI: Face Search in Personals (Dec. 3, 2009), later granted as Patent No.: US 9,753,948 B2: Face Search in Personals (Sept. 5, 2017).

Match.com.[114]   While Yahoo!'s App discusses generally search methods for online dating, the primary focus of the proposed technology was to build upon and improve the "personal characteristic" search used by top online dating services Yahoo! Personals, Match.com, and AOL Personals.[115]   Match.com acquired AOL Personals in 2009 as part of its larger acquisition of People Media, the parent company of OurTime.[116]

160.    Subsequently, in May 2010, Match.com partnered with Yahoo! to merge Yahoo! Personals into a new co-branded site called "Match.com on Yahoo!"[117] According to Match.com, the new site, "Match.com on Yahoo!," offered "compelling features including mobile access, daily personalized matches and robust search tools [that] fully replace the existing Yahoo! Personals experience at the end of the transition period."[118]   As a result of this partnership, Match.com became the exclusive online dating site on Yahoo!.[119]

---

[114] *Id.*

[115] *Id.* (identifying Yahoo! Personals, Match.com, and AOL Personals as online dating services that allow users to provide a personal profile of themselves that contains a collection of personal information and characteristics.).

[116] *People Media Launches Six New Niche Online Dating Communities For AOL Personals, Enhances All Existing Specialty Sites With New Matching and Community Features* (Jun. 25, 2009), https://www.prweb.com/releases/2009/06/prweb2577154.htm

[117] https://www.datingnews.com/apps-and-sites/history-of-match/;
*see also*, https://techcrunch.com/2010/05/24/yahoo-finds-a-new-lover-in-match-com-dumps-personals/ ("The long-term arrangement provides that Match.com will be the exclusive online dating provider and display advertiser on Yahoo!. Match.com will receive media placements on the site, as well as occupy the position served by the personals navigational link on the Yahoo! homepage."); https://www.prnewswire.com/news-releases/iacs-matchcom-partners-with-yahoo-to-be-the-exclusive-online-dating-service-on-yahoo-94744454.html;
https://www.datingnews.com/apps-and-sites/history-of-match/

[118] https://www.prnewswire.com/news-releases/iacs-matchcom-partners-with-yahoo-to-be-the-exclusive-online-dating-service-on-yahoo-94744454.html

[119] *Id.*; *see also*, *IAC's Match.com Partners With Yahoo! to be the Exclusive Online Dating Service on Yahoo!* (May 24, 2010), https://www.prnewswire.com/news-releases/iacs-matchcom-partners-with-yahoo-to-be-the-exclusive-online-dating-service-on-yahoo-94744454.html;    Match.com Partners With Yahoo! (May 24, 2010), https://www.onlinepersonalswatch.com/news/2010/05/matchcom-partners-with-yahoo.html;

161.    As depicted in Figure 14 and Figure 15, the websites for Yahoo! Personals and Match.com are nearly identical.   Moreover, the sign-up process for Yahoo! Personals and Match.com contain a similar advertisement and identical sign-up process.



Fig. 28[120]



Fig. 29[121]

162.    After the launch of "Match.com on Yahoo!" in 2010, Yahoo! and Match.com merged their landing pages to include both company names while keeping the overall appearance and sign-up process the same.   Figure 30 and Figure 31 are example advertisements for Match.com on Yahoo!.

---

Leena Rao, *Yahoo Finds A New Love In Match.com, Dumps Personals, TechCrunch* (May 24, 2010), https://techcrunch.com/2010/05/24/yahoo-finds-a-new-lover-in-match-com-dumps-personals/ ("Yahoo's current online dating site, Personals, will be folded into a new co-branded site called 'Match.com on Yahoo.' Match already powers Yahoo Personals in a number of European markets…Match.com on Yahoo will offer users mobile access, daily personalized matches and more advanced search tools. Match was rumored to be interested in acquiring Yahoo Personals, but this partnership makes sense considering Yahoo can retain part of the brand. And perhaps gain advertising dollars.").

[120] *Match to Buy Yahoo Personals* (Mar. 3, 2009), https://lovesites.com/2009/03/03/match-to-buy-yahoo-personals/.

[121] *Id.*

**Match.com on Yahoo!**



*Fig. 30[122]*

**Match.com on Yahoo!**

*Fig. 31[123]*

163.     Through the acquisition of Yahoo! Personals and AOL Personals, Match.com continued to flourish as one of the largest online dating platforms in the United States and worldwide.  Eventually, Match.com expanded to platforms beyond Yahoo! and merged Yahoo! Personals into Match.com.  Nonetheless, as shown in <u>Figures 32-39</u> below, Match.com continued to operate as an extension of Yahoo! Personals with nearly identical sign-up processes, account features and subscriptions, and services.

**Yahoo! Personals Sign Up**



*Fig. 32*

**Match.com Sign Up**



*Fig. 33*

---

[122] https://www.c reepshield.com/yahoo-personals/
[123] Tiffany J. Sutton, *#1. YahooPersonals – Yahoo Personals Dating Service* (Aug. 31, 2019), https://searching-hearts.com/yahoopersonals.html

**Yahoo! Personals Account**



*Fig. 34*

**Match.com Account**



*Fig. 35*

**Yahoo! Personals Subscriptions**



*Fig. 36*

**Match.com Subscriptions**



*Fig. 37*

**Yahoo! Personals Dating Tips**

**Match.com Dating Tips**



*Fig. 38*



*Fig. 39*

164.     As discussed in Section H, Yahoo!'s App was assigned to Match.com in 2013 and later issued as Patent No.: US 9,753,948 B2 ("Yahoo! Patent").[124]   During this timeframe, Match.com and the other Dating Sites utilized Yahoo!'s "Face Search in Personals" method continuing to explore and improve its use of facial recognition technology internally and through

---

[124] Patent No.: US 9,753,948 B2: Face Search in Personals (September 5, 2017).

outside partnerships.  For example, the Yahoo! Patent provides a method for searching personal

profiles for similar physical features to an ex-boyfriend or ex-girlfriend:

> [I]f a person is searching the personal profiles for a male between the ages of 30 and 40 that has similar facial features to an ex-boyfriend, then the personal characteristics would be 'male' with an age 'between 30 and 40.' The reduced image data sets that would be retrieved from the personal profiles would only come from those personal profiles meeting those two personal characteristics. The above steps can be performed in any order. As just one example, the search for personal profiles can be conducted before calculating the reduced image data set for the target image. A comparison is then performed between the reduced image data set F of the target image and the subset of reduced image data sets B that have the personal characteristic defined in the personal profile search. The goal is to find the distance between reduced image data sets within the face space of all the faces.[125]

Notably, in 2014, Match.com partnered with Los Angeles-based matchmaking service Three Day

Rule to offer members the opportunity to find dates that "look[ed] like their ex."[126]

165.    The Yahoo! patent also describes various embodiments in which users could select

a "target image" that has features that a user finds desirable or limit their search to a specific feature

the user finds attractive.[127]  Match.com, OkCupid, OurTime, and POF offer users the ability to

limit their search to specific physical characteristics.  Additionally, patents issued to Defendants

discuss various embodiments and methods permitting users to limit searches to physical features

---

[125] *Id.*

[126] Caitlin Dewey, *We tried out the facial recognition software that Match.com will use to find people who 'look like your exes'*, THE WASHINGTON POST, June 18, 2014, available at: https://www.washingtonpost.com/news/the-intersect/wp/2014/06/18/we-tried-out-the-facial-recognition-software-that-match-com-will-use-to-find-people-who-look-like-your-exes/    (last visited on July 6, 2021) ("the software essentially does three things: It identifies the hair color, face shape, eye shape and eyebrow structure of the person in the photo; it searches those tags against a database of user photos that have been similarly tagged; and it spits out a collection of approximate matches"); *see also*, Simon Edmunds, *Match.com Partners Three Day Rule Using Facial Recognition of Exes To Find Your Type*, GLOBAL DATING INSITES, June 12, 2014 available at:    https://www.globaldatinginsights.com/news/12062014-match-com-partners-three-day-rule-using-facial-recognition-of-exes-to-find-your-type/ (last visited on July 6, 2021) ("The partnership will see Match take a cut of matchmaking fees, and in return Three Day Rule will get marketing access to Match's userbase, and money to expand into new markets.").

[127] Patent No.: US 9,753,948 B2: Face Search in Personals (September 5, 2017).

that a user finds attractive.[128]   Based on the aforementioned and Defendants' issued patents, at least some, if not all, Dating Sites utilize the "Face Search in Personals" facial recognition technique.

     **B.**      **Patent No.: US 9,733,811 B2**

     166.     From its earliest days, the premise of Tinder has been fundamentally the same and consistent with numerous patents assigned to Defendants.  Tinder users are shown other users as potential matches based on certain parameters, including age range and geographic location. The user is shown a card with a photo of a potential match nearby.  The user is then given a choice to indicate interest by swiping right or lack thereof by swiping the card to the left."[129] If two users swipe right on each other, a match has been made, and the users are permitted to communicate with one another through the Tinder app.[130]

     167.     Defendant was awarded utility patent, U.S. Patent No. 9,733,811 (hereinafter "Patent 811"), entitled "Matching Process System and Method," in connection with the function and innovations embodied in Tinder.  As depicted in Patent 811, Tinder users "swipe" left and right on cards containing user photos to indicate whether the user is interested in the person shown. Swiping left indicates a user is not interested in the person shown, while swiping right indicates that the user is interested in the person.  *See* Figure 26 and Figure 27 below evidencing Tinder's "swipe" functionality.

