Christian Levis (*pro hac vice*)
Margaret MacLean (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
mmaclean@lowey.com
afiorilla@lowey.com

Michael P. Canty (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Danielle Izzo (*pro hac vice*)
Gloria J. Medina (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com
cvillegas@labaton.com
dizzo@labaton.com
gmedina@labaton.com

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| MARCUS BAKER, EVA ADAMS, JILLIAN ABBINANTI, ANN BRESNEN, and CAROLE BUCHANAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MATCH GROUP INC., et al,<br><br>Defendant. | Civil Action No. 3:23-CV-02761<br><br>Hon. David C. Godbey |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

LEGAL STANDARD ................................................................................................................... 4

ARGUMENT ................................................................................................................................. 4

   I.    ILLINOIS LAW APPLIES TO PLAINTIFFS' CLAIMS............................................... 4

      A.   The Court Must Conduct a Choice of Law Analysis ...................................... 4

         i.   Illinois Has a More Significant Relationship with the Parties and the Transaction at Issue Than Texas Under Restatement § 188........................................................... 7

            a.   The § 188 Factors Make Clear Illinois Has the More Significant Relationship ... 7

            b.   The Section 6 Factors Also Demonstrate Illinois Has the More Significant Relationship ................................................................ 10

         ii.   Illinois Has a Materially Greater Interest Than Texas in the Determination of Plaintiffs' BIPA Claims ................................................................ 15

         iii.   Illinois Fundamental Public Policy of Protecting Its Citizens' Privacy Would be Contravened by the Application of Texas Law ...................................................... 17

   II.   PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR BIPA CLAIMS ...................... 17

      A.   Plaintiffs Sufficiently Allege a Violation of BIPA Section 15(b) ............................... 17

      B.   Plaintiffs Sufficiently Allege a Violation of BIPA Section 15(a)................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
     556 U.S. 662 (2009) ........................................................................................... 9, 21

*Cardoni v. Prosperity Bank*,
     805 F.3d 573 (5th Cir. 2015) .............................................................................. passim

*Carpenter v. McDonald's Corp.*,
     580 F. Supp. 3d 512 (N.D. Ill. 2022) ...................................................................... 20

*Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*,
     770 F.3d 322 (5th Cir. 2014) .................................................................................. 21

*Clark v. Microsoft Corp.*,
     No. 23 C 695, 2023 WL 5348760 (N.D. Ill. Aug. 21, 2023) .................................. 19

*CPS , Inc. v. Dresser Indus., Inc.*,
     911 S.W.2d 18 (Tex. App. 1995) .............................................................................. 8

*Delgado v. Meta Platforms, Inc.*,
     No. 23cv4181-SI,  2024 WL 818344 (N.D. Cal. Feb. 27, 2024) ........................... 19, 20, 21, 23

*Demond v. Inifiniti HR, LLC*,
     No. 3:17cv1322-D, 2018 WL 4145053 (N.D. Tex. Aug. 30, 2018) .................................. 14, 15

*Desantis v. Wackenhut Corp.*,
     793 S.W.2d 670 (Tex. 1990) .................................................................................. 4, 5

*Dixon v. Local Express, Inc.*,
     No. 4:16cv2081, 2017 WL 2778245 (S.D. Tex. June 26, 2017) ......................... 9, 21

*ECL Grp., LLC v. Mass*,
     No. 3:17-CV-2399-D, 2018 WL 949235 (N.D. Tex. Feb. 20, 2018) ........................ 7

*Emblaze Ltd. v. Apple Inc.*,
     No. 5:11-cv-1079, 2015 WL 396010 (N.D. Cal. Jan. 29, 2015), ........................... 21

*Goosehead Ins. Agency, LLC v. Williams Ins. & Consulting, Inc.*,
     533 F. Supp. 3d 367 (N.D. Tex. 2020) .................................................................. 6, 11

*Hartford Underwriters Ins. Co. v. Found. Health Servs. Inc.*,
     524 F.3d 588 (5th Cir. 2008) .................................................................................. 12

*Hester v. Bell-Textron, Inc.*,
     11 F.4th 301 (5th Cir. 2021) ..................................................................................... 4

*Hogan v. Amazon.com, Inc.*,
  No. 21 C 3169, 2022 WL 952763 (N.D. Ill. Mar. 30, 2022) .................................................. 15

*Houston Cas. Co. v. Certain Underwriters at Lloyd's London*,
  51 F. Supp. 2d 789 (S.D. Tex. 1999) ........................................................................................ 8

*Huawei Technologies Co., Ltd. v. Yiren Huang*,
  No. 4:17cv00893, 2019 WL 1978339 (E.D. Tex. May 2, 2019) .............................................. 5

*In re Facebook Biometric Info. Priv. Litig.*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) .......................................................................... passim

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*,
  892 F.3d 719 (5th Cir. 2018) .................................................................................................. 19

*Jones v. Microsoft Corp.*,
  649 F. Supp. 3d 679 (N.D. Ill. 2023) ...................................................................................... 19

*King Instruments Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995) .................................................................................................. 21

*Klebba v. Netgear, Inc.*,
  No. 1:18cv438-RP, 2019 WL 453364 (W.D. Tex. Feb. 5, 2019) ........................................ 7, 8

*Le-Vel Brands, LLC v. Bland*,
  No. 3:19cv154-L, 2019 WL 4735805 (N.D. Tex. Sept. 27, 2019) ........................................... 8

*M. Block & Sons, Inc. v. Int'l Bus. Machs. Corp.*,
  No. 04 C 340, 2004 WL 1557631 (N.D. Ill. July 8, 2004) .................................................... 14

*Martin v. Barrett, Daffin, Frappier, Turner, & Engel LLP*,
  No. 15-CV-290-SS-ML, 2015 WL 3688179 (W.D. Tex. June 12, 2015) .............................. 23

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995) ............................................................................................................... 5, 6

*McGoveran v. Amazon Web Servs,, Inc.*,
  No. 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021) ............................................ 16

*Mell v. Goodbody & Co.*,
  295 N.E.2d 97 (Ill. App. Ct. 1973) ........................................................................................ 14

*Melzer v. Johnson & Johnson Consumer Inc.*,
  No. 22-3149 (MAS)(RLS), 2023 WL 3098633 (D.N.J. April 26, 2023) ......................... 13, 16

*Ministers & Missionaries Benefit Bd. v. Snow*,
  45 N.E.3d 917 (N.Y. 2015) ................................................................................................. 6, 11

*Mission Techs. Inc. v. STMicroelectronics Inc.*,
   No. 3:23-CV-0445-X, 2024 WL 150504 (N.D. Tex. Jan. 11, 2024) .................................. 5, 14

*Nabors Drilling Techs. USA v. Deepwell Energy Servs.*,
   568 F. Supp. 3d 756 (S.D. Tex. 2021) ................................................................. 8, 11

*Norberg v. Shutterfly, Inc.*,
   152 F. Supp. 3d 1103 (N.D. Ill. 2015) ...................................................................... 18

*Nu-You Techs. LLC v. Beauty Town Int. Inc.*,
   No. 3:15cv3433-N, 2016 WL 4717991 (N.D. Tex. 2016) .......................................... 21

*Patterson v. Respondus, Inc.*,
   593 F. Supp. 3d 783 (N.D. Ill. 2022) ....................................................... 14, 17, 18, 23

*Pfaff v. Wells Elecs.*, Inc.,
   525 U.S. 55 (1998) ...................................................................................................... 21

*Potomac Leasing Co. v. Chuck's Pub, Inc.*,
   509 N.E.2d 751 (Ill. App. Ct. 1987) .......................................................................... 14

*Realogy Holdings Corp. v. Jongebloed*,
   957 F.3d 523 (5th Cir. 2020) .................................................................................... 4, 5