---

[128] *See, e.g.,* Patent No.: US 9,251,220 B2: System and Method for Finding Matches Between Users in a Networked Environment.

[129] *See, e.g.,* Tinder-style Cards with NativeScript - Love At First Swipe, available at: https://nativescript.org/blog/tinder-style-cards-with-nativescript---love-at-first-swipe/.

[130] *See* Match Group, LLC's Original Complaint filed on March 16, 2018, in the matter of *Match Group, LLC v. Bumble Trading, Inc.*, Docket No.: 6:2018-cv-00080, filed in the United States District Court for the Western District of Texas Waco Division.

**Tinder App "Swipe Right"**     **U.S. Patent No. 9,733,811**

 

*Fig. 40*[131]          *Fig. 41*[132]

168.    As depicted in <u>Figure 42</u> below, Match.com, OkCupid, BLK, Chispa, OurTime,

and POF use the same "swipe" feature as Tinder and as described in Patent 811.

**Match.com**     **OkCupid**     **BLK**     **Chispa**

   

---

[131]https://www.docketbird.com/court-documents/Match-Group-LLC-v-Bumble-Trading-Inc/COMPLAINT-Filing-fee-400-receipt-number-0542-10579940-No-Summons-requested-at-this-time-filed-by-Match-Group-LLC/txwd-6:2018-cv-00080-00001?user_id=guest  at 10.
[132] Patent No.: D798,314: Display screen or portion thereof with a graphical user interface of a mobile device (Sept. 26, 2017).

**OurTime**   **POF**   **Tinder**

  

*Fig. 42*

169.   As described in Patent 811 and displayed in <u>Figure 43</u> and <u>Figure 44</u> below, users cannot communicate over Tinder unless both indicate interest in one another by swiping right to create a "match."[133]

**Tinder –Mutual Interest**[134]   **U.S. Patent No. 9,733,811**

 

*Fig. 43*   *Fig. 44*

---

[133] https://www.docketbird.com/court-documents/Match-Group-LLC-v-Bumble-Trading-Inc/COMPLAINT-Filing-fee-400-receipt-number-0542-10579940-No-Summons-requested-at-this-time-filed-by-Match-Group-LLC/txwd-6:2018-cv-00080-00001?user_id=guest.
[134] *Id.*

170.    Similarly, as depicted in <u>Figure 46</u> below, Match.com, OkCupid, Hinge, OurTime, Tinder, BLK, and Chispa users cannot communicate unless both indicate interest in one another by swiping right to create a "match."  Match.com, BLK, Chispa, and Tinder have nearly identical "match" screens displaying Defendants' trademark phase "It's a Match!"

| **Match.com** | **Hinge** | **OurTime** | **Tinder** |
|---|---|---|---|
|  |  |  |  |

| **BLK** | **Chispa** | **OkCupid** |
|---|---|---|
|  |  |  |

*Fig. 45*

171.    As described in Patent 811, Tinder contains a "match queen" screen where users can find new matches and ongoing conversations with other matches.  As previously mentioned,

a match is generated when both individuals swipe right on each other's profile, thereby indicating

that they are interested in said individual.  The process of matching focuses on analyzing and using

the photos of Tinder users.   As depicted in <u>Figure 47</u>, Tinder's "match queen" screen is identical

to Patent 811 FIG 12C and FIG 12D, which are displayed below.  Additionally, as displayed in

<u>Figure 48</u>, OkCupid contains a nearly identical screen.

| **Tinder** | **Patent 811 (FIG 12C)**[136] | **Patent 811 (FIG 12D)**[137] |
| :---: | :---: | :---: |
|  |  |  |
| *Fig. 46*[135] | | |

| **OkCupid** | **Patent 811 (FIG 12C)**[138] | **Patent 811 (FIG 12D)**[139] |
| :---: | :---: | :---: |
|  | | |

---

[135] *Id.* at 12.

[136] Patent No.: US 9,733,811 BS: Matching Process System and Method (Aug. 15, 2017) at FIG. 12C.

[137] *Id.* at FIG. 12D.

[138] Patent No.: US 9,733,811 BS: Matching Process System and Method (Aug. 15, 2017) at FIG. 12C.

[139] *Id.* at FIG. 12D.



*Fig. 47*[140]

172.     As alleged above, there can be no dispute that the Dating Sites function and operate in accordance with Defendants' issued patents.   Moreover, Defendants emphasize the value and importance of its innovative technology including the claims described in Patent 811 throughout its long-winded patent infringement lawsuit with Bumble.   Specifically, Defendants described Patent 811 as follows:

> The inventions claim a specific computer method, system, and computer-readable medium of matchmaking where parties are not pervmitted to communicate until a match is made, user profiles are specifically "online-dating profiles" and those profiles must be "associated with a social networking platform," a type of platform that is itself computer specific. The claims further describe various actions of a graphical user interface that provide certain information at certain times in response to certain types of inputs.  This is not conventional post-solution activity in order to monopolize an abstract idea of matchmaking or even mutual opt-in matchmaking. Instead, these limitations recite a particularly advantageous computer embodiment of a matchmaking process that also solves computer-specific problems related to the ease of making fake accounts and profiles, the inconvenience of filling out profiles, and the problem of certain online dating users being inundated with messages.[141]

173.     It is indisputable that the Dating Sites function exactly as described in Patent 811.

---

[140] *10 Dating Apps To Lookout For In 2015*!, https://startupdope.com/10-dating-apps-lookout-2015/.
[141] https://www.docketbird.com/court-documents/Match-Group-LLC-v-Bumble-Trading-Inc/COMPLAINT-Filing-fee-400-receipt-number-0542-10579940-No-Summons-requested-at-this-time-filed-by-Match-Group-LLC/txwd-6:2018-cv-00080-00001?user_id=guest at 30.

## VIII.   Defendants' Use of Facial Recognition Technology and Collection of Biometric Data

174.   Not only do Defendants apply facial recognition across its platform to all Dating Sites, the individual sites and apps also have a long history of collecting user's biometric information:

### A.   Match.com and OurTime

175.   In 2014, Match.com broadened its use of facial recognition technology by partnering with Los Angeles-based matchmaking service Three Day Rule.  Match.com offered members the opportunity to upgrade their monthly subscription to Three Day Rule's premium service, which used facial recognition technology to help users find dates that "look[ed] like their ex."[142]  Match.com members submitted photographs of their ex-girlfriends, boyfriends, partners and/or spouses that were scanned with facial recognition technology to pair users with Match.com members with a similar physical appearance and facial structure.[143]  Moreover, patents previously

---

[142] Caitlin Dewey, *We tried out the facial recognition software that Match.com will use to find people who 'look like your exes'*, THE WASHINGTON POST (Jun. 18, 2014), https://www.washingtonpost.com/news/the-intersect/wp/2014/06/18/we-tried-out-the-facial-recognition-software-that-match-com-will-use-to-find-people-who-look-like-your-exes/    ("the software essentially does three things: It identifies the hair color, face shape, eye shape and eyebrow structure of the person in the photo; it searches those tags against a database of user photos that have been similarly tagged; and it spits out a collection of approximate matches") (last visited Aug, 16, 2021); *see also*, Simon Edmunds, *Match.com Partners Three Day Rule Using Facial Recognition of Exes To Find Your Type*, GLOBAL DATING INSITES (Jun. 12, 2014), https://www.globaldatinginsights.com/news/12062014-match-com-partners-three-day-rule-using-facial-recognition-of-exes-to-find-your-type/ ("The partnership will see Match take a cut of matchmaking fees, and in return Three Day Rule will get marketing access to Match's userbase, and money to expand into new markets.") (last visited Aug. 17, 2021).

[143] Anita Hamilton, *For Just $5,000, Match.com Will Find You a Date Who Looks Just Like Your Ex,* TIME (Jun. 19, 2014), https://time.com/2900033/online-dating-facial-recognition-match-three-day-rule/ ("If you like one facial structure, you will probably like someone with a similar facial structure") (last visited on July 6, 2021).

assigned to Match.com and now assigned to Defendants discuss and reference Match.com's use of facial recognition technology.[144]

176.    OurTime operates and functions the same way as Match.com, purportedly using the same algorithms, software, and facial recognition technology.  In 2019, OurTime merged with SeniorPeopleMeet, with OurTime as the surviving entity and consolidated its user database, transferring all data, including user photographs, to Match Group; thus, adding to Match Group's already immense facescan database.[145]

### B.    OkCupid

177.    Beginning in 2014, OkCupid permitted Clarifai, an artificial intelligence start-up, to harvest OkCupid user's biometric identifiers, which Clarifai then used to build Clarifai's face database.  Clarifai continued to collect and obtain OkCupid user's biometric information through at least 2019.[146]  On July 13, 2019, Matt Zeiler, the founder and CEO of Clarifai, admitted during

---

[144] *See* USPTO Patent Assignment 044621/0996, executed on Sept. 12, 2017, and recorded on Dec. 1, 2017,
https://assignment.uspto.gov/patent/index.html#/patent/search/resultAssignment?searchInput=%22match%20group%22&id=44621-996 (Match.com, LLC's conveyance of the following patents to Match Group: (1) Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017; Patent Publication No.: US 2014/0074824 A1:  Matching Process System and Method (Mar. 13, 2014); Patent No.: US 9,959,023 B2: Matching Process System and Method (May 1, 2018); and Patent Publication No.: US 2016/0154569 A1:  Matching Process System and Method (Jun. 2, 2016)).