*Rivera v. Google Inc.*,
   238 F. Supp. 3d 1088 (N.D. Ill. 2017) ....................................................................... 16

*Ronquillo v. Doctor's Associates, LLC*,
   597 F. Supp. 3d 1227 (N.D. Ill. 2022) ....................................................................... 18

*Sewell v. Monroe City School Board*,
   974 F.3d 577 (5th Cir. 2020) ...................................................................................... 21

*Sonat Expl. Co. v. Cudd Pressure Control, Inc.*,
   271 S.W.3d 228 (Tex. 2008) ....................................................................................... 11

*Sortiumusa LLC v. Hunger*,
   No. 3:11-CV-1656-M, 2013 WL 11730655 (N.D. Tex. Mar. 31, 2013) ................. 10, 11, 12

*Telular Corp. v. Mentor Graphics Corp.*,
   282 F. Supp. 2d 869 (N. D. Ill. 2003) ........................................................................ 14

*Thakkar v. ProctorU Inc.*,
   571 F. Supp. 3d 927 (C.D. Ill. 2021) .......................................................................... 12

*Thakkar v. ProctorU, Inc.*,
   642 F. Supp. 3d 1304 (N.D. Ala. 2022) ........................................................... 6, 12, 15

iv

*Torres v. Berry Corp.*,
    No. 3:20-cv-3464, 2022 WL 18715989 (N.D. Tex. Sept. 13, 2022) ........................................ 4

*Toyota Motor Co. v. Cook*,
    581 S.W.3d 278 (Tex. App. 2019) ........................................................................................ 11

*U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*,
    816 F.3d 315 (5th Cir. 2016) ......................................................................................... 22, 23

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) ................................................................................................ 19

*Vance v. Amazon.com Inc.*,
    534 F. Supp. 3d 1314 (W.D. Wash. 2021) .......................................................................... 13

*Wilk v. Brainshark, Inc.*,
    631 F. Supp. 3d 522 (N.D. Ill. 2022) .................................................................................... 7

*WTM, Inc. v. Henneck*,
    125 F. Supp. 2d 864 (N.D. Ill. 2000) ................................................................................... 14

**Statutes**

740 ILCS 14/10(a) ........................................................................................................................ 7

740 ILCS 14/15(b) ...................................................................................................................... 18

TEX. BUS. & COM. CODE § 503.001 ........................................................................................ 13

**Other Authorities**

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971) ............................................. 4, 6

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971) ................................................. 7

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971) ................................................... 10

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1), cmt. b (1971) ................................... 12

## INTRODUCTION

This is a straightforward case concerning the rampant violation of Illinois Biometric Information Privacy Act ("BIPA"). For years, Match Group, Inc. and the other Defendant subsidiaries (collectively, "Defendants" or "Match") collected biometric information from photos of Plaintiffs and other Class members on Match dating applications ("apps") and websites without obtaining consent that complied with BIPA. Marcus Baker, Eva Adams, Jillian Abbinanti, Ann Bresnen, and Carole Buchanan, individually and on behalf of all others similarly situated, (collectively, "Plaintiffs") plausibly allege Match's disregard for these (and other) statutory requirements violated their statutory right to privacy and control over their highly sensitive biometric information under BIPA, entitling them to statutory damages, injunctive relief, and any other equitable remedy necessary to stop this egregious, and ongoing violation.

Match attempts to sidestep BIPA in its entirety, claiming that the adoption of Texas law in their terms of service precludes Plaintiffs and Class members from bringing BIPA claims. This outlandish argument—which would deprive Plaintiffs and Class members of their substantive BIPA rights and override the Illinois legislature's Constitutional authority to protect its residents— has *never* been adopted by any court in the nation that follows the Restatement (Second). Rather, courts outside of Illinois that have considered the same issue have consistently applied choice of law rules to find that Illinois law applies to Plaintiffs' BIPA claims, even where the terms of service select a different forum's law, because of the overwhelming interest of Illinois in regulating its citizens' biometric information. As explained below, applying Texas choice of law rules reaches the same result, and requires that Illinois law govern Plaintiffs' and Class members' BIPA claims here.

Notably, Defendants' attempt to extinguish Plaintiffs' claims through their choice of law analysis reeks of gamesmanship. Plaintiffs initially filed this action in Illinois. There, Defendants filed a motion to dismiss or, in the alternative, to transfer the case to the Northern District of Texas pursuant to a forum selection clause. *Baker v. Match Group, Inc. et al*., No. 2022-cv-6924 (N.D. Ill.), ECF Nos. 17-18. The Court in the Northern District of Illinois denied Defendants' motion to

dismiss and transferred the case to proceed here. *Id.*, ECF No. 27. Now, in a second motion to dismiss, *Baker v. Match Group, Inc. et al.*, No. 2023-cv-02761 (N.D. Tex.), ECF Nos. 66 ("MTD") and 67 ("Motion to Dismiss MOL" or "MOL"), Defendants attempt to relitigate issues already addressed by the transferor Court to strategically cut off Plaintiffs' ability to seek relief at all.

Match's arguments on the merits fair no better and simply ignore the abundance of case law upholding claims for the same type of violations Plaintiffs allege. Struggling to avoid the weight of authority against it, Match relies on cases concerning vendors who, unlike itself, provided only a *component* of a technology that was used by a different company to collect Plaintiffs' biometric identifiers and information. These irrelevant citations, if anything, confirm Match's liability here. Lacking any legal support for dismissal, Match attempts to draw an analogy between itself and other companies that developed technology or held patents as an investment, for example, to sell or "troll" later. But this counterfactual narrative in which Match never used or implemented the biometric information-collecting technology cited throughout the complaint, must be rejected over Plaintiffs' well-plead allegations that Match did in fact use its patented technology to collect biometric information and identifiers in violation of Illinois law.

For these reasons, and those set forth more fully below, Match's motion to dismiss the complaint should be denied in its entirety.

## **BACKGROUND**

Match operates the largest collection of mobile dating apps and websites (collectively, the "Dating Sites")[1] in the world. Users of Match's Dating Sites are encouraged to upload unobstructed photos of their face to increase their chances of finding a romantic match and are required to upload at least one photo (¶ 110)[2] to complete their account set-up and use the Dating Sites. *See* ¶¶ 7, 110-11. Unbeknownst to Plaintiffs and Class members, who are all Illinois residents, Match implements facial recognition technology on its Dating Sites designed to extract, collect, store,

---

[1] Dating Sites refers to Match.com, Tinder, OurTime, OkCupid, Plenty of Fish ("POF"), Hinge, BLK, and Chispa.
[2] "¶" as used herein refers to Plaintiffs' Amended Class Action Complaint and Request for Jury Trial ("Complaint"), ECF No. 60.

and use biometric information from the photographs its users upload to Match's Dating Sites. *See* ¶¶ 146-47, 150-55, 189-90, 183-88, 191-98, 204-08.

The Complaint identifies ample evidence in support of Plaintiffs' allegations that Defendants extract and collect biometric information. For example, Match holds several patents that describe the facial and voice recognition technology it uses to collect its users' biometric identifiers and information in violation of BIPA. *See* ¶¶ 147-58. For example, Match holds the patents for "Face Search in Personals," which leverages biometric data from Match's users to create matches with users' preferred physical characteristics. *See* ¶ 148. It does this by extracting the biometric data from photographs and conducting personal profile searches for specific facial features. *Id.* This process employs a facial recognition method that uses a mathematical equation to characterize a face by a set of geometric parameters and then compares the distance between two points on the faces for similarities. *See* ¶¶ 148, 154. Match uses this technology on all of its Dating Sites. *See* ¶ 148.