[145] *OurTime.com, the Nation's Largest 50+ Dating Site, Reveals that Dating Never Gets Old*, https://match.mediaroom.com/2013-05-29-OurTime-com-the-Nations-Largest-50-Dating-Site-Reveals-that-Dating-Never-Gets-Old ("The flagship site, OurTime.com, was created by combining the membership of People Media's SeniorPeopleMeet.com and SeniorsMeet.com."); *SeniorPeopleMeet Has Been Merged with OurTim*e. DATINGSITEREVIEWS (Jul. 22, 2019), https://www.datingsitesreviews.com/article.php?story=seniorpeoplemeet-is-now-ourtime.

[146] *See* Cade Metz, *Facial Recognition Tech Is Growing Stronger, Thanks to Your Face*, NEW YORK TIMES (Jul. 13, 2019), available at https://www.nytimes.com/2019/07/13/technology/databases-faces-facial-recognition-technology.html (On July 13, 2019, Matt Zeiler, founder and CEO of Clarifai, admitted during an interview with The New York Times, that "his company had built a face database with images from OkCupid" beginning in 2014" and that "Clarifai used the images from OkCupid to build a service that could identify the age, sex and race of detected face."). (last viewed Apr. 12, 2022).

an interview with The New York Times that his company had built a massive "face database" of OkCupid user profile pictures obtained from OkCupid's database.  "Clarifai used the images from OkCupid to build a service that could identify the age, sex and race of detected faces."[147]

178.    According to Zeiler, Clarifai gained access to users' profile photographs through one of its investors, a Chicago-based venture capital group launched by OkCupid's founders.[148] According to an OkCupid spokeswoman, Clarifai contacted the company in 2014 to inquire about collaborating on artificial intelligence and facial recognition technology.

179.    Clarifai created the database which included both the photograph and underlying biometric data to develop and train the algorithms used in its facial recognition technology.  To that end, Clarifai created thousands of unique face templates by scanning the biometric information in each photograph contained in the database and extracting the unique geometry of each face detected therein.  To make matters worse, Zeiler has publicly stated that Clarifai would sell its facial recognition technology to foreign governments.[149]

180.    In   direct   violation   of   BIPA,   OkCupid   never   disclosed   Clarifai's   access   or

---

[147] *See* Cade Metz, *Facial Recognition Tech Is Growing Stronger, Thanks to Your Face*, New York times (July 13, 2019), available at: https://www.nytimes.com/2019/07/13/technology/databases-faces-facial-recognition-technology.html (last accessed on July 7, 2021).

[148] *Id.* ("Matt Zeiler, founder and chief executive of Clarifai, the A.I. start-up, said his company had built a face database with images from OkCupid, a dating site. He said Clarifai had access to OkCupid's photos because some of the dating site's founders invested in his company.").

[149] https://int.nyt.com/data/documenthelper/639-clarifai-letter/3cd943d873d78c7cdcdc/optimized/full.pdf#page=1                              (open                              letter); https://www.nytimes.com/2019/03/01/business/ethics-artificial-intelligence.html    ("[T]he    last questions we have relate our philosophy on data collection. Because the way we treat consumer data is an important part of our ethical framework. It demonstrates how far we are willing to go in the interest of profit, at the expense of privacy and consent. And just this month, we've been asked to download data from cameras whose owners haven't given consent at all (Insecam), and a few other sources that may walk a legal line but are sketchy at best. There are even rumors going around that the photos in the dataset used to build the general model were stolen from a stock photo site.").

harvesting of OkCupid users' biometric data, use of facial recognition technology or storage of users' biometric data on Defendant's shared servers and platforms. OkCupid also violated its statutory obligation to inform those individuals about the purpose and length of the term for which their biometric identifiers would be collected, stored, and used.[150]

181. Moreover, in 2017, OkCupid published an article describing its use of perceptual hash facial recognition technology (hereinafter, "2017 Article").[151]

182. The 2017 Article is publicly available.[152]

183. Specifically, OkCupid's 2017 Article describes the company's study and evaluation of four common perceptual hash functions: (1) difference hash, (2) average hash, (3) perceptual DCT hash, and (4) wavelet hash.[153] OkCupid's study describes processes in which it compared images' (i) rotation; (ii) crop; (iii) gamma correction; (iv) border; and (v) salt and pepper ("S&P") noise and applied the Hamming distance to compare the hash function measurements. Ultimately, OkCupid's study concluded that the hashes behaved in similar manners and could be used to "determine which algorithm's hash distances can be trusted for a given image pair."[154]

184. Perceptual hash ("pHash") algorithms are implemented in facial recognition systems and used for enhanced security to perform automated verification of the identify of users.[155] The pHash algorithm can be implemented into the Discrete Cosine Transfer

---

[150] 740 ILCS 14/5(2).

[151] Zachary Jablons, *Evaluating Perceptual Image Hashes at OkCupid* (May 13, 2017). After publication, OkCupid removed the post from its blog rendering it inaccessible to the public. However, a copy of the original post was retrievable via The Wayback Machine digital archive and is attached hereto as **Exhibit X**.

[152] *Id.*

[153] *Id.* at 8.

[154] *Id.* at 8-25.

[155] *See, e.g.*, Zeba Khanam, Mohammed Najeeb Ahsan, *Implementation of pHash algorithm for face recognition in secured remote online examination system*, INT'L J. ADVANCES IN SCIENTIFIC

("DCT") face recognition technique, which is used in different ways to compare images. Facial processing and recognition techniques that implement pHash typically are based on the concept of extracting landmark facial features, such as the eyes, nose, mouth, and chin. DCT is applied to each of these features and calculates the degrees of recognition.[156] More specifically, this algorithm reduces the size and color of an image. Next, DCT is employed to compute calculations of the images. The mean value of the DCT is computed and reduced further. Finally, the pHash value is calculated by converting the DCT measurements back to the original hash image. The pHash values are compared using the Hamming distance algorithm for similarities and to generate matches. Notably, a 2018 study implementing pHash into a DCT FRT to recognize individuals during remote online proctoring exams revealed that this algorithm has a 98% recognition rate.[157]

185.   OkCupid's 2017 Article describes, compares, and evaluates pHash functions, specifically targeting "perceptual DCT hash," which the study concluded had a "(relatively) high precision" rate.[158]

186.   Upon information and belief, OkCupid uses the pHash function and/or data from this algorithm as part of its facial processing system in which OkCupid reduces images, identifies and extracts key landmark features, computes DCT measurements and calculations, and then determines the pHash values by applying the Hammering distance algorithm.

187.   Upon information and belief, OkCupid stores these measurements, calculations, and values on Match Group's servers.

---

RESEARCH   AND   ENGINEERING   (Nov.   2018),   available   at https://www.academia.edu/37993513/Implementation_of_the_pHash_algorithm_for_face_recognition_in_a_secured_remote_online_examination_system.
[156] *Id.*
[157] *Id.*
[158] *See* **Exhibit X** at 15.

188.     Additionally, regardless of whether OkCupid implemented or uses a pHash in a facial recognition system, at minimum, OkCupid's pHash functions extract calculations of unique facial features that can be used to identify an individual that constitutes "biometric information."[159] The collection of biometric information without user consent directly violates BIPA.

### C.     Tinder and Hinge, BLK, and Chispa

189.     Tinder, now owned by Match Group, has used facial recognition technology since at least 2017.[160]  Notably, Tinder's facial recognition algorithm, as outlined in Tinder's "Matching Process System and Method" patents, is based, at least in part, on Match.com's "Matching Process System and Method."[161]

190.     In fact, a comparison of Match.com's 2008 patent to Tinder's 2017, 2018, and 2019 patents, clearly depicts images of a Match.com user profile and Tinder user profile.  These patents

---

[159] 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first obtains consent"); 740 ILCS 14/10 ("biometric information means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual."); *Rivera v. Google Inc.*, 238 F.Supp.3d 1088, 1090 (2017) ("The Act also bans the non-consensual collection and storage of ***information…that is 'based on' those biometric identifiers***.") (emphasis added)..""); *see also, Carpenter v. McDonald's Corporation,* No. 1:21-cv-02906, 2022 WL 897149, at *3 (N.D. Ill. Jan. 13, 2022) ("To the extent that defendants argue that it must have actually used Plaintiffs voiceprint and identified him as speaking to the voice assistant to implicate BIPA, the Court disagrees. In the Court's view, pursuant to the plain language of the statute, a defendant may violate BIPA by collecting a voiceprint that merely could be used to identify a plaintiff. The collection of a voiceprint-which is explicitly included in the definition of biometric identifier' without consent, even if not collected for the purpose of identifying that person, is a violation of the statute."); *Vance v. Int'l Bus. Machines Corp.*, No. 20 C 577, 2020 WL 5530134, at *5 (N.D. Ill. Sept. 15, 2020) ("Plaintiffs allege that IBM extracted biometric information from photographs to create their DIF Dataset. The DIF Dataset includes biometric measurements that can be used to identify Plaintiffs. Thus, IBM's alleged actions implicate BIPA ... what's important is the potential intrusion on privacy posed by the unrestricted gathering of biometric in formation.").