Match also uses an algorithm in its Dating Sites called "Matching Process System and Method," which uses facial recognition to detect certain characteristics and facial features. *See* ¶¶ 150-53. Match holds a similar international patent for a technology called "System and Method for Recommending Users Based on Shared Digital Experiences" which uses facial recognition technology to extract physical attributes and characteristics from user's photographs to recommend users potential matches in a manner similar to Matching Process System and Method. *See* ¶ 153. This technology uses a machine-learning algorithm to identify key facial landmarks such as eyes, nose, hair, ears, and eyebrows from a user's photograph. *See* ¶ 155. It then extracts and collects the facial geometry and related data from that user. *Id.* Match does not just use its patented technology to collect its users' biometric information. For example, on OkCupid—one of the Dating Sites at issue in this case—Match employs a perceptual hash ("pHash") algorithm with the Discrete Cosine Transfer ("DCT") technique in its facial processing system. *See* ¶ 186. This method extracts landmark facial features, such as eyes, nose, mouth, and chin from an image and employs DCT to each of these features to calculate their measurements and convert it to a pHash

value. *See* ¶ 184, 186. The pHash values (*i.e.*, calculations of the unique facial features) are then compared to those of other images using a distance algorithm to find similarities. *Id.*

Match also uses Amazon Web Services' Rekognition ("Amazon Rekognition") service on Tinder and Hinge. *See* ¶ 191. Upon receiving a command from Tinder and/or Hinge, Amazon Rekognition scans images from Match's database to detect faces and then applies its machine vision algorithm to identify and extract facial landmarks and facial geometry to convert it into a feature vector, which includes precise coordinates that describe the facial landmarks (i.e., nose, corners of the mouth, eyes, pupils, jawline, and chin). *See* ¶ 194. Match then runs a face matching command which searches its database to see if there is a matching FaceId already in the database. *See* ¶ 195.

The Complaint alleges that Match used at least these technologies to automatically detect and collect Plaintiffs' biometric information and identifiers from the photographs of their faces that Plaintiffs uploaded to Match's Dating Sites. *See* ¶¶ 210-11, 217. Nonetheless, Match did nothing to comply with BIPA's requirements, which, amongst other things, require that companies: (i) properly inform Plaintiffs and the proposed Class in writing that their biometric identifiers (face geometry) were being generated, collected, or stored; (ii) properly inform Plaintiffs and the proposed Class in writing of the specific purpose and length of time for which their biometric identifiers were being collected, stored, and used; (iii) provide a publicly available retention schedule and guidelines for permanently destroying the biometric identifiers of Plaintiffs and the proposed Class; and/or (iv) request or receive a written release from Plaintiffs and the proposed Class to collect, capture, or otherwise obtain their biometric identifiers.

Match did not notify Plaintiffs or Class members (all of whom are Illinois residents and resided in Illinois at all relevant times), in the form and manner required by BIPA, that it was collecting their biometric information or identifiers, nor did Match seek their consent to collect, use, or store their biometric data. *See* ¶ 212-13. Match also never advised Plaintiffs or Class members of any retention or destruction policy related to its collection and storage of Plaintiffs and Class members biometric information. *See* ¶ 216.

4

**LEGAL STANDARD**

On a Rule 12(b)(6) motion to dismiss, the court "must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Torres v. Berry Corp.*, No. 3:20-cv-3464, 2022 WL 18715989, at \*1 (N.D. Tex. Sept. 13, 2022). A complaint may only be dismissed if it does not "state a claim to relief that is plausible on its face." *Hester v. Bell-Textron, Inc.*, 11 F.4th 301 (5th Cir. 2021). "A claim is facially plausible … if the plaintiff alleges facts that allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation omitted).

**ARGUMENT**

**I.     ILLINOIS LAW APPLIES TO PLAINTIFFS' CLAIMS**

As a threshold matter, Defendants' argument that Texas law applies—effectively extinguishing Plaintiffs' claims—is incorrect. *See* MOL at 5-16.

**A.  The Court Must Conduct a Choice of Law Analysis**

It is a "longstanding rule" that "federal courts sit[ting] in diversity jurisdiction . . . *must* apply the conflicts-of-law rules of the forum state." *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 532532 (5th Cir. 2020) (emphasis added, citation omitted). Texas follows the Restatement (Second) of Conflict of Laws (hereinafter, "Restatement (Second)") in determining choice-of-law. *Id.* (citing *Desantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990)). Under the Restatement (Second), a choice of law provision is not enforceable "if another state: (1) has a more significant relationship with the parties and the transaction at issue than the chosen state does under Restatement § 188; (2) has a materially greater interest than the chosen state does in the enforceability of a given provision; and (3) has a fundamental policy that would be contravened by the application of the chosen state's law." *Cardoni v. Prosperity Bank*, 805 F.3d 573, 582 (5th Cir. 2015) (citing RESTATEMENT (SECOND) § 187(2) (1971)). A contractual term (including a choice of law provision) does not displace this analysis. *See Realogy*, 957 F.3d at 527 (applying Restatement (Second) despite clause stating Delaware law will govern "regardless of the law that might be applied under principles of conflicts of law"). Accordingly, this Court must conduct a

choice of law analysis to determine, first, whether the choice of law provisions in the Terms of Use ("Terms") are enforceable as to Plaintiffs' claims, and if it is not, determine whether the Court should apply the substantive law of Illinois or Texas (it should apply Illinois law). *See* Section II.B.

Match's position that the Parties "waive[d]" consideration of "Texas's 'conflict of law rules'" through a term in its Terms stating that Texas law applies "without regard to its conflict of law rules" (Exs. P-V, ECF Nos. 60-16-60-22) is a position consistently rejected by courts in this Circuit. *See Realogy*, 957 F.3d at 527; *see also Huawei Technologies Co., Ltd. v. Yiren Huang*, No. 4:17-cv-00893, 2019 WL 1978339, at *4 (E.D. Tex. May 2, 2019) (conducting Restatement (Second) analysis despite provision stating Texas law will apply "without regard to conflicts of law principles"). Indeed, courts specifically distinguish choice of law clauses from other contractual provisions in recognizing that a conflict of law analysis needs to be applied, even where the parties chose a particular state's laws, because of the impact that provision has on "a state's power to regulate conduct within its borders." *Cardoni*, 805 F.3d at 580 (citing *DeSantis* 793 S.W.2d at 677 (explaining that judicial respect for enforcing the contractual expectations of the parties is not unlimited when it comes to choice-of-law agreements because parties "cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply")).

None of the cases Match cites warrant deviating from this established precedent; they either (1) confirm that the Restatement (Second)'s conflict of laws analysis ***must be applied*** regardless of Match's choice-of-law clause (*see* MOL at 7 (citing *Mission Techs. Inc. v. STMicroelectronics Inc.*, No. 3:23-CV-0445-X, 2024 WL 150504, at *2, n.40 (N.D. Tex. Jan. 11, 2024) (applying Texas choice-of-law rules and Restatement (Second) despite existence of choice-of-law provision)), or (2) involve the application of *different* state laws and *different* choice of law analyses that have no applicability here. *See* MOL at 8 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) (allowing punitive damages in arbitration proceedings despite choice-of-law clause in arbitration agreement specifying New York law, which would not permit

6

such damages); *Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 922 (N.Y. 2015) (explaining under *New York* law, *New York* courts must apply a choice-of-law provision when the claims alleged are contract claims arising directly out of that agreement); *Thakkar v. ProctorU, Inc.*, 642 F. Supp. 3d 1304, 1315 (N.D. Ala. 2022) (explaining *Alabama* law dictates that choice-of-law provisions must apply without regard to a choice of law analysis)).