[160] *See* Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017).

[161] *Compare* Patent No.: US 8,566,327 B2: Matching Process System and Method (Oct. 22, 2013) to Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017), Patent No.: US 9,959,023 B2: Matching Process System and Method (May 1, 2018) and Patent No.: US 10,203,854 B2: Matching Process System and Method (Feb. 12, 2019).

once again signify the control that Defendants have, and always have had, over all Dating Sites. A close review of Patent Nos.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017), US 9,959,023 B2: Matching Process System and Method (May 1, 2018), and US 10,203,854 B2: Matching Process System and Method (Feb. 12, 2019) indisputably confirms the use of facial recognition technology.[162]

191.    Moreover, for years, both Tinder and Hinge have held a close relationship with Amazon and acknowledge using Amazon Web Services' ("AWS") deep learning "Rekognition" ("Amazon Rekognition") object and facial recognition services:[163]



*Figure 1[164]*

---

[162] *See, e.g.*, Patent No.: US 9,733,811 B2: Matching Process System and Method (Aug. 15, 2017) ("Implicit signals may also include ***facial recognition*** algorithms to detect ethnicity, hair color, eye color, etc., of profiles that user 14 has expressed interest.") (emphasis added).
[163] Deep Dive on Amazon Rekognition, ft. Tinder & News UK (AIM307-R) - AWS re:Invent 2018, https://www.slideshare.net/AmazonWebServices/deep-dive-on-amazon-rekognition-ft-tinder-news-uk-aim307r-aws-reinvent-2018 at 7. (last viewed Apr. 12, 2022).
[164] *Id.* (emphasis added).

192.    Amazon Rekognition uses deep learning-based image and video analysis to detect faces in images and videos, facial landmarks such as the position of the eyes, detect emotions, and detect objects and scenes within images and videos.[165]   Amazon Rekogition also uses machine vision and algorithmic classification techniques to scan and map facial geometry and analyze the result to determine whether two faces match: "You can also compare a face in an image with a face detected in another image.   When you provide an image that contains a face, Amazon Rekognition detects the face in the image, analyzes the facial attributes of the face, and then returns a percent confidence score for the face and the facial attributes that are detected in the image."[166]

193.    AWS boasts that Amazon Rekognition can also detect objects, people, and scenes in all images and videos, which means that at minimum, Amazon Rekognition is scanning every single image and video uploaded by Tinder and Hinge and collecting facial geometry and facial landmarks to determine whether a person is in the frame.   Amazon Rekognition compares faces and objects returning a confidence index and description of its analysis, which for example, may include that an individual was detected and is smiling and/or wearing sunglasses in the image.   Figures 49-54 depicted below are screenshots from AWS's Amazon Rekognition marketing materials and Tinder's PowerPoint.

---

[165]*Amazon            Rekognition            Developer            Guide*, https://docs.aws.amazon.com/rekognition/latest/dg/rekognition-dg.pdf#what-is at 2, 142.
[166] *Id.* ("You can use storage operations to save facial metadata for faces detected in an image. Later you can search for stored faces in both images and videos. For example, this enables searching for a specific person in a video. For more information.").

For example, if you choose the following sample image as input, Amazon Rekognition detects it as a face and returns confidence scores for the face and the facial attributes detected.



*Fig. 48[167]*



*Fig. 49[168]*



Fig. 50[169]



---

[167] *Id.* at 21-22.
[168] *Id.*
[169] *Id.* at 23-5.



*Fig. 51*



*Fig. 52*[170]



*Fig. 53*

194.   Using Amazon Rekognition, Tinder and Hinge can run commands within the Amazon Application Programing Interface, otherwise known as an "API" interface called "index-faces" on all images it wishes to analyze and/or compare.  The index-faces command instructs Amazon Rekognition to detect and scan faces in images.  Amazon Rekognition then accesses the images stored in Defendants' database, applies its machine vision algorithm to scan, identify, and extract facial landmarks and the facial geometry of the detected faces of the individuals' pictures into a feature vector.  Said feature vectors include precise coordinates describing the essential facial landmarks including the nose, corners of the mouth, eyes, pupils, jawline, and chin.  The feature vectors of facial geometry, as well other details such as the persons emotions, whether a

---

[170] AWS re:Invent 2018: [REPEAT] Deep Dive on Amazon Rekognition, ft. Tinder & News UK (AIM307-R), Youtube (Nov. 28, 2018), https://www.youtube.com/watch?v=yNVmUevq04I at 27:43-28:58.

person is smiling, or sad, is wearing eyeglasses or sunglasses, are then stored in an AWS backend database called a Rekognition "collection." *See* <u>Figure 55</u> below, showing a screenshot of the Rekognition collection.

```
{
    "Faces": [
        {
            "FaceId": "30c8f848-cf8a-46b6-8a69-f135e35f0e91",
            "BoundingBox": {
                "Width": 0.5080749988555908,
                "Height": 0.4542959928512573,
                "Left": 0.2404070049524073,
                "Top": 0.22210200130939484
            },
            "ImageId": "74947044-80e8-36e5-9138-55ac21c5c2a2",
            "ExternalImageId": "Shawn",
            "Confidence": 99.99500274658203
        }
    ],
    "FaceModelVersion": "5.0"
}
```

*Fig. 54*

195.    Next, Defendants use Amazon Rekognition to run a face matching API command. Said face matching command searches for a matching "FaceId" to determine whether an individual is already in the database.  If a match is found, the unique FaceId is returned along with a "Similarity" score, which is a confidence measure indicating the similarity rate between the two matches.  *See* <u>Figure 56</u> below.

```
{
    "SearchedFaceId": "30c8f848-cf8a-46b6-8a69-f135e35f0e91",
    "FaceMatches": [
        {
            "Similarity": 99.99944305419922,
            "Face": {
                "FaceId": "5da9b088-5109-49d7-be85-001d2610417c",
                "BoundingBox": {
                    "Width": 0.18031999468803406,
                    "Height": 0.2648650109767914,
                    "Left": 0.27408599853515625,
                    "Top": 0.12426400184631348
                },
                "ImageId": "01fc3c24-dbde-3538-acee-2df042ca10a3",
                "ExternalImageId": "Shawn2",
                "Confidence": 99.99250030517578
            }
        }
    ],
    "FaceModelVersion": "5.0"
}
```

*Fig. 55*

196.     Speaking during AWS re:Invent in December 2018, Tom Jacques, VP of Technology at Tinder discussed how the company uses the strong learning-powered Amazon Rekognition provider to identify users' key traits by mining the 10 billion photos they upload daily:[171]

> The challenges we face are in understanding who members want to see, who they match with, who will chat, what content can we show you and how do we best present it to you.
>
> ***
>
> …[Tinder] extracts all of this information and feed[s] it into our features store, which is a unified service that allows us to manage online, streaming and batch processing. We take this information and feed into our tagging system to work out what we highlight for each profile.

*Id.*  Premium users of Tinder also get access to a "Top Picks" feature.  This feature provides Tinder Gold subscribers with a curated feed of "personalized high quality potential matches"[172]  All Tinder users receive one free "Top Pick" a day, but Tinder Gold subscribers can tap a diamond icon at any time for a set of Top Picks, which is refreshed daily.[173] According to Jacques, "when it comes to serving this when a member wants their Top Picks we query our recommendation cluster, the same underlying technology that powers our core recognitions, but looking at the outcomes users are trying to achieve and to provide really personalized, high quality matches."[174] Figure 57 and Figure 58 below are diagrams presenting examples in which Amazon Rekognition

---

[171] Scott Harvey, *VP of Engineering on Tinder's Use of Image Recognition Technology* GLOBAL DATING INSIGHTS (Dec. 7, 2018); *see also*, AWS re:Invent 2018: [REPEAT] Deep Dive on Amazon Rekognition, ft. Tinder & News UK (AIM307-R), YOUTUBE (Nov. 28, 2018), https://www.youtube.com/watch?v=yNVmUevq04I at 9:55-11:30. ("Tinder faces many, many challenges serving recommendations relevant to achieve these outcomes at scale and data is essential to do this. [Tinder] ingest[s] over 40 terabytes of data every day that feed into our analytics and machine learning systems.").

[172] *Id.* at 12:22-17:24.

[173] Sarah Perez, *Tinder launches its curated 'Top Picks' feature worldwide* TECHCRUNCH (Sept. 11, 2018).

https://techcrunch.com/2018/09/11/tinder-launches-its-curated-top-picks-feature-worldwide/.