Match's claim that disregarding Texas's choice of law rules is separately warranted by virtue of the "contracting party autonomy" rule is a red herring. *See* MOL at 7. The sole case Match relies on for this proposition states the exact opposite, supporting Plaintiffs' position here. *See* MOL at 6 (citing *Goosehead Ins. Agency, LLC v. Williams Ins. & Consulting, Inc.*, 533 F. Supp. 3d 367, 381 (N.D. Tex. 2020)). In *Goosehead*, the Court explained that—regardless of any purported waiver provision—the court must "determine the enforceability of a choice-of-law provision without respect to the provision itself but ***based on the properly applicable state's law.***" *Goosehead*, 533 F. Supp. 3d at 381 (applying Restatement (Second) analysis despite choice-of-law provisions). Accordingly, this Court must apply the Restatement (Second) analysis, as described in the next section.

**B. The Court Must Apply Illinois Law Under the Texas Choice of Law Analysis**

Under the Restatement (Second), a choice of law provision is unenforceable if another state "(1) has a more significant relationship with the parties and the transaction at issue than the chosen state does under Restatement § 188; (2) has a materially greater interest than the chosen state does in the enforceability of a given provision; and (3) has a fundamental policy that would be contravened by the application of the chosen state's law." *Cardoni*, 805 F.3d at 582 (citing RESTATEMENT (SECOND) § 187(2)). For the reasons described herein, it is clear Match's choice of law provision is unenforceable, and Illinois law—not Texas—applies to Plaintiffs' and Class members' claims.

**i.  Illinois Has a More Significant Relationship with the Parties and the Transaction at Issue Than Texas Under Restatement § 188**

**a.  The § 188 Factors Make Clear Illinois Has the More Significant Relationship**

Regarding the first factor, Courts determine the state with the more significant relationship by examining the following: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *See* RESTATEMENT (SECOND) § 188(2) (1971). It is the "importance of these contacts with respect to the particular issue" that the court looks at rather than the number in making this determination. *Id.*; *see Cardoni*, 805 F.3d at 582-83 ("[t]hese contacts are weighed not by their number, but by their quality").

Each of these factors favor the application of Illinois law. The place Plaintiffs executed and negotiated the contract is Illinois, given that Plaintiffs signed up for Match's Dating Sites and were presented with, considered, and agreed to the Terms of the Dating Sites in Illinois. *See* ¶ 210; *ECL Grp., LLC v. Mass*, No. 3:17-CV-2399-D, 2018 WL 949235, at *6 (N.D. Tex. Feb. 20, 2018) (finding the place of contracting was California because "[plaintiff] signed and returned [the agreement] via email from California."); *Klebba v. Netgear, Inc.*, No. 1:18-cv-438-RP, 2019 WL 453364, at *3 (W.D. Tex. Feb. 5, 2019) (the place of contracting and negotiation was the state where plaintiff "was presented with the Terms . . . and agreed to the Terms"). The place of performance and location of the subject matter is also Illinois because this is where: (1) Plaintiffs uploaded the photographs of their faces[3]—through which Match wrongfully used, collected, and stored the biometric data from without consent; (2) where Plaintiffs were harmed as a result of Match's conduct; and (3) where Match made its Dating Sites available to Plaintiffs. ¶¶ 210-17. *See Le-Vel Brands, LLC v. Bland*, No. 3:19-CV-00154, 2019 WL 4735805, at *6 (N.D. Tex. Sept. 27,

---

[3] In a footnote, Match argues that "Plaintiffs allege no acts or omissions in Illinois" because Plaintiffs "uploaded photographs" and "the photos Plaintiffs uploaded are not even protected under BIPA." *See* MOL at 10 n.6. Match's cherry-picked quote of BIPA *omits* that only photographs "used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical description such as height, weight, hair color, or eye color" are excluded from BIPA's purview, not *all* photographs. 740 ILCS 14/10(a). *See also Wilk v. Brainshark, Inc.*, 631 F. Supp. 3d 522, 530 (N.D. Ill. 2022) ("BIPA's reference to 'photographs' indicates that, but for the limited exception not applicable here, photographs can constitute 'biometric identifiers.'"). Accordingly, the photographs from which Match collected biometric information fall squarely within BIPA.

2019) ("the majority of [the party's] performance took place in Indiana" because "he primarily performed [his duties]" in that state); *see also CPS Int'l, Inc. v. Dresser Indus., Inc*., 911 S.W.2d 18, 30 (Tex. App. 1995) (finding the fact that the conduct was directed from Texas was irrelevant to the choice of law determination because "the conduct was directed to and carried out in Saudi Arabia, and it was the carrying out of the conduct that was the source of its harmful nature."). And Plaintiffs' domicile is, again, Illinois. That Match's principal place of business happens to be in Texas holds little to no significance when viewed in comparison to these important Illinois contacts. *See Klebba*, 2019 WL 453364, at *3 ("[plaintiff] registered for [the] account in [the other state], was presented with the Terms in [the other state] and agreed to the Terms . . . sitting at a computer in [the other state]. Although [defendant] is headquartered in California, there is no evidence that the other factors favor California"); *Houston Cas. Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 798 (S.D. Tex. 1999), *aff'd sub nom*, *Houston Cas. Co. v. Certain Underwriters at Lloyd's*, 252 F.3d 1357 (5th Cir. 2001) ("the place of negotiating and contracting is more significant than the [defendant's] place of business").[4]

Match's claim that "perform[ance]" actually occurred in Texas is factually unsupported.[5] MOL at 9. Match's attempt to fabricate a basis for this argument by pointing to Plaintiffs' venue

---

[4] Indeed, Match's own authority confirms the same. *See* MOL at 9 (citing *Nabors Drilling Techs. USA v. Deepwell Energy Servs.*, 568 F. Supp. 3d 756, 767 (S.D. Tex. 2021)). The *Nabors* decision, in applying the Restatement (Second), specifically held that: (1) the place of contracting is "where occurred that last act necessary" to give it "binding effect" which, here, occurred in Illinois when Plaintiffs agreed and did use Match's service; (2) that the "place of performance" looks to where "services were performed" and where the "injur[y]" occurred (*id.* at 767, 768) (which, again, is Illinois); and (3) that "principal place of business" is only a "more important contact" if it also the location of other relevant contacts such as "place of performance and the location of the subject matter" which is not true in this case. *Id.* at 769. Thus, following *Nabor* (*i.e.*, Match's own authority), Illinois not Texas has the more significant relationship.

[5] The only unaccounted for facts are Match's processing, storage, and use of Plaintiffs' and Class members' biometric identifiers post-improper collection in Illinois. Contrary to Match's claim, nothing in the Complaint states that this "could only have been performed in Texas." MOL at 10. Where Match ultimately processes, stores, and uses Plaintiffs' and Class members' biometric identifiers requires a fact-intensive inquiry that is not appropriate for this stage of the litigation and can only be determined through discovery. *See Dixon v. Local Express, Inc*., No. 4:16-cv-2081, 2017 WL 2778245, at *2 (S.D. Tex. June 26, 2017) (finding it was premature to dismiss claim

allegations in isolation, which state only that some unspecified "acts" occurred there, must be rejected. Tellingly, even though such fact-based arguments are inappropriate on a motion to dismiss, Match does not even attempt to elaborate on what these "acts" were, let alone how these "acts" were performance of the relevant services at issue in this case. *See* MOL at 10 (citing ¶ 23). These vague, unspecific claims are insufficient to override the other Illinois-specific allegations that weigh in favor of applying Illinois law.