[174] *Id.* at 12:22-17:24.

extracts features from a photograph uploaded to Tinder and feeds the labeled data into AWS' tagging system to produce a tag applied to profile, and later recognized and matched as a "Top Pick" to another user.[175]  <u>Figure 59</u> displays a Tinder Gold subscriber's daily "Top Picks."[176]



Fig. 56



Fig. 57



Fig. 58

197.    Tinder uses AWS's image recognition software to create tags associated with that user's profile.   Tinder's issued patent, Patent No.: US 9,715,532 B1, explains that a tag

---

[175] Deep Dive on Amazon Rekognition, ft. Tinder & News UK (AIM307-R) - AWS re:Invent 2018, https://www.slideshare.net/AmazonWebServices/deep-dive-on-amazon-rekognition-ft-tinder-news-uk-aim307r-aws-reinvent-2018 at 27-28. (last viewed Apr. 12, 2022).

[176] *Id.* at p. 23; AWS re:Invent 2018: [REPEAT] Deep Dive on Amazon Rekognition, ft. Tinder & News    UK    (AIM307-R),    YOUTUBE    (Nov.    28,    2018), https://www.youtube.com/watch?v=yNVmUevq04I at 12:22-17:24.

encapsulates various features a user likes, including photographs and behavioral data, and is configured with the feature recognition engine, which can identify a particular person (*e.g.*, the associated object user or other individuals), voices, and groups of persons.[177]

198.    BLK and Chispa also use the same technology and facial recognition software as Tinder.  Additionally, both BLK and Chispa were built with the intention to function like Tinder by utilizing Tinder's proprietary swipe functionality.

**D.    POF**

199.    In 2019, POF began implementing a total ban of face filters and "commit[ed] to an audit of 70 million images" and removal of "face-filtering imagery" from POF user photographs.[178]   POF, like the other Match Group Dating Sites, automatically scans user photographs and "profiles for red flag language and images; [conducts] manual reviews of suspicious profiles, activity, and user generated reports; freez[es] suspicious accounts pending review; and block[s] email addresses[es], phone numbers, and other identifiers."[179]   To remove face-filtering imagery, POF must employ artificial intelligence and facial recognition techniques to: 1) scan the user's photographs to detect whether a face is present in the image; 2) scan the facial geometry of the detected face to identify key facial landmarks such as the eyes, eyebrows, nose,

---

[177] Patent No.: US 9,715,532 B1: Systems and Methods for Content Object Optimization (Jul. 25, 2017).

[178]*New Plenty of Fish Initiatives Under CEO Malgosia Green (*May 25, 2020), https://www.datingsitesreviews.com/article.php?story=new-plenty-of-fish-initiatives-under-ceo-malgosia-green last viewed Aug. 3, 2021).

[179] *See* https://mtch.com/privacy ("Match Group invests millions of dollars annually in its network of sophisticated tools, systems, and processes to prevent, detect, and remove people who engage in inappropriate behavior from our apps. This includes automatic scans of profiles for red-flag language and images; manual reviews of suspicious profiles, activity, and user generated reports; freezing suspicious accounts pending review; and blocking email addresses, phone numbers, and other identifiers.").

and chin; and 3) compare models to training sets or databases to determine whether a mask or filter is present.[180]

## IX.    Defendants' Recent Acts Prove They Intend to Delve Further into Biometric Data Collection as Evidenced in Their Acquisition of Hyperconnect, Inc.

200.    In February 2021, Defendant acquired Hyperconnect, Inc. ("Hyperconnect"), a South Korean social-media company "*that has won recognition at artificial intelligence conferences for its facial recognition technology*,"[181] for $1.725 billion.[182]

201.    On February 9, 2021, CEO Shar Dubey and CFO/COO Gary Swidler hosted an investor call describing Hyperconnect's advanced proprietary video and artificial intelligence tech

---

[180] *See, e.g.*, https://mtch.com/safety ("Video and AI Technology Match Group brands are integrating varying features such as video chat, automated photo review, and photo verification, all of which aid our efforts to help our users ensure that every match is who they say they are.").

[181] https://www.zdnet.com/article/dating-maven-match-spends-1-7-billion-on-south-korea-social-chat-app-maker-hyperconnect/ (emphasis added).

[182] Match Group Investor Presentation, https://s22.q4cdn.com/279430125/files/doc_presentations/2021/Match-Group-Acquisition-of-Hyperconnect.pdf (Describing Hyperconnect as a "South Korea-based app developer driving social connections with proprietary video and AI technology") ; *see also*, https://www.wsj.com/articles/match-group-buys-korean-social-media-company-for-1-725-billion-11612904483 ("Hyperconnect, based in Seoul, has developed two video apps that focus on helping people interact one-on-one and with new communities. Hyperconnect's first app, Azar, offers live video and audio chat and can instantly translate voice and text for users that speak different languages. Hyperconnect's other app, Hakuna Live, is a social live-streaming app that provides group video and audio broadcasts. The apps broaden Dallas-based Match Group's software offerings to include linking casual friends. Match operates several dating apps, including Tinder, Hinge and OkCupid, as well as its namesake brand… The company has been looking to expand beyond its core market of online dating services. The company, in a letter to shareholders this month, said it planned to add to its portfolio to capture nondating uses for social apps. It already provides some of that broader functionality, including through its Ablo live-video chat app that allows users to make friends around the world. Hyperconnect's features include broadcasting and watching messages on low-quality mobile phones without a lag. *Match Group expects to apply some of this technology to its own suite of apps that have introduced more video-dating options since the pandemic started making it more challenging to meet people in person, a company spokeswoman said*.").

infrastructure[183]   created by Sam Ahn, Co-founder, CEO, and CPO of Hyperconnect[184] emphasizing the strategic reason for the acquisition, which included leveraging the "scalable video technology" [185] across the Match Group brands.



*Fig. 59*[186]

[183] Match Group Investor Presentation (Feb. 9, 2021), https://ir.mtch.com/news-and-events/press-releases/press-release-details/2021/Match-Group-Reports-Second-Quarter-2021-Results/default.aspx at 5.

[184] Sam Ahn currently serves on the Board of Directors of Match Group. *See* https://mtch.com/leadership/#Sam%20Ahn (Match Group's leadership profile for Sam Ahn).

[185] *Id.* at 7.

[186] *Match Group Investor Presentation* (Feb. 9, 2021), https://ir.mtch.com/news-and-events/press-releases/press-release-details/2021/Match-Group-Reports-Second-Quarter-2021-Results/default.aspx at 5.



*Fig. 60[187]*

202.    On June 17, 2021, Defendants announced their plan to deploy Hyperconnect's

technology across their portfolio:

> "Hyperconnect's forward-looking technology has already forged new ways for the next generation to make friends and engage with new people, regardless of borders and language barriers," said Shar Dubey, CEO of Match Group. "Our immediate goal is to accelerate Hyperconnect's growth, while deploying their technology across our portfolio, helping to ensure people around the world have access to the best products to meet new people, and create joyful connections."

> Based in South Korea, Hyperconnect employs more than 400 people, of which approximately half are top-tier engineers, and operates two social discovery apps: Azar® and Hakuna Live™. Azar® offers 1:1 live video and voice chat with a strong presence across Asia and growing in Europe. Hakuna Live™, which launched in 2019, provides one to many or group live video, audio, and avatar-based streaming with a highly engaged user base in South Korea, Japan and other markets across Asia.

> "We're thrilled to start capturing the huge synergy potential between Hyperconnect and Match Group's portfolio of world-class brands," said Sam Ahn, CEO of Hyperconnect. "We see clear pathways to turbocharge Hyperconnect's growth

---

[187] *Id.* at 7.

while adding value to Match Group through our unique technology.'" [188]

203.    Following the acquisition of Hyperconnect, Match.com,[189] Hinge,[190] OurTime,[191] and Tinder[192] have launched newly improved video chat functions and video features including a live chat option.  *See* <u>Figures 62-65.</u>

**Match.com**                                         **OurTime**

                     

*Fig. 61*[193]                                         *Fig. 62*[194]

---

[188]    *MATCH GROUP CLOSES ACQUISITION OF HYPERCONNECT* (Jun. 17, 2021), https://ir.mtch.com/news-and-events/press-releases/press-release-details/2021/Match-Group-Closes-Acquisition-of-Hyperconnect/default.aspx.

[189]    *Vibe Check – Video Chat* MATCH.COM, https://www.match.com/dnws/help/faq (last viewed on Apr. 12, 2022) ("Who can I Vibe Check with? You can Vibe Check with any eligible Match member in the app or on your desktop. To be eligible, a member simply needs to accept the community terms and conditions. You also must have each sent a message or a like to each other."); *see* Match.com, *Introducing Vibe Check: Video date on the Match app*, YOUTUBE (Apr. 14, 2020), https://www.youtube.com/watch?v=avMVX_9biyM (last viewed on Apr. 12, 2022); *see also*, Stephanie Milot, *Match's New Video Chat Feature Helps Users Find Love in the Time of COVID-19* PCMag (Apr. 16, 2020), https://www.pcmag.com/news/matchs-new-video-chat-feature-helps-users-find-love-in-the-time-of-covid.

[190]    https://hingeapp.zendesk.com/hc/en-us/articles/360049484354-What-is-Video-Chat-.

[191]    https://www.ourtime.com/v3/help/article/172.

[192]    https://www.help.tinder.com/hc/en-us/articles/360046122311-Face-to-Face-Video-Chat.

[193]    https://www.youtube.com/watch?v=avMVX_9biyM.