Match's argument that the "subject matter" of the action is in Texas because that's where "relevant decisions concerning the services provided under the TOUs were made" is equally meritless. *See* MOL at 10. This fact-based argument, again devoid of support from the pleadings, ignores that the actual "subject matter" of this BIPA action centers around Match's provision of Dating Sites that collected biometric information from Plaintiffs and Class members in Illinois. Whether some individuals involved in the decision to violate Illinois law were in Texas or elsewhere does not change the fact that the core elements of the alleged violation all occurred in Illinois and involved Illinois residents. Match cannot shift the Section 188 analysis in its favor by manufacturing facts that have no impact on Plaintiffs' actual claims.[6]

### b. The Section 6 Factors Also Demonstrate Illinois Has the More Significant Relationship

Some Courts evaluate the "significant relationship" requirement in light the general factors set forth in Section 6 of the Restatement (Second) in addition to those listed in Section 188, described above. *See Cardoni*, 805 F.3d 573, 582 n.9 (explaining some read Texas precedent to mean Section 188 is a more "specific application of the general Section 6 considerations" and

---

where argument required "fact intensive inquiry" because a court "cannot make factual determinations at the motion-to-dismiss stage") (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Because the location of these contacts cannot be determined, they do not favor either Texas or Illinois.

[6] Match's argument in a footnote that the location of its users is "fortuitous" is wrong. *See* MOL at 9. There is nothing fortuitous or random about Plaintiffs and Class members being in Illinois, as this is where Match intentionally chose to provide their services and collect biometric information without consent. If Match wanted "certainty" that BIPA would not apply to them, they should not have engaged in this intentional conduct in that state.

therefore "only" address Section 188 factors). Section 6 outlines a non-exhaustive list of the factors relevant to choice of law as follows: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." RESTATEMENT (SECOND) § 6(2).

Not all factors are considered equal: "[v]arying weight will be given to a particular factor, or to a group of factors, in different areas of choice of law." *Id.* cmt. c. Importantly, the fourth factor (*i.e.*, "protection of justified expectations") is "***entitled to little weight***" where, like here, "the causes of action asserted are . . . mostly torts." *Sortiumusa LLC v. Hunger*, No. 3:11-CV-1656-M, 2013 WL 11730655, at *5 (N.D. Tex. Mar. 31, 2013) (emphasis added). Even if the Court does consider the Section 6 factors, the result is the same.

Illinois has a significant policy interest in protecting its citizens' biometric information—more than that of Texas—as evidenced by its enactment of BIPA to regulate companies like Match's collection and use of Illinois residents' biometric information. *See* Section II.B.iii, below. The needs of the interstate system are also served by the application of Illinois law to Plaintiffs' claims because applying Texas law to claims that arose and occurred in Illinois would undermine Illinois' ability to protect its residents' privacy from companies that seek to violate it while conducting business in Illinois with those Illinois residents. *See Toyota Motor Co. v. Cook*, 581 S.W.3d 278, 286 (Tex. Ct. App. 2019) ("Applying Texas law to tort claims that arose and occurred in Mexico would work to undermine Mexico's sovereignty and ability to regulate safety on its highways, including the vehicles used to transport their occupants."). The certainty, predictability, and uniformity of results and the ease in the determination and application of law also weigh in favor of applying Illinois law. There is no question applying Illinois law to Illinois Plaintiffs' Illinois claims brought pursuant to BIPA would result in certainty, predictability, and uniformity in the results of this action. To do the opposite—leaving Illinois residents to guess whether they

are or are not protected by BIPA, which was enacted specifically to protect residents like them—would cause the exact type of uncertainty this factor seeks to avoid. And lastly, the Court should have no difficulty in applying Illinois law to these claims. The case law on the application of BIPA in similar contexts is abundant. *See* Section III, below. Accordingly, the Section 6 factors favor Illinois, not Texas. Each of Match's arguments to the contrary fails.

Match's argument that the Section 6 factors favor Texas turns on a misstatement of the law. In arguing that the Parties' "expectations" and having "predictability"[7] through the enforcement of contractual provisions are the most important factors under Section 6, Match conveniently omits the case law showing this only true in contract cases not tort actions. *See* MOL at 11 (citing *Nabors*, 568 F. Supp. 3d at 771 (contract action not tort action); *Goosehead*, 533 F. Supp. 3d at 383 (same)); *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 235 (Tex. 2008) (same); *Snow*, 45 N.E.3d at 923 (same)). In tort actions (like here) the parties' expectations and predictability via contract enforcement are found "not [to] materially aid [the] Court's choice-of-law analysis" such that they are given little to no weight. *See Sortiumusa*, 2013 WL 11730655, at *6 (explaining these factors in a "tort[]" action "do not weight for or against the application of either state's substantive laws"); *see also* RESTATEMENT (SECOND) § 145(1), cmt. b (explaining these factors are of "lesser importance in the field of torts"). Because these factors are largely irrelevant in this type of case, and each of the other (and more important) factors point to Illinois, Illinois law should apply.

Match similarly misconstrues the other Section 6 factors. Contrary to Match's claim, the needs of interstate commerce are not met by disregarding a state law designed specifically to protect its own residents simply because Match wants Texas law to apply to these Illinois residents'

---

[7] Even if this factor were important (it is not), it does not support Match here. Match is wrong that there is no "predictability" unless it can apply Texas law across the board for any type of claim. *See* MOL at 11. Match has some of the most profitable and largest dating sites in the country, it cannot feign ignorance of which consumer laws they are subject to as a result of their own conduct. If Match wanted to "predict" whether it would be subject to Illinois BIPA, it should not have collected biometric data from Illinois residents.

claims instead. *See* MOL at 11. *See Hartford Underwriters Ins. Co. v. Found. Health Servs. Inc.*, 524 F.3d 588, 598 (5th Cir. 2008) (finding this factor disfavors applying the law of a state where it "would manifest disrespect for the other state's sovereignty."). Match cites zero cases that support this position, relying once again on the inapposite case *Nabors*, which concerns a run-of-the-mill contract dispute between two sophisticated parties, not a tort action where there is a state law specifically in place to prevent the exact harm alleged here when suffered by that state's residents. Match's citation to *Thakkar v. ProctorU Inc.*, 571 F. Supp. 3d 927, 941 (C.D. Ill. 2021)[8] is even more off-point, if not fully misleading. *See* MOL at 12 (claiming *Thakkar* "enforce[d] Alabama choice of law clause" and supports the application of Texas law here). That case was evaluating whether *transfer* was appropriate—not which state law should apply. It is wholly irrelevant here.[9]

Match's separate claim that applying Texas law is "easy," whereas applying the "foreign" law of Illinois is difficult, is also baseless. MOL at 12-13. This Court is clearly capable of applying the law of any state in the Nation. Match cites no case law for the proposition that a federal court in Texas is not equipped to apply Illinois law, or BIPA, and for good reason: dozens (if not hundreds) of federal courts outside of Illinois have previously done so without issue.[10] *See In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1170 (N.D. Cal. 2016) (court in California applying Illinois law to BIPA claims); *Delgado v. Meta Platforms, Inc.*, No. 23-cv-4181-SI 2024, WL 818344, at \*2 (N.D. Cal. Feb. 27, 2024) (same); *Vance v. Amazon.com Inc.*,

---

[8] It appears Match may have sought to cite a later decision in that case, 642 F. Supp. 3d 1304 (N.D. Ala. 2022), but that decision is equally off-point. That case was applying Alabama choice of law rules, which enforce choice of law provisions at written, without any reference to the Restatement (Second). *Id.* Because this is inconsistent with Texas choice of law rules, it has no applicability here.

[9] Match's hypothetical questions in a footnote that they somehow cannot decipher when BIPA would or would not apply in various factual scenarios does not move the needle. *See* MOL at 12 n.8. Match made the intentional choice to collect and use biometric data from Illinois residents and is obligated to comply (and learn how to comply) with Illinois law regulating that practice.

[10] Match's suggestion that the Court would need to analyze "49 other states' laws" is an exaggeration. *See* MOL at 13. There is one state's law, Illinois, that applies here.

534 F. Supp. 3d 1314, 1328 (W.D. Wash. 2021) (court in Washington applying Illinois law to BIPA claims); *Melzer v. Johnson & Johnson Consumer Inc.*, No. 22-3149 (MAS)(RLS), 2023 WL 3098633, at *2 (D.N.J. April 26, 2023) (New Jersey court applying Illinois law to BIPA claims).