[194]    https://hingeapp.zendesk.com/hc/en-us/articles/360049484354-What-is-Video-Chat-.

**Hinge**



*Fig. 63*[195]

**Tinder**



*Fig. 64*[196]

204.     Hyperconnect's issued patents confirm the use of facial recognition technology and the collection and capture of biometric information and identifiers.  Patent No.: US 10,728,498 B2, granted on June 28, 2020, states:

> The communication method includes performing, by a first terminal, consecutive video call with at least one or more second terminal; selecting, by the first terminal, at least one or more representative frame from among a plurality of frames of an image being photographed during each video call; detecting, by the first terminal, a face from the at least one or more representative frame; generating, by the first terminal, a ***face recognition*** result that includes information on a number of the faces detected from the at least one or more representative frame; outputting, by the first terminal, the ***face recognition*** result to a server; and upon completion of the video call with the at least one or more second terminal, performing, by the first terminal, video call with a third terminal selected based on the ***face recognition*** result from the server.[197]

---

[195] https://www.help.tinder.com/hc/en-us/articles/360046122311-Face-to-Face-Video-Chat.
[196] https://www.ourtime.com/v3/help/article/172.
[197] Patent No.: US 10,728,498 B2: Communication Device, Server and Communication Method Thereof (Jul. 28, 2020).

Similarly, Patent Nos.: US 10,972,700 B2, granted on April 6, 2021, and US 10,602,090 B2, granted on March 24, 2020, state:

> According to some embodiments, the selecting, by the server, the terminal to be matched with the first terminal based on the received *face recognition* result, in response to the second matching request may include, in response to the number of the faces detected being plural, and in response to the *face recognition* result received from the first terminal from among the at least one or more terminal including information on the number of the faces that is two or more, selecting, by the server, a terminal that provided two or more *face recognition* results from among the at least one or more terminal as the terminal to be matched with the first terminal.[198]

205.    Hyperconnect's patents further confirm that facial recognition is achieved using a deep learning algorithm[199] to detect the user's face in images and video frames[200] and then extract

---

[198] Patent No.: US 10,972,700 B2: Video Call Method and Video Call Mediating Apparatus (Apr. 6, 2021) (emphasis added); Patent No.: US 10,602,090 B2: Video Call Method and Video Call Mediating Apparatus (Mar. 24, 2020).

[199] Patent No.: US 11,032,512 B2: Server and Operating Method Thereof (Jun. 8, 2021) ("The processor 350 may train the machine learning model by using a deep learning algorithm. The machine learning model may include at least one or more of Deep Neural Network (DNN), Convolutional Neural Network (CNN), Recurrent Neural Network (RNN), Region-based Convolutional Neural Networks (R-CNN), Restricted Boltzmann Machine (RBM), Deep Belief Network (DBN), or Deep Q-Networks. Moreover, the machine learning model may include Convolutional Neural Network (CNN), AlexNet, ZFNet, GoogLeNet, VGGNet, ResNet, Inception-ResNet, Inception-v2, Inception-v3, or Inception-v4.").

[200] Patent No.: US 10,728,498 B2: Communication Device, Server and Communication Method Thereof (Jul. 28, 2020) ("For example, the face detection module 131b may detect the face from the first frame FR1 selected using a well-known face detecting algorithm... the face detection module 131b may detect characteristics of a face within the representative frame such as eye, nose and mouth, etc., and detect the faces of the persons within the representative frame based on the detected characteristics.") ("FIGS. 2 and 3 disclose an embodiment where the first terminal 100 *extracts a face from an image* (IMG). In another embodiment of the present disclosure, the first terminal 100 may transmit the image (IMG) photographed through the inputter 110 to the server 500. Further, the server 500 may select at least one or more representative frame from among the plurality of frames FR1 to FRn included in the image (IMG), and *extract* a face or facial region from the at least one or more representative frame.") ("*The face detection module 131b may transmit information on an extracted face to the operator* 132. The operator 132 may operate the number of the faces based on the received information on the face and generate the face recognition result. For example, the operator 132 may receive information on two faces A1 and A2 from the face detection module 131b. The operator 132 may compute `2` as the face recognition result. The

the user's face and/or facial features[201, 202] to obtain a feature vector used for classification and

---

computed face recognition result (for example, `2`) may be transmitted to the server 500 through the communicator 150.").

[201] Patent No.: US 11,032,512 B2: Server and Operating Method Thereof (Jun. 8, 2021) ("The image analysis device 340 may analyze the face image of each of users to obtain feature point distribution information. In particular, the image analysis device 340 may **extract** coordinates associated with at least one or more specific points of the face of each of users to generate the feature point distribution information. […] Herein, the feature point distribution information may mean information defining the distribution form of feature points corresponding to predetermined parts (e.g., eyes, nose, mouth, eyebrows, cheekbones, and the like) of the user's face. Moreover, the image analysis device 340 may analyze the similarity between the image of the first user and the stored image of each of users.") ("The server 200 may **extract** the facial feature points of the user included in the video stream by combining one or more of scale invariant feature transform (SIFT), histogram of oriented gradient (HOG), Haar feature, Ferns, local binary pattern (LBP), and modified census transform (MCT), or may **extract** the facial feature points by using another method.").

[202] Patent No.: US 10,970,523 B2: Terminal and Server for Providing Video Call Service (Apr. 6, 2021) ("Referring to 910 of FIG. 9A, the server 200 may receive a video or a video stream of the face of a user from each of a plurality of terminals. Also, the server 200 may receive gender information corresponding to distribution information of facial feature points of the user from each of the plurality of terminals. The gender information is information indicating whether the user is a man or a woman. The server 200 may obtain distribution information of facial feature points of a plurality of users based on the received video or video stream. The server 200 may store the distribution information of the facial feature points of the plurality of users and gender information corresponding to the distribution information of the facial feature points of the plurality of users in the storage 230 of the server 200… Alternatively, the server 200 may store the distribution information of the facial feature points of each of the plurality of users, gender information input when each of the plurality of users subscribes or logs into the application, and actual gender information of each of the plurality of users. […] The distribution information of the facial feature points of each of the plurality of users may be paired with the gender information input when each of the plurality of users subscribes or logs into the application and the actual gender information of each of the plurality of users and may be stored. Referring to 920 of FIG. 9A, the server 200 may learn a correlation between the distribution information of the facial feature points of the plurality of users and the gender information corresponding to the distribution information of the facial feature points of the plurality of users by calculating information stored in the storage 230 through an artificial neural network. In detail, the server 200 may learn a correlation between distribution information of facial feature points of a k.sup.th user and gender information of the k.sup.th user (k=1, 2, 3, 4, 5, . . . , n). That is, the server 200 may calculate, through a plurality of layers, input distribution information of facial feature points and gender information corresponding to the input distribution information of the facial feature points and may perform learning based on values obtained as a calculation result.").

matching.[203]

206.     Hyperconnect's issued patents also confirm the use of voice recognition technology

and collection of biometric data.  Patent No.: US 10,643,036 B2, granted on May 5, 2020, states:

> A method of providing real-time translation for video chat is provided. The method
> includes: continuously receiving first-language voice data and at least one second-
> language word from a first terminal; continuously displaying the at least one
> second-language word at the same time as reproduction of the voice data; acquiring
> a second-language translation of an ended sentence included in a *voice
> recognition* result for the voice data; and substituting at least one word, which
> corresponds to the ended sentence in the displayed at least one second-language
> word, with the acquired translation. The at least one second-language word
> corresponds to respective words included in the ***voice recognition*** result for the
> voice data.

***

> The third server 400 may be a ***voice recognition*** server. The third server 400 may
> provide a ***voice recognition*** service. The third server 400 may receive an encoded
> voice from the first terminal 100 or the second terminal 150. The third server 400
> may perform ***voice recognition*** using the encoded voice. The third server 400 may
> convert the encoded voice into a text as the ***voice recognition*** result. The third
> server 400 may transmit the converted text to the first terminal 100 or the second
> terminal 150.

***

> In operation S120, the first terminal 100 may continuously acquire the ***voice
> recognition*** result for the encoded voice. The controller 102 of the first terminal
> 100 may continuously perform ***voice recognition*** using the encoded voice. The
> controller 102 may continuously convert the encoded voice into a first-language
> text as the ***voice recognition*** result. According to another embodiment, the first
> terminal 100 may continuously acquire the ***voice recognition*** result for the encoded
> voice from the third server 400. The first terminal 100 may continuously transmit
> the encoded voice to the third server 400. The third server 400 may be a server that

---

[203] Patent No.: US 10,728,498 B2: Communication Device, Server and Communication Method
Thereof (Jul. 28, 2020) ("***The face detection module 131b may transmit information on an
extracted face to the operator*** 132. The operator 132 may operate the number of the faces based
on the received information on the face and generate the face recognition result. For example, the
operator 132 may receive information on two faces A1 and A2 from the face detection module
131b. The operator 132 may compute `2` as the face recognition result. The computed face
recognition result (for example, `2`) may be transmitted to the server 500 through the
communicator 150.").

provides a *voice recognition* service. While the voice is being received, the communication interface 104 of the first terminal 100 may continuously transmit at least a part of the voice encoded till now to the third server 400.[204]

Similarly, Patent No.: US 10,430,523, granted on October 1, 2019, states:

> FIG. 5 is a flowchart of operation S200 of acquiring the greeting by the first terminal 100, according to an embodiment. Referring to FIG. 5, in operation S210, the kind of the first language may be identified. The first terminal 100 may identify the kind of the first language. The controller 102 of the first terminal 100 may identify the kind of the first language using the voice of the first user recorded by the input interface 101 of the first terminal 100. The controller 102 may perform *voice recognition* using the recorded voice. The controller 102 may detect the kind of the first language as a result of the *voice recognition*. For example, the controller 102 may extract at least one feature from the recorded voice. The controller 102 may calculate a probability distribution of the kind of the language corresponding to the extracted feature using machine learning. For example, the controller 102 may calculate the probability distribution using Bayesian multinomial logistic regression. The controller 102 may select the kind of the language corresponding to the highest probability in the calculated probability distribution. According to another embodiment, the controller 102 may identify the kind of the first language using language setting set to the first terminal 100. Information about the kind of the language preferred by the first user may be preset to the first terminal 100. The information may be stored in the storage 103 of the first terminal 100. The controller 102 may define the kind of the language corresponding to the information as the kind of the first language.