Match also baselessly claims that Texas public policy would be violated if Texas law is not applied because it has a statute that regulates the collection of biometric information. *See* MOL at 13. Match leaves out that that statute only protects **Texas residents'** biometric information, **not Illinois residents**, such that it conflicts with BIPA and has no applicability here as it cannot override the Illinois statute. *See* Section II.B.iii, below. Thus, the Texas Attorney General—who enforces that statute—is not "better equipped" to protect Illinois residents than BIPA because the Texas Attorney General **has no authority to do so**. *See* Original Petition, *Texas v. Meta Platforms, Inc.*, No. 22-0121, (Harrison Cnty., Tex. February 14, 2022), Dkt. No. 1 (action by the Texas Attorney General alleging "Facebook unlawfully captured the biometric identifiers of **Texans** for a commercial purpose . . . in violation of the Texas Capture or Use of Biometric Identifier Act, Tex. Bus. & Com. Code § 503.001.") (emphasis added).  Because Texas does not have a policy of regulating the collection of non-residents' biometric data, Texas policy is not offended by applying Illinois law here.

Lastly, Match's claim that Illinois public policy would not be offended if Plaintiffs and Class members were stripped of their Illinois BIPA claims is nonsensical. *See* MOL at 14. The enactment of BIPA, in and of itself, makes clear that the legislature sought establish a clear policy that Illinois residents' biometric data cannot be collected and used without clear notice and consent. *See Facebook Biometric*, 185 F. Supp. 3d at 1170 ("There can be no reasonable doubt that the Illinois Biometric Information Privacy Act embodies a fundamental policy of the state of Illinois."); *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 811 (N.D. Ill. 2022), *reconsideration denied*, No. 20-C-7692, 2022 WL 7100547 (N.D. Ill. Oct. 11, 2022) ("BIPA reflects a fundamental Illinois public policy of protecting individual privacy rights in biometric information"). Illinois law would be offended by *not* applying BIPA here (and leaving Plaintiffs with no recourse), not the other way around. *See Facebook Biometric*, 185 F. Supp. 2d at 1169-70 (finding that enforcing

14

the contractual choice of law provision would violate Illinois' policy "in the starkest way possible" because "the Illinois policy of protecting its citizens' privacy interests in their biometric data, especially in the context of dealing with 'major national corporations' like [defendant], would be written out of existence.").

Not surprising, almost none of the cases Match cites involve BIPA (or similar statutory schemes that so clearly reflect the intent of the legislature to regulate the challenged conduct) or situations where, absent application of that law, the plaintiff would be left with no remedy, given that Texas's biometric statute does not apply to out-of-state residents. *See* MOL at 14-15 (citing *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 754 (Ill. App. Ct. 1987) (involving two similar fraud statutes, the only difference being one did not include a notice requirement); *WTM, Inc. v. Henneck*, 125 F. Supp. 2d 864, 868 (N.D. Ill. 2000) (explaining Illinois does not have a "public policy against applying Illinois law to contract actions"); *see also M. Block & Sons, Inc. v. Int'l Bus. Machs. Corp.*, No. 04 C 340, 2004 WL 1557631, at *7 (N.D. Ill. July 8, 2004) (no identification of "public policy concerns"); *Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 871 (N. D. Ill. 2003) (evaluating choice-of-law for common law fraud, not statutory claims); *Mell v. Goodbody & Co.*, 295 N.E.2d 97, 100 (Ill. App. Ct. 1973) (finding Illinois policy not offended because it expressly disclaimed any interest in seeking to regulate the conduct at issue); *Mission Techs.,* 2024 WL 150504, at *3 (finding no "fundamental policy" offended by holding a party to at-will provision it agreed to in a contract); *Demond v. Inifiniti HR, LLC*, No. 3:17-cv-1322-D, 2018 WL 4145053, at *1 (N.D. Tex. Aug. 30, 2018) (finding enforcement of forum selection clause not "unfair" because there were other "remedies available")). Indeed, the only case Match cites that involves BIPA is *Thakkar*, 642 F. Supp. 3d at 1320 (MOL at 15), but that action involved application of ***Alabama choice-of-law principles***, which enforce choice of law provisions as written, without reference to the Restatement (Second), without exception. *Id.* To do so here would be inconsistent with Texas's choice of law rules.

15

ii.   **Illinois Has a Materially Greater Interest Than Texas in the Determination of Plaintiffs' BIPA Claims**

It is clear that Illinois has a materially greater interest than Texas. Courts conducting a choice of law analysis routinely find that Illinois has a materially greater interest than other states in the outcome of disputes involving the collection of biometric information from Illinois residents. *See Facebook Biometric*, 185 F. Supp. 3d at 1170  ("Illinois will suffer a complete negation of its biometric privacy protections for its citizens" if the other state's law is applied, whereas the other state's "law and policy will suffer little, if anything at all, if BIPA is applied."); *Hogan v. Amazon.com, Inc.*, No. 21 C 3169, 2022 WL 952763, at *5 (N.D. Ill. Mar. 30, 2022) ("Illinois made clear through BIPA that it has substantial interest in protecting its residents' biometric data, even if the harm is inflicted by an out-of-state corporation" and thus, Illinois "has the greater material interest in this dispute."). Whatever interest Texas has (if any) because Match resides there does not override that of Illinois in protecting its own residents for conduct occurring within its own state.  *See Cardoni*, 805 F.3d at 585 ("a state's interest in a company's maintaining uniform contracts" cannot be "deemed materially greater than a state's interest in regulating conduct occurring largely within its borders.")

Match's claim that Illinois does not have a material interest because "Plaintiffs allege here that the wrongdoing occurred in Texas" misconstrues Plaintiffs' allegations. *See* MOL at 16. Plaintiffs plainly allege Match's collection of biometric information was from Illinois residents, while using Match's service in Illinois, and resulted in harm in Illinois. ¶¶ 12-16, 210-17. The Court should reject this counter-factual narrative, which is wholly inappropriate at the pleading stage.

Match's reliance on *Blue Racer* is misplaced. *See* MOL at 16 (citing *Blue Racer Midstream, LLC v. Kelchner, Inc.*, No. 3:16-CV-3296, 2018 WL 993781, at *1 (N.D. Tex. Feb. 21, 2018)). In *Blue Racer*, the plaintiffs asserted claims "based on a contract" entered with a "Texas resident" arising out of an exposure of an Ohio pipeline where the employees "including the project manager for the pipeline" were located in Texas. *Blue Racer*, 2018 WL 993781, at *4. The court

16

there found that, because the claims asserted were all contract-based, they naturally implicated Texas' "strong interest" in "its residents' transactions and contracts." *Id.*[11] The same is not true here, where the action sounds in tort (not contract) and exclusively involves harm to out-of-state residents who are not protected under Texas law. This is especially true where here, as described in Section II.B.i.b, Texas has not sought to regulate this type of out-of-state activity harming out-of-state individuals.

Lastly, Match's claim that Illinois does not have an interest because BIPA cannot "apply outside of Illinois" is just not true. *See* MOL at 16. Several cases have applied BIPA outside that state. *See, e.g.*, *Facebook Biometric*, 185 F. Supp. 3d at 1155; *Vance v. Amazon.com Inc.*, No. C20-1084-JLR, 2021 WL 1401633 (W.D. Wash. Apr. 14, 2021); *Melzer*, 2023 WL 3098633, at *2 (New Jersey court applying Illinois law to BIPA claims).