***

> Referring to FIG. 5 again, in operation S220, the kind of the second language may be identified. The first terminal 100 may identify the kind of the second language using the *voice* of the second user recorded by the second terminal 150. The communication interface 104 of the first terminal 100 may receive the *voice* of the second user recorded by the second terminal 150 from the second terminal 150. The controller 102 of the first terminal 100 may perform *voice* recognition using the received *voice* of the second user. The controller 102 may detect the kind of the second language as a result of the *voice* recognition.[205]

*Id.*

207.    Hyperconnect developed and operates two popular live-streaming and video chat

---

[204] Patent No.: US 10,643,036 B2: Language Translation Device and Language Translation Method (May 5, 2020).

[205] Patent No.: US 10,430,523 B2: Terminal and Method of Controlling the Same (Oct. 1, 2019).

apps, Azar and Hakuna Live.[206]  Defendants' acquisition of Hyperconnect allows Defendants to leverage Hyperconnect's video and audio technology, which integrate facial and voice recognition functions,[207] across its Dating Sites to enhance members video and live chat experiences.[208]  Both Azar and Hakuna use Apple's TrueDepth camera and API technology to recognize faces and track facial movements of their users:[209]

---

[206] *Id.; Azar,* https://azarlive.com/ (operated by Hyperconnect, Inc); Hakuna, https://hakuna.live/en (operated by MOVEFAST Company, K.K., a subsidiary of Hyperconnect, Inc.); https://ir.mtch.com/financials/sec-filings/default.aspx.

[207] Patent No.: US 10,728,498 B2: Communication Device, Server and Communication Method Thereof (Jul. 28, 2020); Patent No.: US 10,972,700 B2: Video Call Method and Video Call Mediating Apparatus (Apr. 6, 2021); Patent No.: US 10,602,090 B2: Video Call Method and Video Call Mediating Apparatus (Mar. 24, 2020);  Patent No.: US 11,032,512 B2: Server and Operating Method Thereof (Jun. 8, 2021); Patent No.: US 10,728,498 B2: Communication Device, Server and Communication Method Thereof (Jul. 28, 2020); Patent No.: US 10,970,523 B2: Terminal and Server for Providing Video Call Service (Apr. 6, 2021); Patent No.: US 10,728,498 B2: Communication Device, Server and Communication Method Thereof (Jul. 28, 2020); Patent No.: US 10,643,036 B2: Language Translation Device and Language Translation Method (May 5, 2020); Patent No.: US 10,430,523 B2: Terminal and Method of Controlling the Same (Oct. 1, 2019); Patent Application Publication No.: US 2021/0142440 AI (May 13, 2021); *see* Sungjoo Ha, et al., *MarioNETte: Few-shot Face Reenactment Preserving Identity of Unseen Targets* Hyperconnect, https://hyperconnect.github.io/MarioNETte/;  Sungjoo Ha, et al., *MarioNETte: Few-shot Face Reenactment Preserving Identity of Unseen Targets* ASSOCIATION FOR THE ADVANCEMENT OF ARTIFICIAL INTELLIGENCE  (Nov. 19, 2020), https://arxiv.org/abs/1911.08139; Shurain, *MarioNETte: Few-shot Face Reenactment Preserving Identity of Unseen Targets* YouTube (Nov. 20, 2019), https://www.youtube.com/watch?v=Y6HE1DtdJHg.

[208] *Vibe Check – Video Chat* MATCH.COM, https://www.match.com/dnws/help/faq (last viewed on Apr. 12, 2022) ("Who can I Vibe Check with? You can Vibe Check with any eligible Match member in the app or on your desktop. To be eligible, a member simply needs to accept the community terms and conditions. You also must have each sent a message or a like to each other."); *see* Match.com, *Introducing Vibe Check: Video date on the Match app*, YOUTUBE (Apr. 14, 2020), https://www.youtube.com/watch?v=avMVX_9biyM (last viewed on Apr. 12, 2022); *see also*, Stephanie Milot, *Match's New Video Chat Feature Helps Users Find Love in the Time of COVID-19* PCMAG (Apr. 16, 2020),  https://www.pcmag.com/news/matchs-new-video-chat-feature-helps-users-find-love-in-the-time-of-covid; https://hingeapp.zendesk.com/hc/en-us/articles/360049484354-What-is-Video-Chat-; https://www.ourtime.com/v3/help/article/172; https://www.help.tinder.com/hc/en-us/articles/360046122311-Face-to-Face-Video-Chat; https://www.help.tinder.com/hc/en-us/articles/360046122311-Face-to-Face-Video-Chat; https://www.youtube.com/watch?v=avMVX_9biyM; https://hingeapp.zendesk.com/hc/en-us/articles/360049484354-What-is-Video-Chat-.

[209] *See* https://azarlive.com/home/privacy-policy.html; https://hakuna.live/en/privacy-policy.

Facial information: Facial marks and any additional facial information from Apple's TrueDepth API technologies. We will use Apple's TrueDepth API technologies to recognize user faces in camera experiences based on your consent or if permitted. We may track the movement of your eyes, mouth and face and use this facial information, where this is necessary to deliver the Service you have requested.

208. Match Group's public SEC filings confirm that Match Group has integrated Hyperconnect's technology into several of its Dating Sites including OkCupid, [210] Match.com, Hinge, and POF.[211]



*Fig. 65*[212]

209. Upon information and belief, Match Group uses the same or similar video feature technologies in Defendants' Dating Sites including Tinder and OkCupid.

---

[210]     *Match Group, Inc. Form 8-K*, SEC (Feb. 1, 2022), available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000891103/658f00ff-e679-4318-bda9-18ea203df0c0.pdf at 9 ("Both Match and Meetic continue to optimize their monetization models, and both are incorporating audio and video further info their apps, powered by Hyperconnect technology. OkCupid continues to expand in select international markets and began testing live-streaming video in late 2021.").

[211] *Id.* at 8.

[212] *Id.*

## X.    Plaintiffs' Experiences

210.    Plaintiffs Marcus Baker, Eva Adams, Jillian Abbinanti, Ann Bresnen, and Carole Buchanan were Illinois residents at all relevant times and have been active registered members of Match Group Dating Sites including Match.com, OkCupid, Hinge, Plenty of Fish, OurTime, and Tinder.  To create their accounts, Plaintiffs agreed to the Match Group Dating Sites' Terms of Service, which contained a madatory arbitration clause, and uploaded multiple pictures of their faces to create their dating profiles.

211.    Plaintiffs uploaded several photos to Defendants' platforms including photos of Plaintiffs.

212.    Plaintiffs were never notified of and have never consented to Defendants' use, collection, and storage of Plaintiffs' biometric data.

213.    Plaintiffs did not request or give permission – written or otherwise – to Defendants to collect or store biometric identifiers, nor did Plaintiffs receive or sign a written release allowing Defendants to collect or store biometric identifiers.

214.    Defendants never informed Plaintiffs by written notice or otherwise that Plaintiffs could prevent Defendants from collecting, storing, or using biometric identifiers.

215.    Likewise, Defendants never provided Plaintiffs with an opportunity to prohibit or prevent the collection, storage, use, or sharing of Plaintiffs' face geometry or associated biometric information.

216.    Defendants never advised Plaintiffs in writing, or otherwise, of any policy to destroy the biometric identifiers that Defendants collected and stored of Plaintiffs' face and/or voice.

217.    Nevertheless, when Plaintiffs uploaded photos, Defendants automatically detected and located Plaintiffs' faces, analyzed the geometric data relating to the unique contours of

Plaintiffs' faces and the distances between Plaintiffs' eyes, nose, and ears, and used that data to extract and collect Plaintiffs' scan of face geometry and related data, such as gender, age, race, and location.

218.    As a result of Defendants' unauthorized collection and use of Plaintiffs' biometric identifiers, Plaintiffs were deprived of their control over that valuable information.