Neither of the two cases Match cites actually support this proposition. *See* MOL at 16 n.12 (citing *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1102 (N.D. Ill. 2017) (**rejecting** extraterritoriality argument because Plaintiffs alleged the photographs were from Illinois residents and uploaded from Illinois); *McGoveran v. Amazon Web Servs,, Inc.*, No. 20-1399-LPS, 2021 WL 4502089, at *4 (D. Del. Sept. 30, 2021) (merely noting residency enough is not sufficient to establish Illinois connection for purposes of BIPA)). Unlike in *McGovern*, Plaintiffs here allege much more than just their residency—they allege they joined the Dating Sites in Illinois and uploaded their photographs in Illinois directly to Match's Dating Sites where Match collected and analyzed them for biometric information. ¶¶ 8, 210-18. Like in *Rivera*, these facts are sufficient to allege the conduct occurred in Illinois.

### iii. Illinois Fundamental Public Policy of Protecting Its Citizens' Privacy Would be Contravened by the Application of Texas Law

As described in Section I.B.i.b., BIPA reflects the "fundamental policy of the state of Illinois." *Facebook Biometric*, 185 F. Supp. 3d at 1170. Should the Court apply Texas's law to this action, this fundamental public policy would be contravened because Plaintiffs' claims would be

---

[11] *Goosehead*, another contract case, is distinguishable for this same reason. See MOL at 16.

extinguished, given that Texas has no corresponding law protecting Illinois residents from this conduct. *See Patterson,* 593 F. Supp. 3d at 811 ("Because applying Washington law would leave Plaintiffs without recourse under BIPA or any analogous right of action, it would undermine the fundamental Illinois public policy of protecting individual privacy rights over biometric data").

Match's suggestion that public policy is only contravened if a state legislature expressly states that "citizen's rights under such statutes cannot be waived" is not the law. *See MOL* at 16. Match has not identified a single case standing for this proposition, which is unsurprising given it would be inconsistent with the several cases (above) that have found to disregard BIPA and leave Illinois residents with no recourse contravenes Illinois policy.[12]

## II.    PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR BIPA CLAIMS

For the reasons described below, Plaintiffs sufficiently allege that Match extracts and collects its Illinois users' biometric identifiers or biometric information from the photos those users upload on Match's Dating Sites without proper authorization and has failed to develop a public retention policy for such biometric identifiers and information in violation of Sections 15(a) and (b) of BIPA.

Match does not dispute, and therefore waives, any argument that it does not disclose its collection and use of its Illinois users' biometric information, nor does it obtain informed consent for its conduct, as required by BIPA. *See* ¶¶ 8, 138, 147, 188, 212-15.

### A.  Plaintiffs Sufficiently Allege a Violation of BIPA Section 15(b)

BIPA Section 15(b) requires "a private entity that collects or otherwise obtains an individual's biometric data to first obtain the individual's informed, written consent." *See Patterson*, 593 F. Supp. 3d at 815 (citing 740 ILCS 14/15(b)). "To come within the purview of section 15(b), an entity must, at a minimum, take an active step to obtain the biometric data in question." *Id.* at 824; *Ronquillo v. Doctor's Associates, LLC*, 597 F. Supp. 3d 1227, 1231 (N.D.

---

[12] Match's continued reliance on *Goosehead*, *Missions Techs.*, and *Thakkar*—two contract cases and one action applying Alabama choice of law principles—is wrong for the reasons stated in Sections I.A. and I.B.i.b.

Ill. 2022) (in order for Section 15(b) to apply, "the defendant must take active steps to collect, capture, or otherwise obtain the plaintiff's biometric information.") (collecting cases).

Here, the Complaint adequately alleges that Match implements facial recognition technology on its Dating Sites in order to extract, collect, store, and use those users' biometric information from their photographs. ¶ 147. Not only does Match encourage users to upload unobstructed photographs of their face, it requires it. *See* ¶¶ 7, 110. This is because Match uses its facial processing technology to collect users' biometric data in the form of facial geometry in order to verify a user, create user-specific avatars, provide users with potential matches that fit their preference, and confirm someone is a user of its Dating Sites. *See* ¶¶ 146; ¶¶ 150-55, 189-90 (detailing Match's collection of facial geometry for its personal preference matching system); ¶¶ 183-88 (describing how Match collects biometric information through its facial processing system on OkCupid); ¶¶ 191-98 (describing Match's use of Amazon Rekognition to map and analyze facial geometry to identify a particular person and provide personalized matches); ¶¶ 204-08 (describing Match's integration of video call technology that uses facial and voice recognition technology). Accordingly, Plaintiffs sufficiently allege that (at a minimum) Match takes active steps to collect its users' biometric identifiers or biometric information sufficient to state a claim under Section 15(b). *See Patterson*, 593 F. Supp. 3d at 824 (detailed allegations about how the technology "captures biometric data" was sufficient to allege defendant took an "active step to obtain the biometric data in question."); *Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103, 1106 (N.D. Ill. 2015) (allegations that defendants used "face pattern to recognize and identify" users "in photographs posted to Websites" were sufficient).

Match's contention that *Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679, 683 (N.D. Ill. 2023) and *Clark v. Microsoft Corp.*, No. 23 C 695, 2023 WL 5348760, at *2 (N.D. Ill. Aug. 21, 2023) support dismissal is wrong. *See* MOL at 20. Both of those cases involve claims against a *vendor* that merely provided their technology to another company who, in turn, used it to collect biometric data. *Jones*, 649 F. Supp. 3d at 685; *Clark*, 2023 WL 5348760, at *3. Since defendants were only vendors, who did not themselves use the technology for any purpose, the Court dismissed the

19

claims. Unlike in those cases, Match is not a vendor. Match developed and acquired technology to collect biometric information and deployed it on each of its Dating Sites. Nothing more is required to state a Section 15(b) claim.

Aside from these two factually distinguishable cases, Match spends the remainder of its Motion repeatedly challenging Plaintiffs' factual allegations and asking this Court to disregard them:

*First*, Match takes issue with allegations it cherry-picked that contain the language "information and belief." *See* MOL at 18. There is nothing improper about alleging certain facts based on information and belief. *See Delgado*, 2024 WL 818344, at *5 ("that plaintiff pleads some facts 'on information and belief' does not change" that "the [c]ourt treats as true the factual allegations as stated in plaintiff's compliant and draws all reasonable inferences in her favor").[13] Indeed, even if there was, Match wholly ignores the allegations that are ***not*** pled on this basis, which make clear by themselves that Match violates Section 15(b). *See, e.g.*, ¶¶ 146, 150-55, 189-90, 183-88, 191-98, 204-08.

*Second*, Match attempts to discredit Plaintiffs' allegations by asserting in other, different circumstances not applicable here, that it purports to act lawfully when collecting biometric data. *See* MOL at 18 (claiming that because it purportedly seeks consent for the Tinder account verification process, it must not violate the law in this separate context). Specifically, Match admits that in the separate Tinder account verification process it "do[es] collect biometric information" and that, in those separate cases, it tries to make that "evident" and "know[s] how to comply with BIPA." *See* MOL at 18. This, however, says nothing about whether—in the instances Plaintiffs ***do***

---

[13] Match's reliance on a fraud case, which is held to a higher standard as outlined in Federal Rule of Civil Procedure 9(b), has no bearing here. *See* MOL at 18, n.15 (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (considering the sufficiency of fraud claims under a higher 9(b) standard). And the other case it relies on, while not applicable to this case because it expressly deals with ERISA claims, is not to the contrary. *See id.* (citing *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) ("ERISA plaintiffs should not be held to an excessively burdensome pleading standard that requires them to identify particular plan provisions in ERISA contexts when it may be extremely difficult for them to access such plan provisions.")).