## CLASS ACTION ALLEGATIONS

219.    Pursuant to the Illinois Code of Civil Procedure, 735 ILCS § 5/2-801, Plaintiffs bring claims on behalf of themselves and as a representative of all other similarly situated individuals pursuant to BIPA, 740 ILCS § 14/1, et seq., to recover statutory penalties, prejudgment interest, attorneys' fees and costs, and other damages owed.  As discussed supra, Section 14/15(b) of BIPA prohibits a company from, among other things, collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's or a customer's biometric identifiers or biometric information, unless it first (1) informs the individual in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the individual in writing of the specific purpose(s) and length of time for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information.  740 ILCS § 14/15.  Additionally, Section 14/15(a), requires a company in possession of biometric identifiers or biometric information to develop a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

220.    Plaintiffs seek class certification under the Illinois Code of Civil Procedure, 735

ILCS § 5/2-801, for the following class of similarly situated individuals under BIPA:

> All individuals who had their biometric information and/or biometric identifiers collected, captured, received, otherwise obtained, or disclosed by Defendants while residing in Illinois during the applicable statutory period.

221.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendants, Defendants' parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former officers and directors; (3) persons who properly submit a timely request for exclusion from the Class of which they are a member; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel and members of their immediate families; and (6) the legal representatives, successors, and assigns of any such excluded persons.

222.    This action is properly maintained as a class action under 735 ILCS § 5/2-801 because:

    a)  The class is so numerous that joinder of all members is impracticable;

    b)  There are questions of law or fact that are common to the Class;

    c)  Plaintiffs' claims are typical of the claims of the Class; and,

    d)  Plaintiffs will fairly and adequately protect the interests of the Class.

**<u>Numerosity</u>**

223.    The exact number of members of the Class is unknown to Plaintiffs at this time, however, because Defendants' Dating Sites have been downloaded by more than 82 million individuals,[213] it is believed to amount to thousands of Illinois users.  It is therefore, impractical to join each member of the Class as named Plaintiffs.  Defendants have collected, captured, received,

---

[213] *Id.*

or otherwise obtained biometric identifiers from at least thousands (and potentially even millions) of individuals who fall into the definition of the Class.  Ultimately, members of the Class will be easily identified through Defendants' records, discovery, and other third-party sources.

<u>**Commonality**</u>

224.    There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiffs and all members of the Class have been harmed by Defendants' failure to comply with BIPA.  The common questions of law and fact include, but are not limited to the following:

a)   Whether Defendants collected, captured, maintained, stored or otherwise obtained Plaintiffs' and the Class's biometric identifiers or biometric information or data;

b)   Whether Defendants properly informed Plaintiffs and the Class of their purposes for collecting, using, storing and disseminating their biometric identifiers or biometric information or data;

c)   Whether Defendants properly obtained a written release (as defined in 740 ILCS § 14/10) to collect, use, store and disseminate Plaintiffs' and the Class's biometric identifiers or biometric information or data;

d)   Whether Defendants have disclosed or redisclosed Plaintiffs' and the Class's biometric identifiers or biometric information or data;

e)   Whether Defendants developed a BIPA-compliant written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has

been satisfied or within three years of their last interaction with the individual, whichever occurs first;

f)   Whether Defendants complied with any such BIPA-compliant written policy (if one exists);

g)   Whether Defendants' violations of BIPA have raised a material risk that Plaintiffs' and the Class's biometric data will be unlawfully accessed by third parties;

h)   Whether Defendants used Plaintiffs' and the Class's facial geometry to identify them;

i)   Whether the violations of BIPA were committed negligently; and

j)   Whether the violations of BIPA were committed intentionally or recklessly.

225.   Plaintiffs anticipates that Defendants will raise defenses that are common to the Class.

### Typicality

226.   The claims asserted by Plaintiffs are typical of the Class members they seek to represent.  Plaintiffs have the same interests and suffer from the same unlawful practices as the Class members.

227.   Upon information and belief, there are no other Class members who have an interest individually controlling the prosecution of his or her individual claims.  However, if any such Class member should become known, he or she can "opt out" of this action pursuant to 735 ILCS § 5/2-801.

### Adequacy

228.   Plaintiffs will fairly and adequately protect the interests of all members of the Class,

and there are no known conflicts of interest between Plaintiffs and Class members. Moreover, Plaintiffs have retained experienced counsel who are competent in the prosecution of complex litigation and who have extensive experience acting as Class counsel.

### Predominance and Superiority

229.    As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

### COUNT I

**Violation of the Illinois Biometric Information Privacy Act**
**(Violation of 740 ILCS 14/15(a))**

230.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

231.    Section 15(a) of BIPA requires that any

> private entity in possession of biometric identifiers . . . must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers . . . when the

112

> initial purpose for collecting or obtaining such identifiers . . .
> has been satisfied or within 3 years of the individual's last
> interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

232.     Defendants do not publicly provide a retention schedule or guidelines for permanently destroying Plaintiffs' or the Class's biometric identifiers as specified by BIPA.  *See* 740 ILCS 14/15(a).

233.     Consequently, Defendants do not comply with any established retention schedule or destruction guidelines. *Id.*

234.     On behalf of themselves and the Class, Plaintiffs seek: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to establish and make publicly available a policy for the permanent destruction of biometric identifiers compliant with 740 ILCS 14/15(a); (ii) statutory damages of $5,000 for this intentional violation of BIPA pursuant to 740 ILCS 14/20(2), or at minimum, $1,000 for this negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (iii) reasonable attorneys' fees and costs and other expenses pursuant to 740 ILCS 14/20(2).

## COUNT II

### Violation of the Illinois Biometric Information Privacy Act
### (Violation of 740 ILCS 14/15(b))

235.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

236.     BIPA makes it unlawful for any private entity to, among other things,

(b) collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject or the subject's legally authorized representative in
> writing that a biometric identifier or biometric information is being
> collected or stored;

(2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

. . . .

(d) No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless:

(1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure[.]

740 ILCS 14/15(b) and (d).

237.   Defendants are Texas, New York, and Delaware corporations and thus qualify as a "private entity" under BIPA.  *See* 740 ILCS 14/10.

238.   Defendants violated section (b) in three ways by: (1) generating, (2) collecting, and/or (3) storing Plaintiffs' and the Class's biometric data and information without informed consent.

239.   As explained in detail in Sections III-IX above, Plaintiffs' and the Class's faceprints, face geometry, and voiceprints are "biometric identifiers" pursuant to 740 ILCS 14/10. Additionally, any voice and facial features and/or data extracted from Plaintiffs in a measurable and/or identifying form constitute "biometric information" pursuant to 740 ILCS 14/10.

240.   Defendants systematically and automatically collected, used, and stored Plaintiffs' and the Class's biometric identifiers without first obtaining the specific written release required by 740 ILCS 14/15(b)(3) and (d).

241.   As explained above, Defendants did not properly inform Plaintiffs or the Class in writing that Plaintiffs' or the Class's biometric identifiers or biometric information were collected

and stored, nor did Defendants inform Plaintiffs or the Class in writing of the specific purpose and length of term for which these biometric identifiers were being collected, stored, and used, as required by 740 ILCS 14/15(b)(1)–(2).

242.    By collecting, storing, using, and sharing Plaintiffs' and the Class's biometric identifiers as described herein, Defendants violated Plaintiffs' and the Class's right to privacy of these biometric identifiers and biometric information, as set forth in BIPA, 740 ILCS 14/1, *et seq*.

243.    On behalf of themselves and the Class, Plaintiffs seek: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers; (ii) statutory damages of $5,000 for this intentional violation of 740 ILCS 14/15(b) of BIPA pursuant to 740 ILCS 14/20(2), or at minimum, $1,000 for this negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (iii) reasonable attorneys' fees and costs and other expenses pursuant to 740 ILCS 14/20(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class respectfully request that this Court enter an Order:

a)  Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing Labaton Keller Sucharow LLP and Lowey Dannenberg, P.C. as Class Counsel for the Class;

b)  Declaring that Defendants' actions, as set forth above, violate BIPA, 740 ILCS l4/1, *et seq*.

c)  Awarding statutory damages of $5,000 per intentional or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) and statutory damages of $1,000 per negligent violation of BIPA pursuant to 740 ILCS 14/20(1);

d)  Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs, including, *inter alia*, an order requiring Defendants to collect, store, use, and share biometric identifiers or biometric information in compliance with BIPA, and permanently destroy the biometric identifiers and biometric information that Defendants have collected from Plaintiffs and the Class;

e)  Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees pursuant to BIPA;

f)  Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

g)  Awarding any such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Dated: February 16, 2024

Respectfully submitted,


By: */s/ Michael P. Canty*
Michael P. Canty SBN 4271508 (*pro hac vice*)
Carol C. Villegas SBN 4154324 (*pro hac vice forthcoming*)
Danielle Izzo SBN 5957303 (*pro hac vice*)
**Labaton Keller Sucharow LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

mcanty@labaton.com
cvillegas@labaton.com
dizzo@labaton.com

Christian Levis SBN 5153853 (*pro hac vice*)
Margaret MacLean SBN 4588182 (*pro hac vice*)
Amanda Fiorilla SBN 5772033 (*pro hac vice*)
**Lowey Dannenberg, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
mmaclean@lowey.com
afiorilla@lowey.com

*Attorneys for Plaintiffs and the Proposed Class*