*complain of*—Match obtains clear authorization and consent. Plaintiffs plausibly allege it did not. If there is any truth to Match's claim (which is unlikely given the allegations) that it did not actually engage in wrongdoing, this will bear out in discovery. It is not a basis to dismiss the claims now, prior to discovery, based on Match's word alone about its attempt to "compl[y] with CUBI and BIPA" in other scenarios.[14]

*Third*, Match argues that its hosts of patents relating to the collection and use of biometric information are wholly irrelevant and—when viewed in isolation—do not state a claim. *See* MOL at 19. This too is wrong. Courts routinely find allegations referring to defendants' patents that collect biometric information create a plausible inference that defendants did, in fact, collect biometric information. *See Delgado*, 2024 WL 818344, at *5 (sustaining BIPA claims where the complaint references to defendant's patents to describe the methods of collecting the biometric information); *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 517 (N.D. Ill. 2022) ("[b]ased on facts pleaded in the complaint, including the referenced Patent, it is reasonable to infer—though far from proven—that [d]efendant's technology mechanically analyzes customers' voices in a measurable way such that [defendant] has collected a voiceprint" in the purview of BIPA).

Any assertion by Match that it did not act consistent with its own patented-technology is more appropriately determined at a later stage. *See Delgado*, 2024 WL 818344, at *7 ("Whether or not Meta actually practices the technology described in the voiceprint patents may be appropriately litigated down the line."); *see also Sewell v. Monroe City School Board*, 974 F.3d 577, 581 (5th Cir. 2020) ("[a] motion to dismiss for failure to state a claim is not meant to resolve facts or test the merits of a lawsuit"); *Dixon*, 2017 WL 2778245, at *2 (finding it was premature to dismiss claim where the argument required "fact intensive inquiry" because a court "cannot make factual determinations at the motion-to-dismiss stage") (citing *Ashcroft*, 556 U.S. 662 (2009)).

---

[14] Plaintiffs are aware of no authority that suggests if a defendant claims they did not engage in wrongdoing at one point, that means the Court should disregard all of Plaintiffs' allegations and find they never, in any circumstance, engage in wrongdoing.

Ignoring this precedent, Match cobbles together a series of patent-infringement cases to claim its patents are somehow irrelevant in this separate privacy law context. *See* MOL at 20. The tenets of patent infringement have no relevance here. *See* MOL at 19-20 (citing *Emblaze Ltd. v. Apple Inc.*, No. 5:11-cv-1079, 2015 WL 396010, at *8 (N.D. Cal. Jan. 29, 2015), *aff'd,* 639 F. App'x 639 (Fed. Cir. 2016) (considering issue of whether admission of certain patents during patent infringement trial caused unfair prejudice); *King Instruments Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995) (clarifying meaning of 1952 amendment to the Patent Act in action alleging patent infringement); *Pfaff v. Wells Elecs.*, Inc., 525 U.S. 55, 60 (1998) (clarifying the meaning of terms in the Patent Act in patent infringement action); *Nu-You Techs. LLC v. Beauty Town Int. Inc.*, No. 3:15-cv-3433-N, 2016 WL 4717991, at *2 (N.D. Tex. 2016) (plaintiffs' speculative allegations that defendant "perform[ed] every step of [the patents] claim[ed] method" as required for direct patent infringement claim was not sufficient)). Match's reliance on *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 334 (5th Cir. 2014) (MOL at 20) is equally misplaced. *Casey* was a summary judgment decision where the court was addressing whether an expert's reliance on patents in a design-defect case was proper—none of that reasoning applies in this separate type of action at the motion to dismiss stage.

**Fourth**, Match asks this Court to find that patents it acquired from third parties were never actually in use, despite Plaintiffs' allegations to the contrary. *See* MOL at 20. There is no legal basis to disregard Plaintiffs' allegations in favor of Match's counter-narrative. The only logical reason Match would pay money to acquire patents is if it then used them. While Match refers to some situations where individuals are "patent trolls" and only buy patents for an "economic advantage" (*i.e.*, to sell them to the highest bidder) (MOL at 20), Match does not assert that "troll[ing]" was the purpose of the patents it had acquired or that it has since sold them. *See* MOL at 20.

**Fifth**, Match argues that because the Yahoo! "Face Search" patent it acquired was initially used to identify users with "specific feature[s]," this means this patent, as used by Match, necessarily would have been "user accessible." *See* MOL at 21. Building on this erroneous

assumption, it claims that Plaintiffs would have been able to "identify the feature" in each of Match's Dating Sites and should have "describe[d] it" in the Complaint. *Id.* There is no reason to accept Match's assumption-on-assumption argument, nor is there any legal requirement (even presuming the feature was "user accessible") that Plaintiffs go beyond what they have already alleged, which clearly establishes a Section 15(b) violation.

**Sixth**, Match claims that because patent '811 only refers to facial recognition as an "alternative embodiment[,]" that means Plaintiffs must somehow go above-and-beyond the regular pleading standard and include intricate and technology-heavy details behind how exactly this technology "work[ed]." *See* MOL at 21. It is not shocking Match cites no authority for this claim, given that it is wholly inconsistent with the pleading standard and would require either (1) an expert; or (2) a current or former Match employee; or (3) both, to plead such allegations. No court requires this.

Match repeats the same process of claiming Plaintiffs' allegations should be disregarded merely because it says so for the remainder of their brief. *See* MOL at 22 (arguing Match seeks photos not to collect biometric information, like Plaintiffs allege, but so users can clearly see each other's faces); *id.* at 23 (claiming its pHash algorithm is used not just to find faces, like Plaintiffs allege, but photos more generally); *id.* at 23 (admitting Amazon Rekognition "could" be used for facial recognition but claiming it is "hopelessly conclusory" to claim Match used it for this purpose). Like above, Plaintiffs' allegations must be viewed in their entirety (not in isolation) and they cannot be disregarded simply because Match claims they should. *See U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 321 (5th Cir. 2016) (on a 12(b)(6) motion, "the court's inquiry should focus on the complaint as a whole, regardless of how much of it is discussed in the motion to dismiss"); *Martin v. Barrett, Daffin, Frappier, Turner, & Engel LLP*, No. A-15-CV-290-SS-ML, 2015 WL 3688179, at *2 (W.D. Tex. June 12, 2015) (the court "must accept as true all well-pleaded facts in the complaint, and must view the allegations as a whole in the light most favorable to the non-movant."); *see Delgado*, 2024 WL 818344, at *5 ("[v]iewing the allegations as a whole . . . plaintiff has sufficiently alleged" BIPA claim).

23

Outside of citing non-applicable vendor cases and trying to parse out Plaintiffs' allegations, Match provides no basis to dismiss Plaintiffs' Section 15(b) claim. It should be sustained.

**B. Plaintiffs Sufficiently Allege a Violation of BIPA Section 15(a)**

BIPA Section 15(a) dictates that "a private entity in possession of biometric data to develop, publicly disclose, and comply with a retention schedule and guidelines for destroying the data within specified time limits." *Patterson*, 593 F. Supp. 3d at 802. Plaintiffs sufficiently allege Match possessed biometric information (*see* Section II.A., above), and that it failed to develop a written policy for the retention of that information because it "never advised Plaintiffs in writing, or otherwise, of any policy to destroy the biometric identifiers that [it] collected and stored." *See* ¶¶ 11, 216, 232-33.

Match recognizes that its failure to "provide a retention schedule" in violation of BIPA Section 15(a) is part of the claims Plaintiffs allege (MOL at 9 (referring to its "allegedly failing to publicly provide a retention schedule of guidelines")) but does not address these claims on their merits. Accordingly, these claims must be sustained.

Dated: May 6, 2024

By: */s/ Christian Levis*
Christian Levis (*pro hac vice*)
Margaret MacLean (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
mmaclean@lowey.com
afiorilla@lowey.com

Michael P. Canty (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Danielle Izzo (*pro hac vice*)
Gloria J. Medina (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700

24

Fax: (212) 818-0477
mcanty@labaton.com
cvillegas@labaton.com
dizzo@labaton.com
gmedina@labaton.com

*Attorneys for Plaintiffs and the Proposed
Class*